# Exhibit C



# Qualifications for President and the "Natural Born" Citizenship Eligibility Requirement

**Jack Maskell**
Legislative Attorney

November 14, 2011

**Congressional Research Service**

7-5700
http://www.crs.gov/
R42097

# Summary

The Constitution sets out three eligibility requirements to be President: one must be 35 years of age, a resident "within the United States" for 14 years, and a "natural born Citizen." There is no Supreme Court case which has ruled specifically on the presidential eligibility requirements (although several cases have addressed the term "natural born" citizen), and this clause has been the subject of several legal and historical treatises over the years, as well as more recent litigation.

The term "natural born" citizen is not defined in the Constitution, and there is no discussion of the term evident in the notes of the Federal Convention of 1787. The use of the phrase in the Constitution may have derived from a suggestion in a letter from John Jay to George Washington during the Convention expressing concern about having the office of Commander-in-Chief "devolve on, any but a natural born Citizen," as there were fears at that time about wealthy European aristocracy or royalty coming to America, gaining citizenship, and then buying and scheming their way to the presidency without long-standing loyalty to the nation. At the time of independence, and at the time of the framing of the Constitution, the term "natural born" with respect to citizenship was in use for many years in the American colonies, and then in the states, from British common law and legal usage. Under the common law principle of *jus soli* (law of the soil), persons born on English soil, even of two alien parents, were "natural born" subjects and, as noted by the Supreme Court, this "same rule" was applicable in the American colonies and "in the United States afterwards, and continued to prevail under the Constitution ..." with respect to citizens. In textual constitutional analysis, it is understood that terms used but not defined in the document must, as explained by the Supreme Court, "be read in light of British common law" since the Constitution is "framed in the language of the English common law."

In addition to historical and textual analysis, numerous holdings and references in federal (and state) cases for more than a century have clearly indicated that those born in the United States and subject to its jurisdiction (i.e., not born to foreign diplomats or occupying military forces), even to alien parents, are citizens "at birth" or "by birth," and are "natural born," as opposed to "naturalized," U.S. citizens. There is no provision in the Constitution and no controlling American case law to support a contention that the citizenship of one's parents governs the eligibility of a native born U.S. citizen to be President.

Although the eligibility of native born U.S. citizens has been settled law for more than a century, there have been legitimate legal issues raised concerning those born *outside* of the country to U.S. citizens. From historical material and case law, it appears that the common understanding of the term "natural born" in England and in the American colonies in the 1700s may have included both the strict common law meaning as born in the territory (*jus soli*), as well as the *statutory* laws adopted in England since at least 1350, which included children born abroad to British fathers (*jus sanguinis*, the law of descent).

The weight of legal and historical authority indicates that the term "natural born" citizen would mean a person who is entitled to U.S. citizenship "by birth" or "at birth," either by being born "in" the United States and under its jurisdiction, even those born to alien parents; by being born abroad to U.S. citizen-parents; or by being born in other situations meeting legal requirements for U.S. citizenship "at birth." Such term, however, would not include a person who was not a U.S. citizen by birth or at birth, and who was thus born an "alien" required to go through the legal process of "naturalization" to become a U.S. citizen.

# Contents

History of the Qualifications Clause in the Federal Convention of 1787 ........................................ 4
    Procedural History .................................................................................................................... 4
    Apparent Purpose and Intent .................................................................................................... 5
Common Law Meaning of the Term "Natural Born" Citizen or Subject ...................................... 9
    Common Law and the Constitution ......................................................................................... 9
    Common Law and Persons Born "In" the Country ................................................................ 11
    Common Law and Persons Born Abroad to Citizen-Parents ................................................. 14
Common Understanding in 18th Century of the Term "Natural Born" Citizen ............................ 16
Citizenship at Birth: Case Law and Interpretations .................................................................... 25
    Legal Cases and Senator McCain ......................................................................................... 34
    Legal Cases and President Obama ......................................................................................... 38
        Allegations of Loss of Citizenship ................................................................................. 43
        Assertion of Two Citizen-Parent Requirement ............................................................. 44

# Contacts

Author Contact Information ........................................................................................................ 50

T he standing qualifications to be President of the United States are set out in the Constitution, at Article II, Section 1, clause 5, and state three specific requirements: one must be at least 35 years old, a resident "within the United States" for 14 years, and a "natural born Citizen." The constitutional provision states as follows:

> No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President; neither shall any Person be eligible to that Office who shall not have attained to the Age of thirty five Years, and been Fourteen Years a Resident within the United States.

Questions from time-to-time have arisen concerning whether one who is a U.S. citizen "at birth" because of the operation of federal *law*, is also a "natural born" citizen for purposes of the presidential eligibility clause. Such questions often concern persons born abroad to parents who are U.S. citizens, or persons born abroad when only one parent is a U.S. citizen who had resided in the United States.[1] Although such individuals born abroad may clearly be U.S. citizens "at birth" by statute, would such persons also be "natural born Citizens," or is eligibility to the Presidency limited only to "native born" citizens?[2] Additionally, questions have been recently raised by some as to whether one born "in" the United States of one or more alien parents, and who is thus clearly a U.S. citizen "at birth" by the Fourteenth Amendment, as well as by federal law and common law, was intended to be considered a "natural born" citizen for purposes of the presidential eligibility clause.

The Constitution does not define the term "natural born Citizen," nor are the notes from the debates at the Constitutional Convention of 1787 instructive as to any specific collective intent of the framers concerning the meaning of the term. Furthermore, the Supreme Court has never needed to address this particular issue within the specific context of a challenge to the eligibility of a candidate under Article II, Section 1, clause 5, the only place in the entire Constitution that the phrase appears, although federal courts have discussed the concept extensively with respect to other issues of citizenship. Consequently, although there are numerous Supreme Court cases, as well as other federal and state case law, discussing the phrase and its meaning from which conclusions may be drawn, there has still been certain speculation on the scope of the language.

According to the Supreme Court, words and phrases used, but not defined, within the Constitution, should "be read in light of British common law," since the U.S. Constitution is "framed in the language of the English common law."[3] Although the English common law is not "binding" on federal courts in interpreting the meaning of words or phrases within the Constitution, nor is it necessarily to be considered the "law" of the United States (as it is for the individual states specifically incorporating it), it can be employed to shed light on the concepts and precepts within the document that are not defined there, but which are reflected in the corpus of British law and jurisprudence of the time. As noted by Chief Justice (and former President) Taft, writing for a unanimous Supreme Court, the framers of the U.S. Constitution "were born

---

[1] *See* 8 U.S.C. § 1401, for categories of persons who are deemed to be U.S. citizens "at birth."

[2] *See, e.g.*, Means, *Is Presidency Barred to Americans Born Abroad?* U.S. NEWS AND WORLD REPORT, Vol. 39, No. 26, December 23, 1955, at 26-30; *Is Gov. George Romney Eligible to be President ?* THE NEW YORK LAW JOURNAL, October 16 and 17, 1967, p. 1; *McCain's Canal Zone Birth Prompts Queries About Whether That Rules Him Out*, N.Y. TIMES, February 28, 2008.

[3] Smith v. Alabama, 124 U.S. 465, 478 (1888). See also, more recently, Carmel v. Texas, 529 U.S. 513, 521 (2000), where the Supreme Court noted that the meaning of an undefined term in the Constitution "necessarily requires some explanation," and that "the necessary explanation is derived from English common law well known to the Framers."

and brought up in" the English common law, they "thought and spoke in its vocabulary," and that English common law was thus what the "statesmen and lawyers of the Convention" employed for the meaning of the terms in the Constitution "confident that they could be shortly and easily understood."[4]

The term "natural born" in the context of citizenship appears to derive from the British concept that those born with a "natural liege" (allegiance, tie, or connection) to the nation or to the sovereign, were (under English terminology) "natural born" subjects under the law in England and in the American colonies at the time of independence. There appears to be little scholarly debate that the English common law at the time of independence included at least all persons born on the soil of England (*jus soli*, that is, "law of the soil"), even to alien parents, as "natural born" subjects (unless the alien parents were diplomatic personnel of a foreign nation, or foreign troops in hostile occupation). As noted by the Supreme Court of the United States, this "same rule" was applicable in the colonies and "in the United States afterwards, and continued to prevail under the Constitution" with respect to "natural born" U.S. citizenship.[5]

Although the British common law at the time of independence with regard to *jus soli* was apparently clear, there were varying opinions as whether those born abroad of English subjects were "natural born" subjects under the *common law*, or were considered "natural born" subjects merely by long-standing *statutory* law. Some commentators have claimed that the statutory provisions of English law, first appearing during the reign of Edward III in 1350, were "incorporated" into, or in the alternative, "reflected" the already established English common law.[6] Regardless of the technical state of the common law in England with respect to children born abroad, however, there appear to be significant arguments that the *corpus* of English law applicable within the American colonies, known to the framers and adopted in the states, was broader than merely the "law of the soil." Legal commentators have contended that the body of English law carried forward in the United States relating to citizenship included both the strict common law notion of *jus soli*, as well as that part of the law of descent (*jus sanguinis*) included in long-standing British law[7] (including as "natural born" subjects those born abroad of an English father), and that this was part of the "common understanding" of the term "natural born" to the framers at the time of the drafting of the Constitution.[8]

---

[4] *Ex parte* Grossman, 267 U.S. 87, 108-109 (1925).

[5] United States v. Wong Kim Ark, 169 U.S. 649, 658 (1898). See also Inglis v. Sailor's Snug Harbour, 3 Pet. (28 U.S.) 99, 120 (1830), *see* specifically Story, J., *dissenting on other grounds*, 28 U.S. at 164.

[6] See discussion of controversy of whether the English common law included only those born on the soil, regardless of the nationality of the parents (*jus soli*), or whether the common law also included those born abroad of an English father (*jus sanguinis*), in Flourny, Richard W. (Assistant Solicitor, Department of State), *Dual Nationality and Election*, 30 YALE LAW JOURNAL 545, 548 (1921).

[7] *See* Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND, Volume I, "Of the Rights of Persons," 354-358, 361 (1765): " ... by several more modern statutes ... all children, born out of the king's ligeance, whose fathers were natural-born subjects, are now natural born subjects themselves, to all intents and purposes, without any exception; unless their said fathers were attainted, or banished beyond sea, for high treason; or were then in the service of a prince at enmity with Great Britain." As noted by the Supreme Court in Weedin v. Chin Bow, 274 U.S. 657, 660 (1926): "These statutes applied to the colonies before the War of Independence." For early references to the term natural liege subjects in the American colonies, see Sydney George Fisher, THE EVOLUTION OF THE CONSTITUTION OF THE UNITED STATES, (Lippincott 1897) at 189, citing the Virginia Charter of 1611-1612, and the Concessions of East Jersey, 1665.

[8] *See*, for example, Charles Gordon, *Who Can Be President of the United States: The Unresolved Enigma*, 28 MD. L. REV. 1, 12, 18 (1968). Charles Gordon was formerly General Counsel of the United States Immigration and Naturalization Service.

---

Considering the history of the constitutional provision, the clause's apparent intent, the English common law expressly applicable in the American colonies and in all of the original states, the common use and meaning of the phrase "natural born" subject in England and the American colonies in the 1700s, and the subsequent action of the first Congress in enacting the Naturalization Act of 1790 (expressly defining the term "natural born citizen" to include those born abroad to U.S. citizens),[9] it appears that the most logical inferences would indicate that the phrase "natural born Citizen" would mean a person who is entitled to U.S. citizenship "by birth" or "at birth." Such interpretation, as evidenced by over a century of American case law, would include as natural born citizens those born in the United States and subject to its jurisdiction regardless of the citizenship status of one's parents,[10] or those born abroad of one or more parents who are U.S. citizens (as recognized by statute),[11] as opposed to a person who is not a citizen by birth and is thus an "alien" required to go through the legal process of naturalization to become a U.S. citizen.[12]

The weight of scholarly legal and historical opinion, as well as the consistent case law in the United States, also supports the notion that "natural born Citizen" means one who is a U.S. citizen "at birth" or "by birth."[13] The *Constitution of the United States of America, Analysis and Interpretation*, notes that "[w]hatever the term 'natural born' means, it no doubt does not include a person who is 'naturalized,'" and, after discussing historical and legal precedents and arguments, concludes that "[t]here is reason to believe ... that the phrase includes persons who

---

[9] Act of March 26, 1790, 1 Stat. 103, 104.

[10] U.S CONST. amend. XIV; 8 U.S.C. § 1401(a); see Lynch v. Clarke, 3 N.Y. Leg. Obs. 236, 242, 244 (1 Sand. ch 583) (1844); United States v. Rhodes, 27 F. Cas. 785 (1 Abb. 28) (Cir.Ct.Ky 1866); In re Look Tin Sing, 21 F. 905 (Cal. Cir. 1884); United States v. Wong Kim Ark, 169 U.S. 649, 658, 661-662, 693 (1898); Kwok Jan Fat v. White, 253 U.S. 454, 457 (1920); Yamauchi v. Rogers, 181 F. Supp. 934, 935-936 (D.D.C. 1960); Diaz-Salazar v. INS, 700 F.2d 1156, 1160 (7th Cir. 1982), *cert. denied*, 462 U.S. 1132 (1983); Mustata v. U.S. Department of Justice, 179 F.3d 1017, 1019 (6th Cir. 1999); Hollander v. McCain, 566 F.Supp.2d 63, 66 (D.N.H. 2008); Ankeny v. Governor of the State of Indiana, 916 NE2d 678 (2009), *petition to transfer jurisdiction denied* (Ind. Supreme Court, Apr. 5, 2010); United States v. Carlos Jesus Marguert-Pillado, 648 F.3d 1001, 1006 (9th Cir. 2011).

[11] *See, e.g.*, 8 U.S.C. § 1401(c),(d),(e) and (g); Robinson v. Bowen, 567 F.Supp.2d 1144 , 145-146 (N.D. Cal. 2008); United States v. Carlos Jesus Marguert-Pillado, 648 F.3d 1001, 1006 (9th Cir. 2011).

[12] Schneider v. Rusk, 377 U.S. 163, 165 (1964).

[13] Edward S. Corwin, THE PRESIDENT, OFFICE AND POWERS, 1787-1984, at 38-39 (5th Revised ed. by Bland, Hindson, and Peltason, 1984); James H. Kettner, THE DEVELOPMENT OF AMERICAN CITIZENSHIP, 1608-1870 (U.N.C. Press 1978); Gordon, Mailman, & Yale-Loehr, IMMIGRATION LAW AND PROCEDURE, §§ 91 and 92 (rev. ed. 2010); Jill Pryor, *The Natural Born Citizen Clause and Presidential Eligibility: An Approach to Resolving Two Hundred Years of Uncertainty*, 97 YALE L.J. 881 (1988); Charles Gordon, *Who Can Be President of the United States: The Unresolved Enigma,* 28 MD. L. REV. 1 (1968); Richard W. Flourny, (Assistant Solicitor, Department of State), *Dual Nationality and Election*, 30 YALE LAW JOURNAL 545, 550 (1921); Michael Nelson, *Constitutional Qualifications for President,* PRESIDENTIAL STUDIES QUARTERLY, Vol. XVII, Number 2, at 384-391 (Spring 1987); Warren Freedman, Comment, *Presidential Timber: Foreign Born Children of American Parents*, 35 CORNELL L.Q. 357 (1950); Frederick Van Dyne (Assistant Solicitor of the Department of State), CITIZENSHIP OF THE UNITED STATES (New York 1904); J. Michael Medina, *The Presidential Qualification Clause in the Bicentennial Year: The Need to Eliminate the Natural Born Citizen Requirement*, XII OKLA. CITY UNIV. L. R. 253, 268 (1987); Akil Amar, *Natural Born Killjoy, Why the Constitution Won't Let Immigrants Run for President, and Why That Should Change*, LEGAL AFFAIRS, 16, 17 (Mar-Apr. 2004): "... the presidency and vice presidency were reserved for citizens by birth." For the opposing view, see Isidor Blum, *Is Gov. George Romney Eligible to Be President?*, N.Y.L.J., Oct. 16 & 17, 1967, at 1, which contends that only those born "in" the United States are "natural born" citizens under common law principles. In another analyses, one author would include the children of U.S. citizens who are born abroad when one or both of the parents are abroad under the direction of and officially representing, or on duty for, the United States Government, either in the military or in a civilian governmental role. Christina Lohman, *Presidential Eligibility: The Meaning of the Natural-Born Citizen Clause*, 36 GONZAGA LAW REVIEW 349, 369 (2000/2001).

---

become citizens at birth by statute because of their status in being born abroad of American citizens."[14]

# History of the Qualifications Clause in the Federal Convention of 1787

## Procedural History

The particular clause concerning presidential eligibility and citizenship was placed in the Constitution and approved at the Convention of 1787 with no debate, objection, or comment. The five-person Committee of Detail, appointed by the Convention delegates to report a draft Constitution containing issues and items agreed upon by the Convention up to that point,[15] was instructed by the Convention, on July 26, 1787, to consider provisions requiring certain qualifications for Congress and the Presidency.[16] Although the subsequent report on August 6 from the Committee of Detail contained qualifications for Senator and Representative, it did not offer qualifications for President.[17] On August 20, the Convention adopted a motion by Mr. Gerry of Massachusetts that the "Committee be instructed to report proper qualifications for the President ...,"[18] and on August 22, the Committee of Detail reported its recommendation that several additions be made to the report it had made, including the following concerning the qualifications of the President: "[H]e shall be of the age of thirty five years, and a Citizen of the United States, and shall have been an Inhabitant thereof for Twenty one years."[19] The report of the Committee of Detail was then "considered" and "postponed" on August 22, so "that each member might furnish himself with a copy."[20]

In the subsequent days, the provisions for the qualifications of President were not taken up and thus not agreed upon by the whole Convention, and on August 31, 1787, the delegates agreed to "refer such part of the Constitution as have been proposed, and such parts of reports as have not been acted upon to a Committee of a Member from each State,"[21] which has been referred to as the (third) "Committee of Eleven," or the "Committee on Postponed Matters." On Tuesday, September 4, 1787, the (third) Committee of Eleven "partially" reported to the Convention

---

[14] Congressional Research Service, Library of Congress, THE CONSTITUTION OF THE UNITED STATES OF AMERICA, ANALYSIS AND INTERPRETATION, S. Doc. 108-17, at 456-457 (2004). [CONSTITUTION ANNOTATED]. The United States Senate has also stated its opinion by way of unanimous consent, in S.Res. 511, 110th Congress, that natural born citizens includes those persons born abroad of U.S. citizens.

[15] Max Farrand, THE RECORDS OF THE FEDERAL CONVENTION OF 1787, Vol. II, at 85, 97 (Yale University Press 1911) [hereinafter Farrand]. On Monday July 23, 1787, the Convention delegates unanimously agreed to appoint the committee "for the purpose of reporting a Constitution conformably to the Proceedings aforesaid ...."

[16] II Farrand, at 116-117, 121-125. The instruction was to draft provisions "requiring certain qualifications of landed property and citizenship in the United States for the Executive, the Judiciary, and the Members of both branches of the Legislature of the United States ...," although the word "landed" was removed upon agreement of a motion by Mr. Madison of Virginia to strike out that word (and thus that qualification). *Id.* at 123-124.

[17] *Id.* at 177-179, 185.

[18] *Id.* at 337, 344.

[19] *Id.* at 366-367.

[20] *Id.* at 376.

[21] *Id.* at 473.

several "additions and alterations," including the specific reference for the first time to a presidential qualification to be a "natural born" citizen:

> No Person except a natural born Citizen, or a Citizen of the U.S. at the time of the adoption of this Constitution shall be eligible to the office of President: nor shall any Person be elected to that office, who shall be under the age of 35 years, and who has not been in the whole, at least 14 years a resident within the U.S.[22]

The language proposed on presidential eligibility on September 4 was agreed to without objection and without debate on Friday, September 7, 1787.[23] Stylistic and grammatical changes were made through the Committee of Style to the clause on presidential qualifications to conform to the other phrasing and usage in the document, which resulted in the final language adopted by the delegates and sent to the states for ratification.[24]

## Apparent Purpose and Intent

Tracing the development of this clause through the Constitutional Convention of 1787 clearly indicates that there were no specific discussions or other explications within the Convention on the meaning of the specific term "natural born" citizen. This does not mean, however, that there were no discussions at all of the concept of a citizenship qualification for federal officers. In fact, the issue of citizenship for Members of Congress was one that garnered much consideration and debate in the Convention of 1787 and, it has been contended, it is within the framework of this discussion that the eventual citizenship eligibility requirement was adopted for President and may be analyzed.[25]

In stating concerns regarding the citizenship of congressional officeholders, and the required length of such citizenship, George Mason argued that although he "was for opening a wide door for immigrants; ... [h]e did not chuse to let foreigners and adventurers make laws for us"; nor would he want "a rich foreign Nation, for example Great Britain, [to] send over her tools who might bribe their way" into federal office for "invidious purposes."[26] These arguments were echoed later by delegates at the Convention who were concerned with "admitting strangers into our public Councils,"[27] and feared that "foreigners without a long residency in the Country ... bring with them, not only attachments to other Countries; but ideas of Govt. so distinct from ours that in every point of view they are dangerous."[28] Thus, citizenship requirements of seven years for Representatives and nine years for Senators were eventually adopted, although the Convention did not act upon the wishes of Mr. Gerry "that in the future the eligibility might be confined to Natives."[29] When the citizenship eligibility requirements for President were

---

[22] *Id.* at 493-494, 498.

[23] According to Madison's notes: "The (section 2.) ... requiring that the President should be a natural-born Citizen, &c & have been resident for fourteen years, & be thirty five years of age, was agreed to nem: con:" II Farrand, at 536.

[24] II Farrand at 574, 598.

[25] See discussion in Michael Nelson, *Constitutional Qualifications for President*, PRESIDENTIAL STUDIES QUARTERLY, Vol. XVII, Number 2, at 384-391 (Spring 1987).

[26] II Farrand, at 216.

[27] *Id.* at 235 (Mr. Morris).

[28] *Id.* at 236 (Mr. Butler).

[29] *Id.* at 268. Mr. Gerry stated his fear that "Persons having foreign attachments will be sent among us & insinuated into our councils, in order to be made instruments for their purpose."

eventually reported and recommended after the debates and discussion of congressional eligibility requirements, there were no further discussions of the issue in Convention.[30]

Although there was no discussion concerning the precise meaning or derivation of the term "natural born," there is in the Documentary History of the Convention a possible clue from where the qualification for President to be a "natural born" citizen may have derived. The history of the Convention indicates that George Washington, the presiding officer, received a letter dated July 25, 1787, from John Jay, which appears to raise for the first time the issue of a requirement to be a "natural born" citizen of the United States as a requisite qualification to be President:

> Permit me to hint, whether it would not be wise & seasonable to provide a strong check to the admission of Foreigners into the administration of our national Government; and to declare expressly that the Command in chief of the american army shall not be given to, nor devolve on, any but a natural born Citizen.[31]

There is no specific indication as to the precise role this letter and its "hint" actually played in the adoption by the Convention of the particular qualification of being a "natural born" citizen. However, no other expressions of this particular term are evident in Convention deliberations prior to the receipt of Jay's letter, and the September 4 draft of the Constitution reported from the Committee of Eleven to the delegates, at a time shortly after John Jay's letter had been acknowledged by Washington, contained for the first time such a qualification.[32] The timing of Jay's letter, the acknowledgment of its receipt by Washington on September 2, and the first use of the term in the subsequent report of the Committee of Eleven, on September 4, 1787, may thus indicate more than a mere coincidence. If this were the case, then the concern over "foreigners," without sufficient allegiance to the United States, serving as President and Commander-in-Chief, would appear to be the initial and principal motivating concern of the framers, in a somewhat similar vein as their concerns over congressional citizenship qualifications.[33]

Such purpose of the "natural born" citizen qualification was expressed by Justice Joseph Story in his historic treatise on the Constitution in 1833:

> It is indispensable, too, that the president should be a natural born citizen of the United States ... [T]he general propriety of the exclusion of foreigners, in common cases, will scarcely be doubted by any sound statesman. It cuts off all chances for ambitious foreigners, who might otherwise be intriguing for the office; and interposes a barrier against those corrupt

---

[30] Presidential scholar Michael Nelson explains that when the qualifications of electors were not to be regulated or prescribed by the Constitution, then the qualifications of the elected needed to be so prescribed. In the case of the President, however, the Convention at first had intended under the Virginia Plan that the President be chosen by the legislature, and thus it did not focus on the need for express qualifications of the President until later in the Convention. Nelson, PRESIDENTIAL STUDIES QUARTERLY, at 392-393.

[31] III Farrand, Appendix A, LXVIII, at 61; Documentary History of the Constitution, IV, at 237.

[32] A letter from Washington to John Jay on September 2, 1787, references Jay's "hint" and suggestion to Washington. III Farrand, Appendix A, XCIX, at 76; Documentary History Of the Constitution, IV, 269.

[33] The provision was not directed at foreign-born statesmen or politicians in the country at the time of the drafting of the Constitution, such as Alexander Hamilton who was born in the Caribbean, since the eligibility clause expressly "grand-fathered" in those who were citizens at the time of the adoption of the Constitution. Hamilton, in any event, supported the idea of limiting the eligibility to be President to a current citizen, or thereafter one who is "born a Citizen of the United States." III Farrand, at App. F, p. 629.

interferences of foreign governments in executive elections, which have inflicted the most serious evils upon the elective monarchies of Europe.[34]

"Ambitious foreigners" who may be "intriguing for the office" of head of state, which had been the unfortunate experience in Europe, appeared to be a generalized and widespread concern at the time of the drafting of the Constitution, as was the concern over the possibility of allowing foreign royalty, monarchs, and their wealthy progeny, or other relatives to control the government of the new nation. Max Farrand, in his treatise on the adoption of the Constitution, discussed these concerns and rumors during the Convention of 1787:

> During the sessions of the convention, but it would seem especially during the latter part of August, while the subject of the presidency was causing so much disquiet, persistent rumors were current outside that the establishment of a monarchy was under consideration. The common form of the rumor was that the Bishop of Osnaburgh, the second son of George III, was to be invited to become King of the United States.[35]

Others have noted that rumors were extant concerning colonial statesmen approaching or making inquiries of other foreign royalty about seeking the chief executive's position of the United States, including rumors involving Price Henry of Prussia, and the ascension of King George's second son, Frederick, Duke of York. Presidential scholar Michael Nelson has commented:

> The presidency they were creating was, the framers realized, the closest analog in the new constitution to a king, just by being a separate, unitary executive. Even before the convention assembled, von Steuben had disseminated a rumor that Nathaniel Gorham, president of Congress under the Articles of Confederation and a convention delegate from New Hampshire, had approached Price Henry of Prussia about serving as America's King. Similar stories involved the ascendancy of King George's second son, Frederick, Duke of York. During the summer, these rumors gained new currency. The story spread that the convention, whose deliberations were secret, was advancing the plot behind closed doors.[36]

The question of not only "foreign influence" of wealthy persons immigrating to the United States to become President, but also the issue of an American monarchy, were thus very real concerns of the populace, as well as the framers, and appeared to establish the context in which the role, qualifications, duties, and powers of an American chief executive were developed.[37] As noted by constitutional scholar Akhil Amar, the concerns and anxieties over ambitious and duplicitous foreigners, and the "possibility that a foreign earl or duke might cross the Atlantic with immense wealth and a vast retinue, and then use his European riches to buy friends on a scale that no home-grown citizen could match," led the framers to incorporate Article II's "most questionable

---

[34] Joseph Story, Commentaries on the Constitution of the United States, Vol. 3, § 1473, pp. 332-33 (1833). Story distinguished "natural born" citizens eligible to be President from "foreigners" who are generally excluded, noting the exception only for a "naturalized citizen to become president" when such person was a citizen at the time of the adoption of the Constitution "out of respect for those distinguished revolutionary patriots, who were born in a foreign land, and yet had entitled themselves to high honors in their adopted country." Story, at § 1473, pp. 332-333.

[35] Max Farrand, The Framing of the Constitution of the United States, 173 (Yale University Press 1913).

[36] Nelson, Presidential Studies Quarterly, at 395.

[37] "The Framers had no antecedent to draw upon when creating the presidency and determining the qualifications for the office. There was no executive officer under the Articles of Confederation. The Framers' only model was a negative one: they wanted an executive officer who would not have the attributes of a hereditary monarch." Lawrence Freidman, *An Idea Whose Time Has Come – The Curious History, Uncertain Effect, and Need for Amendment of the 'Natural Born Citizen' Requirement For the Presidency*, 52 St. Louis L.J. 137, 141 (Fall 2007).

eligibility rule."[38] Amar also agrees that the framers' aversion to hereditary monarchies appeared to play an additional role in erecting a barrier to immigrants being President within the Constitution—a document that was otherwise, for its time, enlightened as permitting immigrants to weave their way into the fabric of American political and social life:

> These anxieties had been fed by England's 1701 Act, which inclined early Americans to associate the very idea of a foreign-born head of state with the larger issue of monarchial government. Though England banned foreigners from all other posts, it imposed no natural-born requirement on the head of state himself. In fact, the 1701 Act explicitly contemplated foreign born future monarchs—the German House of Hanover, in particular. By 1787 this continental royal family had produced three English kings named George, only the third of whom had been born in England itself. Article II's natural-born language squarely rejected the 1701 idea of future foreign-born heads of state, in no small part because many republicans had come to link the idea (perhaps more sociologically than logically) with hereditary succession and foreign intrigue. Foreign-born princes might be good enough to rule in the Old World but should be kept out of the New World order—or at least the New World presidency.[39]

The apparent purposes of this citizenship clause were thus to assure the requisite fealty and allegiance to the nation from the person to be the chief executive of the United States, and to prevent wealthy foreign citizens, and particularly wealthy foreign royalty and their relatives, from coming to the United States, becoming naturalized citizens, and then scheming and buying their way into the Presidency or creating an American monarchy. The possibility of satisfying these purposes would appear to be as likely from an interpretation of the term "natural born" citizen which would include one who is a citizen "at birth" by either common law principles of *jus soli*, that is, being born on the soil (in the general usage of the term, one who is "native born"), or by the operation of statutory law of the principles of *jus sanguinis*, that is, through the law of descent by being born to U.S. citizens abroad. That is, one who is a citizen of the United States "at birth" by descent under federal law could develop the requisite allegiances and reverences for the United States passed down, inculcated, and taught by one's parent-citizens, and would have a lifetime of allegiance to the United States at least as strong, in a theoretical sense, as one of a "native born" citizen.[40] Native born citizens, that is, those born "in" the country, who are subject to its jurisdiction, regardless of the nationality or citizenship of their parents, have always under British common law, as well as under the laws of the original states, and then the United States since its founding, been considered to have the "natural" allegiance and ties to the nation.[41]

---

[38] Akhil Reed Amar, AMERICA'S CONSTITUTION, A BIOGRAPHY, at 164 (Random House 2005).

[39] *Id.* at 165.

[40] *See* Tuan Anh Nguyen v. INS, 533 U.S. 53, 64-65 (2001): Citizenship statutes requiring certain relationships of children born abroad to U.S. citizen parent or parents are adopted "… to ensure that the child and the citizen parent have some demonstrated opportunity or potential to develop not just a relationship that is recognized, as a formal matter, by the law, but one that consists of the real, everyday ties that provide a connection between child and citizen parent and, in turn, the United States." *See also* Miller v. United States, 523 U.S. 420, 438-440 (1998) noting the interest of "fostering ties with this country …."

[41] See Kettner, THE DEVELOPMENT OF AMERICAN CITIZENSHIP, 1608-1870, at 287 (UNC Press 1978): "No one appeared to re-examine and justify Coke's idea of the 'natural-born citizen.' Americans merely continued to assume that 'birth within the allegiance' conferred the status and its accompanied rights. Natives were presumably educated from infancy in the values and habits necessary for self-government, and there was no need to worry about their qualifications for membership." See also discussion in Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND, Volume I, "Of the Rights of Persons," 354, 357-358 (1765).

# Common Law Meaning of the Term "Natural Born" Citizen or Subject

## Common Law and the Constitution

If the term "natural born" with respect to citizenship conveyed a concept clearly within the English common law, there would then be a strong implication that such term and its legal meaning would either have been incorporated into, or at least would strongly influence the framers in using such phrase, as well as subsequent interpretive construction by the courts of the relevant provision of the U.S. Constitution.[42] As noted by the Supreme Court,

> There is, however, one clear exception to the statement that there is no national common law. The interpretation of the Constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history.[43]

Many of the terms used in the U.S. Constitution were not specifically defined in that document (such as "natural born" citizen, the privilege of the writ of "habeas corpus," and the prohibitions against "bills of attainder" and "ex post facto" laws, for example), and thus referral to the English common law, "well known" to the framers and applicable in the American colonies, must be made for a definitional reference for such terms. The Supreme Court has explained with reference to the constitutional prohibition on "ex post facto" laws, for example, that the meaning of such term, not defined in the Constitution, requires some explanation, and that "the necessary explanation is derived from English common law well known to the Framers":

> The proscription against ex post facto laws "necessarily requires some explanation; for, naked and without explanation, it is unintelligible, and means nothing." Calder v. Bull, 3 Dallas 386, 390 (1798) (Chase, J.). In Calder v. Bull, Justice Chase stated that the necessary explanation is *derived from English common law well known to the Framers*: "The expressions 'ex post facto laws,' are technical, they had been in use long before the Revolution, and had acquired an appropriate meaning, by Legislators, Lawyers, and Authors." *Id*. at 391; see also *id*. at 389.[44]

Similarly, Chief Justice (and former President) Taft explained (in a Supreme Court decision dealing with the parameters of the offenses to which the "pardon" authority of the President extends) that the meaning of the language and phrases in the Constitution, when they are not specifically defined in that document, can only be discerned and interpreted by reference to the British common law in place at the time of the drafting of the Constitution. The Chief Justice, writing for a unanimous Court, found that the British common law was what the framers "were born and brought up in," that the framers "thought and spoke in its vocabulary," and was thus what the "statesmen and lawyers of the Convention" employed for the meaning of the terms in the Constitution "confident that they could be shortly and easily understood":

---

[42] *Ex parte* William Wells, 18 Howard (59 U.S.) 307, 311 (1855); Moore v. United States, 91 U.S. 270, 274 (1875); Smith v. Alabama, 124 U.S. 465, 478 (1888); United States v. Wong Kim Ark, 169 U.S. 649, 654-655 (1898); *Ex parte* Grossman, 267 U.S. 87, 108-109 (1925); Carmel v. Texas, 529 U.S. 513, 521 (2000).

[43] Smith v. Alabama, 124 U.S. at 478.

[44] Carmel v. Texas, 529 U.S. at 521 (Emphasis added).

> The language of the Constitution cannot be interpreted safely except by reference to the common law and to the British institutions as they were when the instrument was framed and adopted. The statesmen and lawyers of the Convention who submitted it to the ratification of the Conventions of the thirteen States, were born and brought up in the atmosphere of the common law, and thought and spoke in its vocabulary. They were familiar with other forms of government, recent and ancient, and indicated in their discussions earnest study and consideration of many of them, but when they came to put their conclusions into the form of fundamental law in a compact draft, they expressed them in terms of the common law, confident that they could be shortly and easily understood.[45]

Justice Joseph Story explained in his celebrated work on the United States Constitution, *Commentaries on the Constitution,* that the British common law formed the "foundation" upon which American jurisprudence stands:

> The universal principle (and the practice has conformed to it) has been that the common law is our birthright and inheritance, and that our ancestors brought hither with them upon their emigration all of it, which was applicable to their situation. The whole structure of our present jurisprudence stands upon the original foundations of the common law.[46]

The British common law was, in fact, regularly adopted or recognized as in force *expressly* in the constitutions, or in the early acts of the legislatures, of the original thirteen states after independence had been declared in July of 1776. The original Constitution of Delaware, for example, stated,

> The common law of England, as-well as so much of the statute law as has been heretofore adopted in practice in this State, shall remain in force, unless they shall be altered by a future law of the legislature; such parts only excepted as are repugnant to the rights and privileges contained in this constitution, and the declaration of rights, &c., agreed to by this convention.[47]

The experience and the wording of the constitutions, or original statutes, adopted in most of the other original states were similar to that of Delaware quoted above.[48] Those immediately involved in framing constitutions for the states in the 1770s, many of whom were also prominent in framing the Constitution for the United States in 1787, were thus not only intimately familiar

---

[45] *Ex parte* Grossman, 267 U.S. 87, 108-109 (1925). See also *Ex parte* William Wells, 18 Howard (59 U.S.) 307, 311 (1855): "Prior to the revolution, the colonies, being in effect under the laws of England, were accustomed to the exercise of it in the various forms, as they may be found in the English law books. They were, of course, to be applied as occasions occurred, and they constituted a part of the jurisprudence of Anglo-America. At the time of the adoption of the constitution, American statesmen were conversant with the laws of England …. We must then give the word the same meaning as prevailed here and in England at the time it found a place in the constitution."

[46] Justice Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES, Vol. I, § 157, p. 140 (1833).

[47] Constitution of Delaware, 1776, Article 25.

[48] *See,* for example, similar language in the Constitution of New Jersey, 1776, Article XXII; Constitution of Maryland, November 11, 1776, Declaration of Rights, paragraph III; Constitution of New York, April 20, 1777, Article XXXVI; Laws of Virginia, July 3, 1776, Ch. 38. Interestingly, the Constitution of Massachusetts, the colony in which the armed rebellion began, did not mention "England" or "Great Britain" in its adoption of "[a]ll the laws which have heretofore been adopted, used and approved in … Massachusetts, … and usually practiced on in the courts of law," but which, as recognized in case law in Massachusetts, referred, of course, to the British common law. Constitution of Massachusetts, 1780, Pt. 2, C. 6, Art. 6; *see, e.g.,* Com. v. Leach, 1 Mass. 59 (1804); Com. v. Knowlton, 2 Mass. 530 (1807); Pearce v. Atwood 13 Mass. 324 (1816); Sackett v. Sackett, 25 Mass. 309 (1829); Boynton v. Rees, 26 Mass. 528 (1830); Com. v. Churchill, 43 Mass. 123 (1840); Com. v. Rowe 257 Mass. 172 (1926); Com. v. Lopes 318 Mass. 453 (1945).

---

with, but also expressly recognized the continued application of the British common law within this country.

Similar to the concept expressed in the original constitutions and enactments of the new states, Justice Story has also noted in a Supreme Court decision that we did not necessarily, however, adopt all of the British common law, but rather adapted it to our own situation.[49] An analysis of the term "natural born" citizen which begins with the British common law meaning of the phrase might thus not necessarily end there, but must also take into consideration the unique American experience, and the application and interpretation of the underlying concepts involved by the courts in the United States.[50]

## Common Law and Persons Born "In" the Country

There appears to be very little scholarly or legal dispute as to the British common law applicable in England and in the American colonies with respect to those born "on the soil." As to those children born in the geographic boundaries of the country, even of alien parents, the Supreme Court of the United States in *United States v. Wong Kim Ark*, citing the British decision in *Calvin's Case* reported by Lord Coke,[51] found that such persons were, under British common law, considered "natural born" subjects (with minor exceptions for children born of foreign diplomatic personnel or of hostile military forces in occupation, that is, those not "under the jurisdiction" of that host country). This rule of law, noted the Court, applied to the American colonies at the time of the Declaration of Independence and, significantly, "in the United States afterwards, and continued to prevail under the Constitution ...."[52]

The premiere treatise on British law at the time of the drafting of the Constitution, which was well-known and well-used in the colonies, was Blackstone's *Commentaries on the Laws of England* (1765). Blackstone explained that "[t]he first and most obvious division of the people is into aliens and natural-born subjects,"[53] and that the "natural" allegiance due of "natural-born" subjects, as opposed to merely "local" allegiance of aliens and sojourners, "is such as is due from all men born within the king's dominions immediately upon their birth."[54] Blackstone traced the

---

[49] Van Ness v. Pacard, 27 U.S. [2 Peters] 137, 143-144 (1829).

[50] One Court of Appeals has noted, for example, that the British common law with respect to "natural born" subjects as those born within the entire "realm" of the British Empire, was not necessarily imported wholly into American jurisprudence, as those born in the *possessions* of the United States, or in unincorporated territories, such as in the Philippines, would not be "natural born" citizens of the United States, as they had not been born "in" the geographic area of the United States. Rabang v. INS, 35 F.3d 1449, 1454, n.9 (9th Cir. 1994), *cert. denied, sub nom.* Sanidad v. INS, 515 U.S. 1130 (1995).

[51] Calvin's Case, 7 Rep. 1, 4b -6a, 18a, 18b (1608).

[52] 169 U.S. at 658. For a thorough history of the adoption of the English common law principles of citizenship, and the applications of those principles in the colonies, in the states, and then on a national basis in the United States, see Kettner, THE DEVELOPMENT OF AMERICAN CITIZENSHIP, 1608-1870 (U.N.C. Press 1978).

[53] Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND, Volume I, "Of the Rights of Persons," 354 (1765).

[54] *Id.* at 357-358: "Natural allegiance is such as is due from all men born within the king's dominions immediately upon their birth. For, immediately upon their birth, they are under the king's protection .... Natural allegiance is therefore a debt of gratitude; which cannot be forfeited, cancelled, or altered by any change of time, place or circumstance, nor by anything but the united concurrence of the legislature. An Englishmen who removes to France, or to China, owes the same allegiance to the king of England there as at home, and twenty years hence as well as now. ... Local allegiance is such as is due from an alien, or stranger born, for so long time as he continues within the king's dominion and protection: and it ceases the instant such stranger transfers himself from this kingdom to another. Natural allegiance is therefore perpetual, and local temporary only ...."

---

development of the concept of "natural-born" allegiance to the reciprocal duties of protection and allegiance (fealty, or "ligamen" (tie)), that developed concerning land ownership and use under the feudal system, eventually understood to encompass the reciprocal protection/allegiance of all English subjects with respect to the crown.[55]

In 1844, in a probate case in New York State, Assistant Vice-Chancellor Lewis Sandford authored a detailed and scholarly opinion, later cited and relied upon by numerous federal courts and legal treatises, on the legal history of natural born citizenship status in the United States.[56] The opinion in *Lynch v. Clarke* found that one of the litigants, Julia Lynch, who was born in New York to *alien* parents who were merely on a "temporary sojourn" in this country, was a natural born U.S. citizen who had the legal capacity to inherit. Sandford concluded that all persons born in the United States, even of alien parents who were only here temporarily, had "natural born" citizenship status under English common law, carried forward in the laws in all of the original thirteen states after independence, and then under the laws and constitutional provisions of the United States:

> My conclusion upon the facts proved is, that Julia Lynch was born in this state of alien parents, during their temporary sojourn. That they came here as an experiment, without any settled intention of abandoning their native country, or of making the United States their permanent home....
>
> It is indisputable that by the rule of the common law of England, if applied to these facts, Julia Lynch was a natural born citizen of the United States. And this rule was established and inflexible in the common law, long anterior to the first settlement of the United States ... By the common law, all persons born within the ligeance of the crown of England, were natural born subjects, without reference to the *status* or condition of their parents....
>
> \*               \*               \*
>
> At the formation of our present national government, the common law prevailed as a system of jurisprudence, in all the thirteen states which then constituted the nation....
>
> I need not dwell more at large upon this unquestionable proposition....
>
> As the common law prevailed in all the colonies, and was the basis of their laws and jurisprudence, it follows that all persons born in the colonies while in the ligeance of the King of England, became subjects of the Crown of England; unless it be made to appear that the rule of the common law was incompatible with the situation with the colonists, or unsuited to their circumstances; or that it was altered by legislation.
>
> Instead of abridging the rule, all colonial legislation which has come under my observation, proceeded on the assumption that it was the settled law of the land.
>
> \*               \*               \*
>
> It may then be safely assumed, that at the Declaration of Independence, by the law of each and all of the thirteen states, a child born within their territory and ligeance respectively, became thereby a citizen of the state of which he was a native. This continued unchanged to

---

[55] *Id.* at 354-357.

[56] Lynch v. Clarke, 3 N.Y. Leg. Obs. 236 (1 Sand. ch. 583) (1844).

the time when our National Constitution went into full operation. There is no evidence of any alteration of the rule of any of the states during the period that intervened....[57]

The Supreme Court of the United States, in its landmark opinion on birthright citizenship authored by Justice Gray in *United States v. Wong Kim Ark*, citing both the common law and numerous legal precedents in the United States, explained in 1898 that a child born of alien parents within the country and subject to its jurisdiction (that is, whose parents are not diplomatic personnel representing a foreign nation or troops in hostile occupation) is considered a "natural born" citizen (in the United States) or subject (in England),[58] as that term has been used over the centuries in England and the United States:

> It thus clearly appears that by the law of England for the last three centuries, beginning before the settlement of this country, and continuing to the present day, aliens, while residing in the dominions possessed by the Crown of England, were within the allegiance, the obedience, the faith or loyalty, the protection, the power, the jurisdiction, of the English Sovereign; and therefore *every child born in England of alien parents was a natural born* subject, unless the child of an ambassador or other diplomatic agent of a foreign State, or of an alien enemy in hostile occupation of the place where the child was born.

> *The same rule* was in force in all the English Colonies upon this continent down to the time of the Declaration of Independence, and in the United States afterwards, and *continued to prevail under the Constitution as originally established.*[59]

The Court noted several judicial precedents finding that the clear common law from England, as well as statutory law pertaining to such things as inheritance (which prevailed in the states in this country unless expressly repealed), was that "persons born within the realm, although children of alien parents, were called 'natural-born subjects.'"[60] Citing an earlier precedent, the Court noted Justice Story's opinion that the principles of common law "treated it as unquestionable that by that law a child born in England of alien parents was a natural born subject."[61] The Court referenced with approval an earlier decision of a federal circuit court, written by Supreme Court Justice Swayne sitting on circuit, explaining that "the rule of the common law" of England, and now "of this country, as well as in England," is that "*all* persons born in the allegiance of the United States are natural born citizens."[62]

---

[57] *Id.* at 238, 242, 243-244. The opinion then concluded that the Constitution, in using the phrase "natural born citizen" was a "direct recognition of the common law principle ...." *Id.* at 246.

[58] As to the use of "subject" or "citizen" with respect to "natural born," the Supreme Court of the United States referenced a court decision in North Carolina, explaining that "The term 'citizen,' as understood in our law, is precisely analogous to the term 'subject' in the common law, and the change of phrase has entirely resulted from the change of government. The sovereignty has been transferred from one man to the collective body of the people; and he who before was a 'subject of the king' is now 'a citizen of the State." 169 U.S. at 663-664, citing State v. Manuel, (1838) 4 Dev. & Bat. 20, 24-26. *See also* United States v. Villato, 2 U.S. (Dall.) 370, 371 (1797); Hennessey v. Richardson Drug Company,189 U.S. 25, 34-35 (1903). *But see,* however, limitations as to "subject" of the realm, and those born in United States' possessions, in United States. Rabang v. INS, 35 F.3d at 1454, n. 9.

[59] 169 U.S. at 658. Emphasis added

[60] 169 U.S. at 661, citing an English statute of 1700, and referencing cases including *The Charming Betsey*, 2 Cranch (6 U.S.) 64 (1804); and *Inglis v. Sailor's Snug Harbor* 3 Pet. (28 U.S.) 99 (1830).

[61] 169 U.S. at 661-662, discussing *McCreery v. Somerville*, 9 Wheat. 354 (1824), where, the court noted, that such rule of natural born citizenship by birth within the country "of course extended to the Colonies, and, not having been repealed in Maryland, was in force there."

[62] 169 U.S. at 662-663 (emphasis added), *citing* United States v. Rhodes, 27 Fed. Case 785 (No. 16151) (C.C. Ky. 1866).

The Supreme Court in *Wong Kim Ark* thus concluded that the Fourteenth Amendment "affirms" the common law rule of "citizenship by birth within the territory," even if one is born of alien parents in this country, and approved of the characterization of the children of such resident aliens as "natural born" citizens of the United States.[63] The Fourteenth Amendment further requires that the person born "in" the United States also be "subject to the jurisdiction" of the United States which, as noted, is interpreted to mean that such person is subject to the laws of this country, such that jurisdiction may be exercised over them, and thus would exclude children of foreign diplomats here officially, and those of foreign troops in hostile occupation.[64]

Being born within the geographic boundaries of the United States, however, unlike the meaning under British common law, does not necessarily include being born in the unincorporated "territories," possessions, or protectorates of the United States, unless such citizenship "at birth" is otherwise provided by statute.[65] A U.S. Court of Appeals, relying on the "Insular cases," found that birth in an unincorporated territory or possession of the United States, such as the Philippines, did *not* grant Fourteenth Amendment or common law citizenship as being born "in" the geographic area of the "United States," even though under the British common law one may have been a natural born "subject" of the crown when born within the far-flung dominions ruled by the British Empire.[66]

## Common Law and Persons Born Abroad to Citizen-Parents

In *United States v. Wong Kim Ark*, the Supreme Court, in examining an immigration question not dealing specifically with the meaning of the presidential eligibility requirement, provided a lengthy examination of the English common law of citizenship at the time of the drafting of the Constitution, and whether such citizenship was obtained by the place of birth (*jus soli*) only, or also by descent (*jus sanguinis*). As noted above, the Court found that the common law of England was that of *jus soli*, that is, derived from the feudal notion of the reciprocal responsibilities of allegiance and protection of an individual that was established in England by the *place* of that person's birth; and that the latter principle of citizenship by descent (because of the citizenship or nationality of one's father—*jus sanguinis*) was, as a general matter, the law in England by statute, and thus not necessarily as part of the "common law," even though there existed a long-standing

---

[63] 169 U.S. at 693.

[64] *In re* Look Tin Sing, 21 F. 905, 906 (Cal. Cir. 1884); United States v. Wong Kim Ark, 169 U.S. at 687, 693. See discussion in more recent case of Plyer v. Doe, 457 U.S. 202, 211-215 (1981), finding that for due process, as well as equal protection purposes in the Fourteenth Amendment, that one "within the jurisdiction" of a state is one "subject to its laws": "In appellants' view, persons who have entered the United States illegally are not 'within the jurisdiction' of a State even if they are present within a State's boundaries and subject to its laws. Neither our cases nor the logic of the Fourteenth Amendment supports that constricting construction of the phrase 'within its jurisdiction'" (457 U.S. at 211). Rather, the Court found that "the protections of the Fourteenth Amendment extends to anyone … who *is* subject to the laws of a State …." (457 U.S. 215).

[65] *See*, for example, 8 U.S.C. § 1402 (Puerto Rico, born on or after April 11, 1899), § 1403 (Canal Zone or Republic of Panama, born on or after February 26, 1904), § 1404 (Alaska, born on or after March 30, 1867), § 1405 (Hawaii, born on or after April 30, 1900).

[66] Rabang v. INS, 35 F.3d 1449, 1453 (9th Cir. 1994), *cert. denied, sub nom.* Sanidad v. INS, 515 U.S. 1130 (1995): "[T]he Citizenship Clause has an express territorial limitation which prevents its extension to every place over which the government exercises its sovereignty." *See also, id.* at 1454, n.9, where the Court of Appeals opined that "wholesale importation of British common law on 'subject' status to interpret the meaning of the Citizenship Clause [of the Fourteenth Amendment] is inadvisable because of possible differences between 'subjects' and 'citizens,'" and thus those born in U.S. unincorporated territories or possessions should not necessarily be considered as being born "in" the United States.

statutory recognition (since 1350) of the rights of "natural-born subjects" who were born abroad to British parents or a British father.[67]

As pointed out by the Supreme Court in *Wong Kim Ark*, however, there was not necessarily unanimity in legal scholarship concerning a narrow reading of the British common law with regard to the children of subjects/citizens born abroad.[68] Some legal scholars in England and in the United States have argued that the long-standing statutory and parliamentary recognition of children born abroad to English subjects as "natural-born" was merely "declaratory" of the existing common law principles and understandings in England, although this was disputed in *dicta* by the Supreme Court in *Wong Kim Ark:*

> It has sometimes been suggested that this general provision of the statute of 25 Edw. III. [1350] was declaratory of the common law. See Bacon, arguendo, in Calvin's Case, 2 How. St. Tr. 585; Westlake and Pollock, arguendo, in De Geer v. Stone, 22 Ch. Div. 243, 247; 2 Kent, Comm. 50, 53; Lynch v. Clarke, 1 Sandf. Ch. 583, 659, 660; Ludlam v. Ludlam, 26 N. Y. 536. But all suggestions to that effect seem to have been derived, immediately or ultimately, from one or the other of these two sources: The one, the Year Book of 1 Rich. III. (1483) fol. 4, pl. 7, reporting a saying of Hussey, C. J., "that he who is born beyond sea, and his father and mother are English, their issue inherit by the common law, but the statute makes clear," etc., - which, at best, was but obiter dictum, for the chief justice appears to have finally rested his opinion on the statute. The other, a note added to the edition of 1688 of Dyer's Reports, 224a, stating that at Trinity term 7 Edw. III. Rot. 2 B. R., it was adjudged that children of subjects born beyond the sea in the service of the king were inheritable, - which has been shown, by a search of the roll in the king's bench so referred to, to be a mistake, inasmuch as the child there in question did not appear to have been born beyond sea, but only to be living abroad.[69]

The position of the dissenting Justices in *Wong Kim Ark* was characterized and discussed by the Court in the later case of *Weedin v. Chin Bow:* "The attitude of Chief Justice Fuller and Mr. Justice Harlan was, that at common law the children of our citizens born abroad were always natural-born citizens from the standpoint of this Government...."[70] A detailed law review article in 1921 by the assistant solicitor of the Department of State noted that a number of legal scholars and historians contend that the English common law specifically included *jus sanguinis*, as well as *jus soli*, and noted that the "question has been a subject of controversy for six centuries or more...."[71]

Other legal scholars have contended that long-standing and commonly accepted principles incorporated into English law by statute over several centuries, even if they did not merely

---

[67] 169 U.S. 655- 671. *See also* Blackstone, at 354-361.

[68] It has also been argued, even on the basis of the incorporation of only a very narrow and technical concept of the early English common law rule of *jus soli* into the Constitution, that the common law understanding, meaning, and usage of the term "natural born" subject/citizen would include, at the very least, the children of U.S. citizens born abroad when one parent is abroad because of service in an official capacity on behalf of, and under the direction and control of, the United States Government. This argument would include both diplomatic personnel as well as military forces who were not in hostile occupation, but were invited into, and stationed, in the foreign country. See Lohman, 36 GONZAGA LAW REVIEW, at 351-352, 365-369; *Wong Kim Ark*, 169 U.S. at 686, *citing* Chief Justice Marshall, in The Schooner Exchange v. McFaddon, 11 U.S. [7 Cranch] 116 (1812).

[69] 169 U.S. at 669- 670.

[70] 274 U.S. 657, 670 (1926).

[71] Flourny, Richard W. (Assistant Solicitor, Department of State), *Dual Nationality and Election*, 30 YALE LAW JOURNAL 545, 548 (1921).

"declare" already-existing English common law, actually modified the *corpus* of the common law to incorporate such principles, and that this body of law was the one known to the framers, such that the provisions of the Constitution must be interpreted in that light. Charles Gordon, who was then general counsel for the United States Immigration and Naturalization Service, explained in 1968 that in addition to recognizing birthright citizenship as to the *place* of birth (*jus soli*), "the consistent practice over several centuries, in England and the United States, [was] to recognize citizenship status by descent."[72] Gordon thus concluded that "[t]he common law, as it had developed through the years, recognized a combination of the *jus soli* and the *jus sanguinis*,"[73] and that the English common law adopted by the United States had been expanded by the long-standing statutory inclusions over the centuries in England:

> [T]here were doubts concerning the applicability of the *jus sanguinis* under the early common law. But those doubts were eliminated by statutes enacted in England before the American Revolution, which became part of the body of law followed in England and passed on to this country. It can be argued ... that this total corpus was the common law which this country inherited, and that it persevered unless specifically modified.[74]

That the United States was not confined to only the narrow common law of England in our usages and applications, was noted by the Supreme Court in an opinion authored by Justice Story in 1829:

> The common law of England is not to be taken, in all respects, to be that of America. Our ancestors brought with them its general principles, and claimed it as their birthright; but they brought with them and adopted, only that portion which was applicable to their situation.[75]

It was, in fact, common in the states after independence, upon the adoption of their constitutions and statutes, to incorporate both the common law of England, as well as the *statutory* laws adopted by Parliament and applicable in the colonies up until a particular date.[76] There is thus some argument and indication that it was common for a "modified" English common law—modified by long-standing provisions of English statutory law applicable in the colonies—to be among the traditions and bodies of law incorporated into the laws, applications, usages, and interpretations in the beginning of our nation.

# Common Understanding in 18th Century of the Term "Natural Born" Citizen

In addition to examining the common law meaning of the term "natural born" as it related to citizenship, there are other interpretive analyses that might be employed in an attempt to understand the "meaning to the framers" of the term "natural born" citizen when the term was

---

[72] Gordon, *Who Can Be President of the United States: The Unresolved Enigma*, 28 Md. L. Rev. 1, at 12, 18 (1968).

[73] *Id.* at 18.

[74] *Id.* at 12.

[75] Van Ness v. Pacard, 27 U.S. [2 Peters] 137, 143-144 (1829).

[76] Constitution of Delaware, 1776, Article 25; Constitution of New Jersey, 1776, Article XXII; Constitution of Maryland, November 11, 1776, Declaration of Rights, paragraph III; Constitution of New York, April 20, 1777, Article XXXVI; Laws of Virginia, July 3, 1776, Ch. 38; Constitution of Massachusetts, 1780, Pt. 2, C. 6, Art. 6.

adopted in the Constitution in 1787.[77] If, as noted by the Supreme Court in an opinion authored by Justice Story, the "common law of England is not to be taken, in *all* respects, to be that of America,"[78] there may be accorded some significance to an analysis of what the term "natural born" citizen was commonly understood to mean in the American colonies at the time of the revolution and framing of the Constitution.

It is, of course, always a somewhat speculative exercise to attempt to discern the "common understanding" of a group of individuals who may be geographically, professionally, and politically diverse, particularly during a period many years removed from the current time.[79] The fact that no discussion appears in the notes of the Federal Convention of 1787 on the presidential eligibility clause, and the fact that the actual debates and discussions in the Convention were held in secret with no official journal of the debates being kept (other than for recording votes) highlight the problems in such speculation. That being said, however, one might argue that there existed what might be called a "common" or "general understanding," or at least common "usage" of the term "natural born," as it related to those who were considered "natural born" subjects of England in the American colonies at the time of independence, and "natural born" citizens at the time of the adoption of the Constitution. The "state of the law" in colonial America concerning who was a "natural born" subject of England under English laws, both common law as well as statutory laws, was certainly known to the framers since, as noted by the Supreme Court, "These statutes applied to the colonies before the War of Independence."[80]

From examination of historical documents, it appears that the term "natural born" as it related to citizenship under English law and jurisprudence was a term widely known and used in the American colonies in the 1700's, and was employed in the context and understanding of British common law as well as British statutory law. For example, more than a decade before John Jay had employed the term in his "hint" to General Washington at the Convention of 1787, the First Continental Congress of the American colonies, meeting in Philadelphia beginning in September of 1774, adopted a resolution asserting that the common law of England was fully applicable to the colonies in America, as were such statutory laws of England as would be relevant to their circumstances, and expressly included in the resolution an assertion of the rights of their

---

[77] One commentator has averred that whether or not the common law was modified by statute is irrelevant; the only relevant matter is what the "common understanding" of the meaning of "natural born" was at the time of the Convention of 1787, regardless of whether that meaning was based solely on British common law or partly on adopted statutes from England. Seligman, *A Brief for Governor Romney's Eligibility for President*, 113 CONG. REC. 35019, 35020 (1967).

[78] Van Ness v. Pacard, 27 U.S. at 143-144.

[79] Jack N. Rakove, ORIGINAL MEANINGS: POLITICS AND IDEAS IN THE MAKING OF THE CONSTITUTION, p. 6: "Both the framing of the Constitution in 1787 and its ratification by the states involved processes of collective decision-making whose outcomes necessarily reflected a bewildering array of intentions and expectations, hopes and fears, genuine compromises and agreements to disagree. The discussions of both stages of this process consisted largely of highly problematic predictions of the consequences of particular decisions. In this context, it is not immediately apparent how the historian goes about divining the true intentions and understandings of the roughly two thousand actors who served in the various conventions that framed and ratified the Constitution, much less the larger electorate that they claimed to represent. … For all these reasons, then, the ideal of "unbiased" history remains an elusive goal, while the notion that the Constitution had some fixed and well-known meaning at the moment of its adoption dissolves into a mirage." See also Leonard W. Levy, ORIGINAL INTENT AND THE FRAMERS' CONSTITUTION, ix (1988): "For several decades after the ratification of the Constitution the fading memories of those who had attended the Philadelphia Constitutional Convention supplied the main evidence of the Framers' intent. Even when those memories were fresh, the framers disagreed vehemently about what the Convention had meant or intended ...." *See also, id.* at pp. 1-29.

[80] Weedin v. Chin Bow, 274 U.S. at 660.

---

ancestors to be considered "natural-born subjects within the realms of England." As noted in Elliot's compilation and analysis of documents related to independence,

> On the same day [14th of October, 1774], Congress unanimously resolved, "that the respective colonies are entitled to the *common law of England*, and more especially to the great and inestimable privilege of being tried by their peers of the vicinage according to the course of that law." They further resolved, "that they were entitled to the benefit of such of the English statutes as existed at the time of their colonization, and which they have, by experience, respectively found to be applicable to their several and local circumstances." They also resolved, that their ancestors, at the time of their immigration, were "entitled to all the rights, liberties, and immunities, of free and natural-born subjects within the realms of England."[81]

It is thus clear that the delegates to the First Continental Congress in 1774, among whom were several framers of the Constitution at the Federal Convention of 1787, as well as other notable "founding fathers" (including John Jay),[82] were already familiar with and employed the term "natural born" in the context of and within the understanding of British common law and statutory law concepts of the rights and privileges of citizenship.

Of relevance to any meaning and "common understanding" of the term "natural born" within the American colonies and at the time of the drafting of the Constitution is the legal treatise on the laws of England referred to as "Blackstone," for its author William Blackstone. Published in 1765, this treatise was not only available, but was widely known to the framers at the time of the drafting of the Constitution.[83] As noted by the Supreme Court of the United States, "Blackstone's Commentaries was widely circulated in the Colonies ...,"[84] and that "undoubtedly the framers of the Constitution were familiar with it."[85] As discussed in the earlier section of this report on the common law, Blackstone explained that "natural born" subjects in England and the American colonies included all those born "in" the lands under British sovereignty. Concerning specifically the issue of children born *abroad* of English subjects, Blackstone explains clearly that such children are then (in 1765) considered under the law of England as "natural born" subjects, and have been considered as such for most purposes since at least the time of Edward III (1350),

---

[81] Jonathan Elliot, THE DEBATES IN THE SEVERAL STATE CONVENTIONS, ON THE ADOPTION OF THE FEDERAL CONSTITUTION [ELLIOT'S DEBATES], Vol. I, "Gradual Approaches Towards Independence," at 44 (2d Ed. 1836). Emphasis in original.

[82] Delegates to that First Continental Congress in 1774 included such framers present at the Convention of 1787 as Roger Sherman of Connecticut, William Livingstone of New Jersey, Thomas Mifflin of Pennsylvania, George Read of Delaware, George Washington of Virginia, and John Rutledge of South Carolina, as well as other notable "founding fathers," including John Adams and Samuel Adams of Massachusetts, John Jay of New York, and Patrick Henry and Richard Henry Lee of Virginia.

[83] One noted historian of the American colonial era has commented on the "deep legalism" of society in colonial America "where William Blackstone's *Commentaries on the Laws of England* was selling as well as it was in England." Jack Rackove, REVOLUTIONARIES, at 68 (2010). See also Schick v. United States, 195 U.S. 65, 69 (1904), discussing Blackstone's Commentaries: "... it has been said that more copies of the work had been sold in this country than in England ...."

[84] Powell v. McCormack, 395 U.S. 486, 538 (1969). "Sir William Blackstone's Commentaries on the Laws of England (1765-1769) is the most important legal treatise ever written in the English language. It was the dominant lawbook in England and America in the century after its publication and played a unique role in the development of the fledgling American legal system." William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND, [hereinafter Blackstone], Volume I, Of the Rights of Persons (1765) (Introduction at iii).

[85] Schick v. United States, 195 U.S. at 69.

---

because of the development of statutory law in England to "encourage also foreign commerce." As stated by Blackstone in his 1765 treatise,

> [A]ll children, born out of the king's ligeance, whose fathers were natural-born subjects, are now natural born subjects themselves, to all intents and purposes, without any exception; unless their said fathers were attainted, or banished beyond sea, for high treason; or were then in the service of a prince at enmity with Great Britain.[86]

The "commonly understood" meaning of the term "natural born" in the United States at the time of the drafting of the Constitution might thus be broader than the early, strict English "common law" meaning of that term.[87] As noted by Charles Gordon, former Chief Counsel of the Immigration and Naturalization Service, whether the body of English law in the 1770s was from early common law, from statutory law, or from the common law modified over the years by statutory law, these provisions "were part of the corpus of the English law in existence at the time of the Revolution, which was substantially recognized and adopted by our forefathers."[88] This common usage and popular understanding to the framers of the term "natural born" subject (as employed in England), and the term's apparent evolution and broadening of meaning through statutory law, has thus led several other legal commentators and historians to conclude: "The constitutional Framers had a broad view of the term 'natural-born' and considered all foreign-born children of American citizen parents eligible for the Office of the Presidency"[89]; or, as stated by another: "[T]he delegates meant to apply the evolved, broader common law meaning of the term when they included it in the presidential qualifications clause."[90]

Presidential historian Michael Nelson has also averred that the term appeared to have a common meaning at the time of the drafting of the Constitution which involved within its concept both the *common law* definition and mode of acquisition of citizenship (through *jus soli*), as well as the common understanding of the long-standing broadening of such term by the operation of English statutory law to include those subjects who may have traveled abroad for purposes of commerce, or otherwise. As noted by Nelson (and pointed out by others), a more restrictive meaning to include only those born within the boundaries of the United States would mean that John Jay, who

---

[86] *Id.* at 361: "When I say that an alien is one who is born out of the king's dominions, or allegiance, this also must be understood with some restrictions. ... [T]he children of the king's ambassadors born abroad were always held to be natural subjects: for as the father, though in a foreign country, owes not even a local allegiance to the prince to whom he is sent; so, with regard to the son also .... To encourage also foreign commerce, it was enacted by statute 25 Edw. III. ft. 2. that all children born abroad, provided both their parents were at the time of the birth in allegiance to the king ... might inherit as if born in England: and accordingly it hath been so adjudged in behalf of merchants. But by several more modern statutes these restrictions are still further taken off: so that all children, born out of the king's ligeance, whose fathers were natural-born subjects, are now natural born subjects themselves, to all intents and purposes, without any exception; unless their said fathers were attainted, or banished beyond sea, for high treason; or were then in the service of a prince at enmity with Great Britain."

[87] As noted in the preceding section of this report, legal scholars in England were not completely unanimous about English common law during this period, as some had averred that it included as "natural born" subjects not only *jus soli*, but also those born abroad of English parents, and/or that the statute of 1350 in the reign of Edward III was merely a recitation or "declaration" of the common law, which might also have lead to a common or popular perception (or even a commonly held misunderstanding) of the meaning of the term in the U.S. as including the issue of citizens born in foreign lands even in the narrower concept of the "common law." *See also* Flourny, Richard W. (Assistant Solicitor, Department of State), *Dual Nationality and Election*, 30 YALE LAW JOURNAL 545, 548 (1921).

[88] Gordon, 28 MD. L. REV., at 18.

[89] Lohman, 36 GONZAGA LAW REVIEW, at 369.

[90] Nelson, at 396. See also 7 Charles Gordon, Stanley Mailman, & Stephen Yale-Loehr, IMMIGRATION LAW AND PROCEDURE, § 92.03[1][b] (rev. ed. 2000); Pryor, 97 YALE L.J. at 882 (1988); Gordon, 28 MD. L. REV at 5-7.

---

may have recommended the precise term to the Convention, would have intended to exclude from eligibility his own children who were born in Spain and France while Jay was representing the United States abroad:

> The provision for "natural born Citizen" probably was aimed at immigrants, although the term is so unusual as to be vague.... [b]ut [it] had deep roots in British common law. In medieval times it had embodied the doctrine of jus soli: a natural born citizen was one born within the realm (on the soil, so to speak). But with increased commerce and travel, Parliament, starting in 1350, seemed to expand the definition of natural born to incorporate the doctrine of jus sanguinis. Now babies born of British citizens abroad or at sea were included as well. One can presume only that Jay and the delegates meant to apply the evolved, broader common law meaning of the term when they included it in the presidential qualifications clause. Certainly Jay did not mean to bar his own children born in Spain and France while he was on diplomatic assignments, from legal eligibility to the presidency.[91]

With respect to the common or general meaning of the term "natural born" to the framers of the Constitution in the context of those born *abroad* to U.S. citizens, it may be significant to note that the first Congress, under its express constitutional authority "to establish an uniform Rule of Naturalization,"[92] enacted the Naturalization Act of 1790.[93] The first of several such acts, this 1790 statute stated that

> [T]he children of citizens of the United States, that may be born beyond the sea, or out of the limits of the United States, shall be considered as natural born citizens: Provided, That the right of citizenship shall not descend to persons whose fathers have never been resident in the United States....[94]

This early congressional act provides some argument that the term "natural born" citizen was seen to include more than merely the "native born," that is, those born in the country (in accordance with the common law principle of *jus soli*), but also to include the long-standing English statutory recognition of citizenship by descent through one's father when an individual is born abroad, that is, all of those who are citizens "at birth" or "by birth." The significance of such a statute passed by the first Congress was, of course, the fact that many of the framers of the Constitution were Members of that first Congress, as well as the fact that the first Congress's understanding of the meaning of the terms of the Constitution was most contemporaneous in time with the document's adoption. One author has noted that of the "Committee of Eleven," which first proposed to the Convention of 1787 the eligibility requirement of being a "natural born" citizen, 8 of the 11 committee members were in that first Congress, and none stated objections to or disagreement with the characterization of the term "natural born" by statute by the Congress.[95] The Supreme Court has expressly noted the weight of authority of early actions of the first Congress in explicating portions of the Constitution because of the make-up of that Congress, and

---

[91] Michael Nelson, *Constitutional Qualifications for President*, PRESIDENTIAL STUDIES QUARTERLY, Vol. XVII, No. 2, at 396 (Winter 1987), citing Gordon, *Who Can Be President?*

[92] U.S. CONST. art. I, § 8, cl. 4.

[93] Act of March 26, 1790, ch. 3, 1 Stat. 103, 104.

[94] The 1790 statute was repealed and superseded by a 1795 naturalization statute which omitted the phrase "natural born." Act of Jan. 29, 1795, ch. 20, 1 Stat. 414, 415. There is no legislative history indicating the reason for the deletion of that term; however, in that statute the phrase "shall be considered as citizens" referred to the status of minor children derivatively naturalized upon the naturalization of their parents, who are not "natural born," as well as to the children born abroad to U.S. citizens, so it is possible that the deletion is merely a stylistic/grammatical decision.

[95] Lohman, 36 GONZAGA LAW REVIEW at 371.

its proximity in time to the Convention. As noted by the Court, an act "passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, ... is contemporaneous and weighty evidence of its true meaning."[96]

One of the more noted political and constitutional scholars on the American presidency, Edward S. Corwin, has explained that "natural born" citizens eligible to be President clearly include all of those born "on the soil" of the United States and subject to its jurisdiction, under the common law principles of *jus soli* applicable in the United States, but also would appear to include those born abroad of U.S. citizens under the principle of *jus sanguinis*, as adopted by Congress by statute. Corwin noted that Congress has the authority as the legislative body of a sovereign nation "to determine who shall and shall not be admitted to the body politic":

> But who are "natural-born citizens"? By the so-called *jus soli,* which comes from the common law, the term is confined to persons born on the *soil* of a country; and this rule is recognized by the opening clause of the Fourteenth Amendment, which declares to be citizens of the United States "all persons born or naturalized within the United States and subject to the jurisdiction thereof." On the other hand, by the so-called *jus sanguinis*, which underlay early Germanic law and today prevails on the continent of Europe, nationality is based on *parentage*, a principle recognized by the first Congress under the Constitution in the following words:
>
> > The children of citizens of the United States that may be born beyond the sea, or outside of the limits of the United States, shall be considered as natural-born citizens of the United States; provided that the right of citizenship shall not descend to persons whose fathers have never been resident in the United States.
>
> By succeeding legislation the general clause of this provision has been continued in force to this day. The question arises, whence did Congress obtain the power to enact such a measure? By the Constitution the Congress is authorized to pass "an uniform rule of naturalization," that is, a uniform rule whereby *aliens* may be admitted to citizenship; while the provision under discussion purports to recognize a certain category of persons as citizens from an because of *birth*. The provision must undoubtedly be referred to the proposition that, as the legislative body of a nation sovereign at international law, Congress is entitled to determine who shall and who shall not be admitted to the body politic.
>
> Should, then, the American people ever choose for President a person born abroad of American parents, it is highly improbable that any other constitutional agency would venture to challenge their decision ....[97]

It may be noted that some have argued that the relevant common meaning of natural born citizen that was prevalent in 18th century America should *not* be the one that was actually applicable in the American colonies during that time from British statutory and common law, and which was adopted specifically by the states after independence in 1776 (and which, as noted by Justice Story, formed the "foundation" for American jurisprudence), but rather should be recognized as

---

[96] Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 297 (1888); Marsh v. Chambers, 463 U.S. 783, 788-791 (1983). See also Michel v. Anderson, 14 F.3d 623, 631 (D.C. Cir. 1994): "Although the actions of the early congresses are not a perfect indicator of the Framers' intent, those actions provide some indications of the views held by the Framers, given the propinquity of the congresses and the framing and the presence of a number of Framers in those congresses."

[97] Edward S. Corwin, THE PRESIDENT, OFFICE AND POWERS, 1787-1984, at 38-39 (5th Revised ed. by Bland, Hindson, and Peltason, 1984). (Footnotes omitted).

one derived from what has been described as a "philosophical treatise"[98] on the law of nations by a Swiss legal philosopher in the mid-1700s.[99] This particular treatise, however, in the editions available at the time of the drafting of the U.S. Constitution, did not actually use, either in the original French or in English interpretations at that time, the specific term "natural born citizens."[100] It was not until *after* the adoption of the Constitution in the United States did a translator interpret the French in Emmerich de Vattel's *Law of Nations* to include, in English, the term "natural born citizens" for the first time, and thus that particular interpretation and creative translation of the French, to which the Vattel enthusiasts cite, could not possibly have influenced the framing of the Constitution in 1787.[101]

Furthermore, and on a more basic level, the influence of the work of Vattel on the framers in employing the term "natural born" in relation to domestic *citizenship* within the Constitution is highly speculative at best, is without any direct historical evidence, and is contrary to the mainstream principles of constitutional interpretation and analysis within American jurisprudence. Although it appears that there is one single reference by one delegate at the Federal Convention of 1787 to Vattel (in reference to several works of different authors to support an argument for equal voting representation of the states in the proposed Congress),[102] there is no other reference to the work in the entire notes of any of the framers published on the proceedings of the Federal Convention of 1787,[103] and specifically there is *no* reference or discussion of the work at all in relation to *citizenship* at the Convention, in the Federalist Papers,[104] or in any of the state ratifying conventions.[105]

---

[98] Craig v. United States, 340 Fed. Appx. 471, 473 (10th Cir. Okla. 2009), *cert. denied,* 130 S.Ct. 141 (2009).

[99] Emmerich de Vattel, THE LAW OF NATIONS, OR PRINCIPLES OF THE LAW OF NATURE, APPLIED TO THE CONDUCT AND AFFAIRS OF NATIONS AND SOVEREIGNS (London 1760)[hereinafter THE LAW OF NATIONS]. The 1760 Volume is an English translation of the original French, E. De Vattel, DROIT DES GENS: OU, PRINCIPLES DE LA LOI NATURELLE, APPLIQUES A LA CONDUCT & AUX AFFAIRES DES NATIONS & DES SOUVERAINS (1758)[hereinafter DROIT DES GENS].

[100] In the original French, the sentence reads: "Les naturels ou indigenes font ceux qui font nés dans le pays, de Parens Citoyens." (DROIT DES GENS, *supra* at Ch. XIX, p. 111). In the English translation available at the time of the framing of the Constitution, translated in English in 1760 and in 1787, the terms "naturels or indigenes" were simply interpreted as "natives or indigenes": "The natives, or indigenes, are those born in the country of parents who are citizens." THE LAW OF NATIONS, *supra* at Vol. I, Book 1, Ch. XIX, § 212, at p. 92 (1760), and at p. 166 of the 1787 edition. The English phrase "natural born citizen" in early French translations of the U.S. Constitution's Article II, § 1, cl. 5, however, was interpreted as either "citoyen-né" ([a "born citizen"] John Stevens or Warren Livingston, EXAMEN DU GOUVERNEMENT D'ANGLETERRE, COMPARE AUX CONSTITUTIONS DES ÉTAT-UNIS," at 257 (Paris 1789)), or "citoyen né dans les États-Unis," ([a "citizen born in the United States"], L.-P. Conseil, MÉLANGES POLITIQUES ET PHILOSPHIQUES, "Constitution Des États-Unis," at 160 (Paris 1833), and M. Du Ponceau, EXPOSÉ SOMMAIRE DE LA CONSTITUTION DES ÉTATS-UNIS D'AMÉRIQUE, at 45 (Paris 1837)), or in more recent French translations, "citoyen de naissance" ("citizen at birth"). None of these French expressions for the English term "natural born citizen" were used by Vattel.

[101] Compare the 1760 London edition of Vattel's *Law of Nations*, to the 1797 English translation (London 1797), at Book 1, Ch. XIX, p. 101 (Lib. of Congress No. JX2414 .E5 1797).

[102] I Farrand at 437-438 (Mr. Martin, of Maryland).

[103] Farrand's work, *The Records of the Federal Convention of 1787*, includes the personal notes of the following framers: Robert Yates of New York, James Madison of Virginia, Rufus King of Massachusetts, James McHenry of Maryland, William Pierce of Georgia, William Paterson of New Jersey, Alexander Hamilton of New York, and George Mason of Virginia, as well as the Journal kept by the Secretary of the Convention, Major William Jackson. I Farrand, *supra* at xi-xxii.

[104] THE FEDERALIST: A COLLECTION OF ESSAYS, WRITTEN IN FAVOUR OF THE NEW CONSTITUTION, AS AGREED UPON BY THE FEDERAL CONVENTION, SEPTEMBER 17, 1787 (New York 1788).

[105] There were only two apparent references in all of the state ratifying debates to Vattel: one by a delegate in South Carolina in relation to a nation's duty to honor treaties (4 ELLIOT'S DEBATES at 278), and one in Pennsylvania mentioned with other "political writers" to support the notion that not all of the rights of the people of a nation could be (continued...)

It would appear to be somewhat fanciful to contend that in employing terms in the U.S. Constitution the framers would disregard the specific and express meaning of those precise terms in British common law, the law in the American colonies, and subsequently in all of the states in the United States after independence, in favor of secretly using, without comment or explanation, a contrary, non-existent English translation of a phrase in a French-language treatise on international law. In a state case cited with approval by the U.S. Supreme Court, an extensive legal analysis of the question of natural born citizenship under the law of the United States by Assistant Vice Chancellor Sandford, in New York in 1844, found that the laws in all of the American colonies, and then in all of the states after independence, followed the English common law principles of *jus soli*, that is, that birth in the territory governed citizenship at birth, regardless of the nationality or citizenship of one's parents.[106] Sandford found that it would be "inconceivable" that the framers, in drafting the Constitution, would abandon without explicit comment or explanation in the document, the existing law in all of the colonies, and then in all of the states, of who were natural born citizens in favor of an "international" or "natural" law theory of citizenship by "descent" (through one's father), an argument pressed by one of the litigants relying, in part, on Vattel. Addressing specifically the question of the use of the term "natural born citizen" in the federal Constitution as one of the qualifications for President, Vice Chancellor Sandford found the following:

> It is a necessary consequence, from what I have stated that the law which had prevailed on this subject, in all the states, became the governing principle or common law of the United States. Those states were the constituent parts of the United States, and when the union was formed, and further state regulation on the point terminated, it follows, in the absence of a declaration to the contrary, that the principle that prevailed and was the law on such point *in all the states*, became immediately the governing principle and rule of law thereon in the nation formed by such union.... The term *citizen*, was used in the constitution as a word, the meaning of which was already established and well understood. And the constitution itself contains a direct recognition of the subsisting common law principle, in the section that defines the qualification of the President. "No person except a *natural born citizen, or a citizen* of the United States at the time of the adoption of this constitution shall be eligible to the office of President," &c. The only standard which then existed, of *natural born citizen*, was the rule of the common law, and no different standard has been adopted since. Suppose a person should be elected President who was native born, but of alien parents, could there be any reasonable doubt that he was eligible under the Constitution? I think not. The position would be decisive in his favor that by the rule of common law, in force when the constitution was adopted, he is a citizen.

> Moreover, the absence of any avowal or expression in the constitution of a design to affect the existing law of the country on this subject, is conclusive against the existence of such design. It is inconceivable that the representatives of the thirteen sovereign states, assembled in convention for the purpose of framing a confederation and union for national purposes, should have intended to subvert the long-established rule of law governing their constituents on a question of such great moment to them all, without solemnly providing for the change

---

(...continued)

"completely enumerated" in a constitution. 2 ELLIOT'S DEBATES at 453-454.

[106] Lynch v. Clarke, 3 N.Y. Leg. Obs. 236, 242, 244 (1 Sand. ch. 583) (1844). This case was cited with approval by the Supreme Court in *United States v. Wong Kim Ark*, at 664, 674, and also by the U.S. Court of Appeals in *In re Look Tin Sing*, 21 F. 905, 909 (Cal. Cir. 1884).

in the constitution; still more that they should have come to that conclusion without even once declaring their object.[107]

The treatise in question by Emmerich de Vattel was a work concerning the "law of nations," which we would now classify generally as "international law." However, the concept of citizenship within a particular country is one governed *not* by international law or law of nations, but rather is governed by municipal law, that is, the internal law of each country.[108] Vattel's writings on citizenship by "descent" reflected in many circumstances what the law or practice may have been in certain *European* nations at the time—that is, that citizenship followed the nationality or citizenship of one's father, as opposed to the place of birth.[109] This concept, although prevalent on the European Continent was, even as expressly noted in Vattel's work itself, clearly *not* the law in England or thus the American colonies,[110] and clearly was not the concept and common understanding upon which U.S. law was based. James Madison, often referred to as the "Father of the Constitution," expressly explained in the House of Representatives in the First Congress, in 1789, that with regard to citizenship the "place" of birth, and not "parentage" was the controlling concept adopted in the United States.[111] Additionally, the Supreme Court in 1971 simply and succinctly explained, after citing historical legal precedent: "We thus have an acknowledgment that our law in this area follows English concepts with an acceptance of the *jus soli*, that is, the place of birth governs citizenship status except as modified by statute."[112] Again in 1998, the Supreme Court expressly recognized *jus soli*, the place of birth, as controlling in the United States, noting that in this country "citizenship does not pass by descent" except as provided by Congress in statute.[113]

---

[107] Lynch v. Clark at 246-247. Emphasis in original.

[108] Inglis v. Sailors' Snug Harbor, 3 Pet. 99, 162 (1830); United States v. Wong Kim Ark, 169 U.S. 649, 668 (1898); Perkins v. Elg, 307 U.S. 325, 329, (1939); Lynch v. Clark at 249; see also Frederick Van Dyne (Assistant Solicitor, Department of State), CITIZENSHIP OF THE UNITED STATES, at 3-4 (New York 1904).

[109] See discussion of European nations following concepts of citizenship by "descent" through one's father, in Flournoy, *Dual Nationality and Election*, 30 YALE LAW JOURNAL, at 554-559. Vattel explained that the citizenship of "children naturally follow the condition of their fathers," and that "in order to be of the country, it is necessary that a person be born of a father who is a citizen ...." Vattel, LAW OF NATIONS, at Ch. XIX, p. 101 (1797 ed.). It is interesting to recognize that Vattel never expressly postulated a "two-citizen" parent requirement for what he described as natives or indigenes. Rather, grammatically, the plural of parent or relative (parens) merely conforms to the plural subject of "natives" or "indegenes." That is, for example, if the rule is that the *children* born in the United States of foreign *diplomats*" are not to be considered natural born "citizens" of the United States under common law principles, such statement does *not* necessarily require that *both* parents must be foreign diplomats to deny such U.S. citizenship status to that child. See, *e.g.*, In re Thenault, 47 F.Supp. 952 (D.D.C. 1942).

[110] Vattel, LAW OF NATIONS, at Ch. XIX, p. 102 (1797 ed.). See discussion by the Connecticut Supreme Court of Errors, in *Town of New Hartford v. Town of Canaan*, 5 A. 360 (Conn. 1886): "In Field's International Code, 132, it is said: 'A legitimate child, wherever born, is a member of the nation of which its father at the time of its birth was a member.' Upon this Morse, in his work on Citizenship, p. 17, thus comments: 'This is the law in most European States (Westlake, p. 16; Foelix, p. 54), but not in England or in the United States.'"

[111] "It is an established maxim that birth is a criterion of allegiance. Birth, however, derives its force sometimes from place, and sometimes from parentage; but, in general, place is the most certain criterion; it is what applies in the United States ...." James Madison, explaining the citizenship eligibility of Representative-elect William Smith, in the election contest of Ramsay v. Smith, 1st Cong., 1st Sess. (1789), in Clarke and Hall, CASES OF CONTESTED ELECTIONS IN CONGRESS, FROM THE YEAR 1789 TO 1834, INCLUSIVE, at p. 33 (Washington 1834).

[112] Rogers v. Bellei, 401 U.S. 815, 828 (1971).

[113] Miller v. Albright, 523 U.S. 420, 434, n.11 (1998). The "common" understanding of the term "natural born" citizen during the revolutionary period, the time of the drafting of the Constitution, and in the generation after, was clearly that of one who was a citizen "at birth," and the determining factor in the United States was the place of birth in the territory of the United States, rather than that of ancestry, lineage, or descent, except as provided in statute. This common understanding has continued up until this day as the term "natural born" citizen has entered the popular, "common" (continued...)

# Citizenship at Birth: Case Law and Interpretations

The overwhelming evidence of historical intent, general understandings, and common law principles underlying American jurisprudence thus indicate that the most reasonable interpretation of "natural born" citizens would include those who are considered U.S. citizens "at birth" or "by birth," either by the operation of the strict "common law" of *jus soli* derived from English common law (physically born in the United States and subject to its jurisdiction, without reference to parentage or lineage), or under existing federal *statutory* law incorporating long-standing concepts of *jus sanguinis*, the law of descent, including those born abroad of U.S. citizen-parents. This general historical understanding and interpretation is supported, as well, by specific federal case law in the United States, and in official legal opinions of U.S. officers.

Although the Supreme Court has not needed to rule specifically on the presidential eligibility clause, as discussed in more detail below, numerous federal cases, as well as state cases, for more than a century have used the term "natural born citizen" to describe a person born in this country and under its jurisdiction, even to parents who were aliens in the U.S.[114] Additionally, several Supreme Court cases, as well as numerous constitutional scholars, have used the term "native born" citizen to indicate all of those children physically born in the country (and subject to its jurisdiction), without reference to parentage or lineage, and employed such term in reference to those citizens eligible to be President under the "natural born" citizenship clause, as opposed to "naturalized" citizens, who are not.[115] In no currently controlling legal opinion in American jurisprudence has the citizenship or nationality of one's parents or forebears been considered a determining factor in the eligibility of a *native born U.S. citizen* to be President, and no holding in any case in federal court has ever established a "two citizen-parent" requirement, or other requirement of lineage or bloodline, for a native born U.S. citizen to be eligible for the Presidency.

---

(...continued)

legal lexicon as defined as: "A citizen by birth, as distinguished from a citizen who has been naturalized." BALLENTINE'S LAW DICTIONARY, at 831 ("natural-born citizen") (3rd ed. 1969), and as "A person born within the jurisdiction of a national government," BLACK'S LAW DICTIONARY, at 278 ("natural-born citizen") (9th ed. 2009), as well as the common dictionary meanings of "natural-born," as "having a specified status or character by birth" (note specific reference to presidential eligibility), WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED, at p. 1507 (1976). It may also be noted that the English word "natural," according to the OXFORD ENGLISH DICTIONARY, is rooted in the "Middle English (in the sense 'having a certain status *by birth*') ...." Emphasis added.

[114] Lynch v. Clarke, 3 N.Y. Leg. Obs. 236 (1 Sand. ch. 583) (1844 ); United States v. Rhodes, 27 Fed. Case 785 (No. 16151) (C.C. Ky. 1866); In re Look Tin Sing, 21 F. 905, 906 (Cal. Cir. 1884); Town of New Hartford v. Town of Canaan, 5 A. 360 (Conn. 1886); United States v. Wong Kim Ark, 169 U.S. 649, 662-63, 674-75 (1898); Kwok Jan Fat v. White, 253 U.S. 454, 457 (1920); Dos Reis *ex rel.* Camara, 68 F.Supp. 773, 774 (D.Mass. 1946); Yamauchi v. Rogers, 181 F. Supp. 934, 935-936 (D.D.C. 1960); Diaz-Salazar v. INS, 700 F.2d 1156, 1160 (7th Cir. 1982), *cert. denied*, 462 U.S. 1132 (1983); Mustata v. U.S. Department of Justice, 179 F.3d 1017, 1019 (6th Cir. 1999); Hollander v. McCain, 566 F.Supp.2d 63, 66 (D.N.H. 2008); Ankeny v. Governor of the State of Indiana, 916 NE2d 678, 688 (2009), *pet. to transfer jur. den.* (Ind. Supreme Court, Apr. 5, 2010).

[115] Luria v. United States, 231 U.S. 9, 22 (1913); United States v. Schwimmer, 279 U.S. 644, 649 (1929); United States v. MacIntosh, 283 U.S. 605 (1931); Schneider v. Rusk, 377 U.S. 163, 165 (1963); Kent, COMMENTARIES ON AMERICAN LAW, at 273 (Vol. I, 2d ed. 1832); Story, A FAMILIAR EXPOSITION OF THE CONSTITUTION OF THE UNITED STATES, § 271, at 167 (Boston 1840); St. George Tucker, William Blackstone, BLACKSTONE'S COMMENTARIES: WITH NOTES AND REFERENCE TO THE CONSTITUTION AND LAWS, OF THE FEDERAL GOVERNMENT OF THE UNITED STATES AND OF THE COMMONWEALTH OF VIRGINIA, Vol. I, App. at 323 (Philadelphia 1803); Gordon, Mailman, & Yale-Loehr, IMMIGRATION LAW AND PROCEDURE, Vol. 7, §§ 91.02[4][a] and § 91.02[4][c] (rev. ed. 2010).

Some of the legal arguments based on American jurisprudence forwarded by those who support an alternate and highly exclusionary reading of the term "natural born" citizen (including reading into the Constitution a requirement for one to have two U.S. citizen-parents) often begin with a citation to language in the 1857 *Dred Scott* decision, *Scott v. Sandford*.[116] The *Dred Scott* decision, in addition to denying that even freed slaves or their progeny could be "citizens" of the United States (and thus finding that the specific petitioner in that case did not have the capacity to bring the original suit under consideration), attempted to provide legal justification under the Constitution for human slavery in the United States and the resultant treatment of "negroes of the African race" as property and chattel without rights under the Constitution. In so doing, the Court fashioned a very exclusive understanding, eventually rejected and overturned by later Supreme Court decisions, of who were "citizens" of the United States, even if one were born to *emancipated* slaves in this country. The opinion of the Court, written by Chief Justice Taney, noted that the status of those "whose ancestors were negroes of the African race … imported into this country, and sold and held as slaves" was that of non-citizens.[117] That is, that even "descendants of such slaves, when they shall be emancipated, or who had been born of parents who had become free before their birth" were "not intended to be included, under the word 'citizens' in the Constitution, and can therefore claim none of the rights and privileges which that instrument provides…."[118] The Court based such findings regarding citizenship and ancestry on the opinion that such persons did not make up, and were not thought to be part of the community or the "political body" of the "sovereign people" of the United States who ratified the Constitution, and were thus not "a constituent member of this sovereignty" since "they were at that time considered as a subordinate and inferior class of beings, who had been subjugated by the dominant race, and, whether emancipated or not, yet remained subject to their authority for, and had no rights or privileges but such as those who held the power and the Government might choose to grant them."[119]

In a *concurring* opinion in *Scott v. Sandford* , one Justice cited to Vattel's discussion of citizenship and "natural born" citizen (as later interpretations into English had expressed the French usage in his treatise, *Law of Nations*), not specifically with regard or intent to define "natural born" citizenship in reference to presidential eligibility, but rather to support his opinion that Negroes brought to America as slaves, as well as their progeny, could not be citizens of the United States.[120] It should be noted that this particular opinion was not only a concurring opinion, not joined by any other Justice in the *Dred Scott* decision, but that such concurrence by Justice Daniel has never formed the basis or authority for *any* majority ruling of a federal court in the history of American jurisprudence.[121] Similar to the opinion of the Court, Justice Daniels' opinion has been superseded and controverted by later Supreme Court rulings and constitutional amendments.

---

[116] Scott v. Sandford, 60 U.S. (19 Howard) 393 (1857).

[117] 60 U.S. at 403.

[118] 60 U.S. at 403-404.

[119] 60 U.S. at 404-405. The Court also found that the Congress had exceeded its authority in outlawing slavery in new territories that the United States had acquired, giving a very narrow and restrictive reading of the express constitutional authority of Congress over federal lands (Article IV, Sec. 3, cl. 2) to cover only those lands owned at the time of the drafting of the Constitution, and not those subsequently acquired from foreign nations. 60 U.S. at 432.

[120] 60 U.S. at 476-477, Daniel, J., concurring.

[121] A somewhat parallel, restrictive argument (and reference to de Vattel) was put forth again later in the 1800's in the *minority* opinion in *Wong Kim Ark*, 169 U.S. at 708 (Fuller, C.J., Harlan, J., dissenting) but, as noted, has never since formed the basis of a majority opinion or any controlling precedent in American jurisprudence.

It is general knowledge that the *Dred Scott* decision has widely and commonly been described as the "worst" and most vilified Supreme Court decision in the history of the United States.[122] The ruling in that case, not only because of the enactment of the Thirteenth, Fourteenth, and Fifteenth Amendments, but also because of its specious constitutional and legal reasoning,[123] has been reduced to an "historical curiosity."[124] As explained by historian and professor James Kettner in his work, *The Development of American Citizenship, 1608-1870*:

> In seeking to derive consistent exclusionist principles from an ambivalent legal tradition, Taney could only succeed by distorting history and making "bad law." ... In making national citizenship exclusively the effect of naturalization or pedigree, he disregarded *volumes of judicial precedents emphasizing place of birth without regard to ancestry*. Taney's opinion rested instead on the social fact of prejudice and discrimination.[125]

Within a few years of the *Dred Scott* decision, in 1862, the Attorney General of the United States, Edward Bates, issued a formal legal opinion to a federal department on the question of "citizenship" of those born within the geographic boundaries of the United States which clearly demonstrated the weakness in the legal reasoning of the Court in *Dred Scott*.[126] This opinion is significant because it preceded the adoption of the Fourteenth Amendment, and was thus based on the then-existing state of the law, constitutional precepts, and common law principles derived from English law, and clearly expressed the legal and constitutional reasoning concerning "citizenship" in the United States underlying previous federal court precedent (other than and ignored by the majority in *Dred Scott*) as well as the foundational principles in subsequent Supreme Court determinations over the next 150 years. The formal opinion of the Attorney General concluded that those who were "natural born" citizens were those who were U.S. citizens "by birth":

> We have *natural-born* citizens, (Constitution, article 2, sec. [1],) not made by law or otherwise, but *born*. And this class is the large majority; in fact, the mass of our citizens, for all others are exceptions specially provided for by law. As they became citizens in the natural way, *by birth*, so they remain citizens during their natural lives, unless, by their own

---

[122] United States, National Archives and Records Administration, http://www.ourdocuments.gov: "The decision of *Scott v. Sandford*, considered by legal scholars to be the worst ever rendered by the Supreme Court …"; David Savage, *How Did They Get It So Wrong?* ABA JOURNAL, January 1, 2009: "… the worst decisions of the U.S. Supreme Court? Historians and court scholars agree on a pair of 19th century opinions: *Dred Scott v. Sandford*, the 1857 ruling that upheld slavery even in the free states …."; Paul Finkelman, DRED SCOTT V. SANDFORD: A BRIEF HISTORY WITH DOCUMENTS, at pp. 4-5, citing, among others for the proposition that the case is the worst Supreme Court decision, Justice Antonin Scalia, Professor Alexander Bickel of Yale Law School, Chief Justice Charles Evans Hughes; Justice Felix Frankfurter; and Justice John Marshall Harlan; Junius P. Rodriguez (editor), SLAVERY IN THE UNITED STATES: A SOCIAL, POLITICAL, AND HISTORICAL ENCYCLOPEDIA, p. 265 (2007): "Universally condemned as the U.S. Supreme Court's worst decision …"; Corinne J. Naden and Rose Blue, DRED SCOTT: PERSON OR PROPERTY, at p. 111 (2005): "Part of the legacy of Scott v. Sandford is that it is generally regarded as the worst decision ever handed down by the Supreme Court and the worst failure of the U.S. judicial system"; Lawrence Baum (Ohio State University), Perspectives on Politics, Cambridge Journal On Line, Cambridge University Press, Vol. 5, No. 2, at p. 338 (June 2007): "Scott v. Sandford (1857), the Dred Scott decision, is the consensus choice as the worst decision in the Supreme Court's history."

[123] Robert Bork, THE TEMPTING OF AMERICA, p. 28 (1990): "Speaking only of the constitutional legitimacy of the decision, and not of its morality, this case remained unchallenged as the worst in our history …."

[124] CONSTITUTION ANNOTATED, S. Doc. 108-17, at 362.

[125] Kettner, THE DEVELOPMENT OF AMERICAN CITIZENSHIP, 1608-1870, at 328 (U.N.C. Press 1978). Emphasis added.

[126] The Attorney General of the United States has the express statutory authority to issue official legal opinions to the departments and agencies of the federal government. Judiciary Act of 1789, Section 35, 1 Stat. 73 (September 24, 1789), see now 28 U.S.C. § 512.

---

> voluntary act, they expatriate themselves, and become citizens of another nation. For we
> have no law, (as the French have,) to *decitizenize* a citizen who has become such either by
> the natural process of birth, or by the legal process of adoption.... The Constitution itself does
> not *make* the citizens; it is, in fact, made by them. It only intends and recognizes such of
> them as were natural—home-born; and provides for the *naturalization* of such of them as were
> alien—foreign born ....
>
> As far as I know, Mr. Secretary, you and I have no better title to the citizenship which we
> enjoy than the "accident at birth"—the fact that we happened to be born in the United States.
> And our Constitution, in speaking of *natural-born citizens*, uses no affirmative language to
> make them such, but only recognizes and reaffirms the universal principle ... that the people
> born in a country do constitute the nation, and, as individuals, are *natural* members of the
> body politic....[I]t follows that every person born in the country is, at the moment of birth,
> *prima facie* a citizen; and he who would deny it must take upon himself the burden of
> proving some great disfranchisement strong enough to override the "*natural-born*" right as
> recognized by the Constitution ... That *nativity* furnishes the rule, both of duty and of right as
> between the individual and the government, is a historical and political truth ... Nevertheless,
> for the satisfaction of those who may have doubts upon the subject, I note a few books,
> which, I think, cannot fail to remove all such doubts: Kent's Com., vol. 2, part 4, section 25;
> Bl. Com., book 1, chapter 10, p. 365; 7 Co. Rep., Calvin's case; 4 Term Rep., p. 300, Doe *vs.*
> Jones; 3 Pet.Rep., p. 246; Shanks *vs.* Dupont; and see a very learned treatise, attributed to
> Mr. Binney, in Am. Law reporter, 193. [127]

The Attorney General thus opined that those who are "born" citizens of the United States, as
opposed to those who are "aliens" and must go through the legal process of naturalization, are
"natural born" citizens of this country, without any reference to the "citizenship" or nationality of
their parents. The Attorney General's opinion emphasized that these "natural born" citizens, those
who are citizens of the United States at birth or "by birth," including "every person" who is
"home born," are not within a very narrow or special category, but rather are "the mass of our
citizens." In an earlier formal opinion from Attorney General Bates to Secretary of State Seward,
the Attorney General similarly concluded: "I am quite clear in the opinion that children born in
the United States of alien parents, who have never been naturalized, are native-born citizens of
the United States, and, of course, do not require the formality of naturalization to entitle them to
the rights and privileges of such citizenship."[128]

The Supreme Court itself soon began to question, re-evaluate, and move away from the legal
reasoning underlying the *Dred Scott* decision. In one early Supreme Court case after *Dred Scott*,
the Court narrowly applied the earlier theory of citizenship in *Dred Scott* (as being only the
original community of people who ratified the Constitution and their progeny),[129] and relied
instead on the *common law* to discuss the concept of citizenship in the United States after the
original generation of citizens. The Court noted that those children born on the soil of the United
States to citizen-parents would clearly be among those who are "natural born" citizens under the
common law, but did *not* rule or hold that such category of citizenship was *exclusive* to such
children.[130] The Supreme Court in *Minor v. Happersett*, in ruling in 1875 that women did *not* have
the constitutional right to vote in federal or state elections (as a privilege or immunity of
citizenship), raised and discussed the question in *dicta* as to whether one would be a "natural

---

[127] 10 OP. ATTY. GEN. 382, 389, 394-395 (November 29, 1862). Emphasis in original.

[128] 10 OP. ATTY. GEN. 328 (September 1, 1862).

[129] Minor v. Happersett, 88 U.S. 162, 166-167 (1875).

[130] *Id.* at 167-168.

born" citizen if born to only one citizen-parent or to no citizen-parents, noting specifically that "some authorities" hold so. The Court, however, expressly declined to rule on that subject in this particular case. In *dicta*, that is, in a discussion not directly relevant to or part of the holding in the case, the Court explained:

> The Constitution does not, in words, say who shall be natural-born citizens. Resort must be had elsewhere to ascertain that. At common-law, with the nomenclature of which the framers of the Constitution were familiar, it was never doubted that all children born in a country of parents who were its citizens became themselves, upon their birth, citizens also. These were natives, or natural-born citizens, as distinguished from aliens or foreigners. *Some authorities go further and include as citizens children born within the jurisdiction without reference to the citizenship of their parents.* As to this class there have been doubts, but never as to the first. *For the purposes of this case it is not necessary to solve these doubts.* It is sufficient for everything we have now to consider that all children born of citizen parents within the jurisdiction are themselves citizens.[131]

Those issues or "doubts" raised in *dicta* by the Supreme Court in *Happersett* in 1875 were, however, answered by the Supreme Court in a later decision in 1898, in *United States v. Wong Kim Ark*, which clearly repudiated the narrow and exclusive "original-community-of-citizens" reasoning of the Court in *Dred Scott* based on lineage and parentage, in favor of interpreting the Constitution in light of the language and principles of the British common law from which the concept was derived. The majority opinion of the Court clearly found, by any fair reading of its reasoning, discussion, and holding, that every person born in the United States and subject to its jurisdiction (that is, not the child of foreign diplomats or of troops in hostile occupation), regardless of the citizenship of one's parents, is a "natural born" citizen, and that the Fourteenth Amendment merely *affirmed* the common law and fundamental rule in this country that one born on the soil of the United States and subject to its jurisdiction is a "natural born" citizen:

> The Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children born here of resident aliens, with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes. The Amendment, in clear words and manifest intent, includes the children born, within the territory of the United States, of all other persons, of whatever race or color, domiciled within the United States. Every citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States. His allegiance to the United States is direct and immediate, and although but local and temporary, continuing only so long as he remains within our territory, is yet, in the words of Lord Coke, in Calvin's Case, 7 Rep. 6a, "strong enough to make a natural subject, for if he hath issue here, that issue is a natural born subject"; and his child, as said by Mr. Binney in his essay before quoted, "if born in the country, is as much a citizen as the natural-born child of a citizen, and by operation of the same principle."[132]

---

[131] Minor v. Happersett, at 167-168. Emphasis added. Any analysis of the distinction between "holding" and *dicta* is simplified in *Minor v. Happersett*, as the Supreme Court *expressly* explained that "For the purposes of this case it is not necessary to solve" the issue of parental citizenship, thus clearly stating that its discussion was not part of, and the resolution of the issue not necessary to, the underlying holding or ruling of that case.

[132] 169 U.S. at 693. The Court also found in this case that those who are "subject to the jurisdiction" of the United States means those who come within the jurisdiction of its laws, such that jurisdiction may be exercised over them, thus (continued...)

The Supreme Court in *Wong Kim Ark* cited with approval to an earlier decision of a federal circuit court, written by Supreme Court Justice Swayne sitting on circuit, explaining that

> All persons born in the allegiance of the King are natural-born subjects, and all persons born in the allegiance of the United States are natural born citizens. Birth and allegiance go together. Such is the rule of the common law, and it is the common law of this country, as well as in England.... We find no warrant for the opinion that this great principle of the common law has ever been changed in the United States. It has always obtained here with the same vigor, and subject to the same exceptions, since before the Revolution.[133]

The underlying opinions and reasoning of the Attorney General in 1862 (citing the historical intent, understanding, and common law principles relating to citizenship), the federal appellate court opinion written by Supreme Court Justice Swayne in 1866, and the detailed discussion of citizenship and the holding by the Supreme Court in *Wong Kim Ark* in 1898, citing to judicial precedents such as *The Charming Betsey* (1804); *Inglis v. Sailor's Snug Harbor* (1830), *McCreery v. Somerville* (1824), and *Lynch v. Clarke* (1844), have been regularly confirmed and supported by later Supreme Court and other federal court decisions finding that the *two* general categories of "citizens" are: (1) those who are "natural born" citizens, that is, those who are citizens "by birth" or "at birth," including all native born citizens, and (2) those who were born "aliens" and must be "naturalized" to be citizens.[134] As explained by the Supreme Court in 1998:

> There are "two sources of citizenship, and two only: birth and naturalization." *United States v. Wong Kim Ark*, 169 U.S. 649, 702 (1898). Within the former category, the Fourteenth Amendment of the Constitution guarantees that every person "born in the United States, subject to the jurisdiction thereof, becomes at once a citizen of the United States, and needs no naturalization." 169 U.S. at 702. Persons not born in the United States acquire citizenship by birth only as provided by Acts of Congress. *Id.* at 703.[135]

The interpretation that one who obtains "citizenship by birth" is a "natural born" citizen eligible to be President, as distinguished from one who derives "citizenship by naturalization" and who is not so eligible, was discussed by the Supreme Court as early as 1884:

> The distinction between *citizenship by birth* and *citizenship by naturalization* is clearly marked in the provisions of the Constitution, by which "no person, except a natural-born citizen, or a citizen of the United States at the time of the adoption of this Constitution, shall

---

(...continued)

clarifying some confusion that might have arisen from *dicta* in an earlier Supreme Court case (*The Slaughterhouse Cases*, 16 Wall. (83 U.S.) 36, 73 (1874)). 169 U.S. at 687, 693.

[133] 169 U.S. at 662-663, citing *United States v. Rhodes*, 27 Fed. Case 785 (No. 16151) (C.C. Ky. 1866).

[134] *Elk v. Wilkins*, 112 U.S. 94, 101 (1884); *Luria v. United States*, 231 U.S. 9, 22 (1913); *Rogers v. Bellei*, 401 U.S. 815, 828 (1971); *Schneider v. Rusk*, 377 U.S. 163, 165 (1963); *MacIntosh v. United States*, 42 F.2d 845, 848 (2nd Cir. 1930); *Diaz-Salazar v. INS*, 700 F.2d 1156, 1160 (7th Cir. 1982), *cert. den.* 462 U.S. 1132 (1983); *Mustata v. U.S. Department of Justice*, 179 F.3d 1017,1019 (6th Cir. 1999); *Robinson v. Bowen*, 567 F.Supp. 1144, 1145-1146 (ND Cal. 2008); *Hollander v. McCain*, 566 F.Supp. 63, 66 (D.N.H 2008); note also state court in Ankeny v. Governor of the State of Indiana, 916 NE2d 678 (2009), *petition to transfer jurisdiction denied* (Ind. Supreme Court, Apr. 5, 2010).

[135] *Miller v. Albright*, 523 U.S. 420, 423-424 (1998). See also Scalia, J. and Thomas, J., concurring: "The Constitution 'contemplates two sources of citizenship, and two only: birth and naturalization.'" When one is born "in" the United States and "subject to the jurisdiction" of the United States that person becomes a citizen "at birth," that is, "becomes at once a citizen of the United States, and needs no naturalization." 523 U.S. at 461, citing *Wong Kim Ark*, 169 U.S. at 702.

be eligible to the office of President;" and "the Congress shall have the power to establish an uniform rule of naturalization." Constitution, art. 2, sect. 1; art. 1, sect. 8.[136]

The federal courts have on numerous occasions examined those *two* categories of citizens of the United States—"natural born" citizens (those who are citizens "by birth"), and "naturalized" citizens (those who are born "aliens" and who must go through the process of "naturalization")—in the context of the various rights and duties of such citizens within these two categories. The Court has thus explained that "eligibility to the Presidency" is one of the very few "rights and prerogatives of citizenship *obtained by birth in this country*" which is not available to a "naturalized" citizen.[137] Similarly, the Court has noted: "The *naturalized* citizen has as much right as the *natural-born* citizen to exercise the cherished freedoms of speech, press and religion....";[138] and the Court has examined the right of New York to require its "class of civil servants to be citizens, either natural born or naturalized."[139] The United States Court of Appeals for the 9th Circuit more recently explained that "once *naturalized* [appellant] is afforded precisely the same protection of his right to associate as is a *natural born* citizen."[140] Referring specifically to eligibility to the office of President, a United States Court of Appeals found:

> No more is demanded of an *alien* who becomes a citizen than a *natural-born* citizen, and, when an alien becomes a citizen, he is accorded all the rights and privileges afforded to a *natural-born* citizen except eligibility to the presidency.[141]

It should be noted that numerous constitutional scholars and commentators have used the term "native born" or "native citizen" in a manner which might in some contexts be considered synonymous with "natural born," to indicate a U.S. citizenship from birth in relation to Presidential eligibility, and to distinguish such eligibility from one who is a "naturalized" citizen. James Kent, for example, in his *Commentaries on American Law*, explained: "As the President is required to be a native citizen of the United States, ambitious foreigners can not intrigue for the office, and the qualification of birth cuts off all those inducements from abroad to corruption, negotiation, and war...."[142] Similarly, Justice Joseph Story used the term "native citizen" in a treatise on the Constitution: "It is not too much to say that no one but a native citizen, ought ordinarily to be entrusted to an office so vital to the safety and liberties of the people."[143] As noted

---

[136] Elk v. Wilkins, 112 U.S. 94, 101 (1884). Emphasis added.

[137] Knauer v. United States, 328 U.S. 654, 658 (1946) (emphasis added): "Citizenship obtained through naturalization is not a second-class citizenship. It has been said that citizenship carries with it all the rights and prerogatives of citizenship obtained by birth in this country 'save that of eligibility to the Presidency.'"

[138] Baumgartner v. United States, 322 U.S. 665, 680 (1944) (emphasis added). The Court also noted there: "Under our Constitution, a naturalized citizen stands on equal footing with the *native citizen* in all respects save that of eligibility to the Presidency." *Id.* at 673.

[139] Sugarman v. Dougall, 413 U.S. 634, 661 (1973) (Rehnquist, J., dissenting, as to whether such distinction between citizens and aliens in New York's civil service law violates equal protection clause).

[140] Price v. United States Immigration and Naturalization Service, 941 F.2d 878, 884-885 (9th Cir. 1991). Note also Justices Rutledge and Murphy concurring in a case concerning denaturalization, comparing the rights of a "natural-born citizen [to] his birthright" citizenship and the rights of "naturalized" citizens. Klapprott v. United States, 335 U.S. 601, 617 (1949).

[141] MacIntosh v. United States, 42 F.2d 845, 848 (2nd Cir. 1930), *reversed on other grounds*, United States v. MacIntosh, 283 U.S. 605 (1931). The Supreme Court, in the appeal of this case, similarly found: "The alien, when he becomes a naturalized citizen, acquires, with one exception, every right possessed under the Constitution by those citizens who are native born." 283 U.S. at 623-624.

[142] Kent, Commentaries on American law, at 273 (Vol. I, 2d ed. 1832).

[143] Story, A Familiar Exposition of the Constitution of the United States, § 271, at 167 (Boston 1840).

in the legal treatise from1803 by the noted legal scholar St. George Tucker, editing Blackstone's works and placing them in an American context: "That provision of the Constitution that requires that the President be a native-born citizen (unless he were a citizen of the United States when the Constitution was adopted) is a happy means of securing against foreign influence...."[144]

Although the term "native born" citizen or "native citizen" was seemingly used synonymously with "natural born" in reference to presidential eligibility by such noted constitutional scholars, it is most often not necessarily considered a specific term of art in a legal sense, does not appear in the Constitution, and generally means, in common usage with respect to U.S. citizenship, anyone born physically within the geographic boundaries of the United States, without reference to the citizenship of one's parents. In one of the most extensive and widely respected multi-volume treatises on immigration and naturalization laws, *Immigration Law and Procedure*, the authors discuss the meaning of the term "native-born":

> **[a] Native-Born Citizens**
>
> This is by far the largest group of U.S. citizens, and their status is *acquired simply through birth in the United States*, as described in Chapter 92 below. The Constitution does not refer to native-born citizens, although it does mention natural-born citizens. Nor does this term appear in the statute, which includes the native born among various categories who acquire citizenship at birth. However, the designation of the native born is an accurate and convenient one, generally used in colloquial and legal discussions.[145]

Under common, modern understanding and later Supreme Court explanations, "natural born" citizens would include "native born" U.S. citizens, that is, those born physically within the borders of the country, but might also include others whose citizenships were "obtained by birth" in other ways. The Supreme Court of the United States has on several occasions also used the terminology "native born" citizens or "native" citizens to distinguish such citizenship "at birth" from those who have obtained U.S. citizenship through "naturalization." Even considering that the Court was using the terms in a narrow sense, and putting aside for the moment the issue of children born abroad of U.S. citizens, it is clear that the Supreme Court in these instances indicated that, at the least, *all* of those persons obtaining citizenship by birth within the geographic area of the United States (i.e., "native born" citizens) were eligible for the presidency (as being within the category of "natural born" citizens), as opposed to "naturalized" citizens. In *Schneider v. Rusk,* the Supreme Court appeared to use the term "native born" as synonymous and interchangeable with the term "natural born" in referencing those citizens eligible for the presidency, as opposed to "naturalized" citizens who are not eligible:

> We start with the premise that the rights of citizenship of the native born and of the naturalized person are of the same dignity and are coextensive. The only difference drawn by the Constitution is that only the "natural born" citizen is eligible to be President. Art. II, § 1.[146]

---

[144] St. George Tucker, William Blackstone, BLACKSTONE'S COMMENTARIES: WITH NOTES AND REFERENCE TO THE CONSTITUTION AND LAWS, OF THE FEDERAL GOVERNMENT OF THE UNITED STATES AND OF THE COMMONWEALTH OF VIRGINIA, Vol. I, App. at 323 (Philadelphia 1803).

[145] Gordon, Mailman, & Yale-Loehr, IMMIGRATION LAW AND PROCEDURE, Vol. 7, § 91.02[4][a] (rev. ed. 2010). Emphasis added. *See also* United States v. Wong Kim Ark, 169 U.S. at 674-675.

[146] 377 U.S. 163, 165 (1963).

A similar distinction between "naturalized" citizens who are not eligible to the Presidency, and those who are "native" citizens (that is, those who are citizens by birth in the country) who are eligible was made in the earlier Supreme Court case of *Luria v. United States*:

> Citizenship is membership in a political society, and implies a duty of allegiance on the part of the member and a duty of protection on the part of society. These are reciprocal obligations, one being a compensation for the other. Under our Constitution, a naturalized citizen stands on an equal footing with the native citizen in all respects save that of eligibility to the Presidency.[147]

The Supreme Court in 1929, in *United States v. Schwimmer*, had stated in a similar manner that "Except for eligibility to the Presidency, naturalized citizens stand on the same footing as do native born citizens,"[148] and noted again in 1931 that, "The alien, when he becomes a naturalized citizen, acquires, with one exception, every right possessed under the Constitution by those citizens who are native born."[149]

Although a small faction of advocates now apparently attempt to cast doubt as to whether every native born U.S. citizen is a "natural born" citizen under the Constitution, all doubt in the judicial arena has been resolved for more than a century in favor of "natural born" status of such individuals who are citizens "by birth" or "at birth" (as having been born in and under the jurisdiction of the United States). As discussed in more detail in the following section of this report, there have been some legitimate legal arguments and varying opinions about the status of *foreign* born children of U.S. citizens as being either "natural born" citizens under common law principles, or citizens who are "naturalized" by statute. There appears, however, to be no legitimate legal issue outstanding concerning the eligibility of all native born citizens of the United States to be President. The case law in the United States, as well as the clear historical record, does *not* support the argument or contention that there is some further or additional "subcategory" of "citizen" of the United States who, although *native born* and subject to the jurisdiction of the United States, is neither a "natural born" citizen *nor* a "naturalized" citizen.[150] Rather, as the cases discussed above demonstrate, the categories uniformly recognized and referred to in case law in the United States as "citizens" of the United States are "natural born" citizens (including all "native born" citizens), that is, those who are citizens "at birth," as opposed to "naturalized" citizens, that is, those who are aliens at birth and must go through naturalization to become citizens.

---

[147] 231 U.S. 9, 22 (1913). This case cites further to *Osborn v. United States Bank*, 9 Wheat. (22 U.S.) 737, 827 (1824), in which Chief Justice Marshall noted the distinctions between a "naturalized citizen" and a "native citizen," noting that the "naturalized citizen … becomes a member of the society, possessing all the rights of a native citizen …. He is distinguishable in nothing from a native citizen, except so far as the constitution makes the distinction …."

[148] United States v. Schwimmer, 279 U.S. 644, 649 (1929).

[149] United States v. MacIntosh, 283 U.S. 605, 623-624 (1931).

[150] As to the possibility of the rather unique argument that native born U.S. citizens, born within the United States to non-citizen parents, could be somehow considered "naturalized" citizens, the Supreme Court cases noted immediately above, clearly repudiate that notion by distinguishing native born citizens from naturalized citizens. As explained by the Supreme Court in *Miller v. Albright*, 523 U.S. 420, 423-424 (1998), every person "born in the United States, subject to the jurisdiction thereof, becomes at once a citizen of the United States, and needs no naturalization."

## Legal Cases and Senator McCain

During the 2008 presidential campaign between Senators McCain and Obama, several lawsuits were initiated challenging the "natural born" citizenship eligibility of Senator McCain who was not born "in" the United States, but rather in the Panama Canal Zone in 1936. Because the *place* of birth is the concept that principally and traditionally governs common law natural born citizenship in the United States,[151] questions have arisen as to whether those born outside of the geographic boundaries of the United States to U.S. citizen-parents, and who thus are citizens at birth by descent, should also be considered "natural born" citizens eligible to be President. The legal and historical questions were summarized in the treatise *Immigration Law and Procedure*:

> **[c] Natural-Born Citizens**
>
> Under the Constitution, only "natural born" citizens are eligible to become President or Vice President of the United States. The Constitution nowhere defines this term, and its precise meaning is still uncertain. *It is clear enough that native-born citizens are eligible and that naturalized citizens are not. The doubts relate to those who acquire U.S. citizenship by descent, at birth abroad to U.S. citizens.*
>
> "Natural born citizen" is an archaic term, derived from ancient British antecedents. Other than its use in the Presidential Qualifications Clause, its only other use was in the provision for citizens by descent in the naturalization statute enacted by the first Congress in 1790.
>
> The uncertainty concerning the meaning of the natural-born qualification in the Constitution has provoked discussion from time to time, particularly when the possible presidential candidacy of citizens born abroad was under consideration. There has never been any authoritative adjudication. It is possible that none may ever develop. However, there is substantial basis for concluding that the constitutional reference to a natural-born citizen includes every person who was born a citizen, including native-born citizens and citizens by descent.[152]

It has been noted by certain proponents of a narrow interpretation of natural born citizen (to include only those born *in* the United States) that the Fourteenth Amendment now clearly provides that a U.S. citizen is one who is either "born or naturalized in the United States." Under such reasoning, it is argued that a "citizen" of the United States would be a citizen only or *exclusively* by virtue of either being "born ... in" the United States (under the common law principles of *jus soli* as reflected in the Fourteenth Amendment), or by virtue of being "naturalized" in the United States, which some argue means that one is made a citizen by the operation of statutory law. Earlier federal court cases gave credibility to this version of who would be a native or natural born citizen, as opposed to a "naturalized" citizen. As explained by the Supreme Court in *Wong Kim Ark*:

---

[151] Rogers v. Bellei, 401 U.S. 815, 828 (1971): "We thus have an acknowledgment that our law in this area follows English concepts with an acceptance of the *jus soli*, that is, the place of birth governs citizenship status except as modified by statute"; United States v. Wong Kim Ark, 169 U.S. *supra* at 693: "The Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country ...."; Miller v. Albright, 523 U.S. 420, 434, n.11 (1998): other than as provided by statute "citizenship does not pass by descent"; Lynch v. Clarke, 3 N.Y. Leg. Obs. 236, 243-244 (1 Sand. ch. 583) (1844): "... at the Declaration of Independence, by the law of each and all of the thirteen states, a child born within their territory and ligeance respectively, became thereby a citizen of the state of which he was a native. This continued unchanged to the time when our National Constitution went into full operation"; 10 OP. ATTY. GEN. 382, 394-395 (November 29, 1862).

[152] 7 IMMIGRATION LAW AND PROCEDURE at § 91.02[4][c]. Emphasis added, footnotes omitted.

---

> Every person born in the United States, and subject to the jurisdiction thereof, becomes at once a citizen of the United States, and needs no naturalization. A person born out of the jurisdiction of the United States can only become a citizen by being naturalized, either by treaty, as in the case of annexation of foreign territory, *or by authority of Congress, exercised either by declaring certain classes of persons to be citizens, as in the enactments conferring citizenship upon foreign-born children of citizens*, or by enabling foreigners individually to become citizens by proceedings in the judicial tribunals, as in the ordinary provisions of the naturalization acts.[153]

Under such argument, a person who is born of American parents abroad, although clearly a "citizen" of the United States by law, is one who is not a citizen by virtue of being "born ... *in*" the United States,[154] and *must*, therefore, be one of those citizens who has been "naturalized" by the operation of law, even though such naturalization was "automatic" at birth. It is therefore argued that such citizen should not be considered a "natural born" citizen, but rather a "naturalized" citizen who is not eligible for the Presidency. Some earlier federal cases had, in fact, specifically held that a person who was born abroad of a father who was a naturalized American citizen, and who therefore was a citizen of the United States by virtue of a statutory provision, was himself a "naturalized" American citizen. In *Zimmer v. Acheson*, the United States Court of Appeals for the 10th Circuit found that the appellant, who had been born in Germany to a father who had been a naturalized U.S. citizen, was himself a "naturalized" citizen who could be expatriated under the provisions and requirements of the then-existing federal law:

> There are only two classes of citizens of the United States, native-born citizens and naturalized citizens; and a citizen who did not acquire that status by birth in the United States is a naturalized citizen.

> Revised Statutes § 1993, in force at the time of the birth of Harry Ward Zimmer [appellant], provided: "All children heretofore born or hereafter born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States."

> If Werner Herman Zimmer [the appellant's father], by virtue of his naturalization on October 30, 1896, was a citizen of the United States on August 9, 1905, the date of the birth of Harry Ward Zimmer, then the latter, at the time of his birth, became a citizen of the United States by virtue of the foregoing statute, but his status as a citizen was that of a naturalized citizen and not a native-born citizen.[155]

Those who support a broader, more inclusive reading of the Constitution to include as "natural born" citizens those born abroad to U.S. citizen-parents, note that these earlier decisions were

---

[153] 169 U.S. at 702-703. Emphasis added.

[154] *See, e.g.*, "Insular cases" where the Supreme Court, in another context, found that the phrase "within the United States" means within the geographical limits of the states and the District of Columbia, and in those territories under the jurisdiction of the United States only if they have been "incorporated" into the United States. Downes v. Bidwell, 182 U.S. 244, 250-251 (1901); Balzac v. Porto Rico, 258 U.S. 298, 304-305 (1922). In Rabang et al. v. Immigration and Naturalization Service, 35 F.3d 1449 (9th Cir. 1994), ), *cert. denied, sub nom.* Sanidad v. INS, 515 U.S. 1130 (1995), the Court of Appeals found that those born in the Philippines, at the time it was a United States possession, were *not* citizens at birth merely because of their place of birth since they were not born "in" the geographic United States, regardless of the exercise of American jurisdiction over the territory.

[155] Zimmer v. Acheson, 191 F.2d 209 (10th Cir. 1951). See similar finding in Schaufus v. Attorney General of the United States, 45 F. Supp. 61, 66-67 (D.Md. 1942).

based on the more narrow language of the Fourteenth Amendment, but argue that the Fourteenth Amendment was adopted to rectify the wrongly reasoned and decided Supreme Court decision in the *Dred Scott* case,[156] and was not intended to amend or necessarily even to address the issue of "natural born" citizenship under Article II, Section 1, cl. 5, relating to the eligibility for President.[157] The term "natural born citizen" in Article II, it is argued, should be interpreted not only in light of the later Fourteenth Amendment, and the reasons for adopting the Fourteenth Amendment, but also in light of the common law and common understanding and usage of the term at the time of the adoption of the Constitution.[158]

It has been pointed out that more recent cases have held that the seemingly exclusive language of the Fourteenth Amendment of citizenship being limited only to those who are "born or naturalized in the United States," is applicable only with regard to Fourteenth Amendment first-sentence-citizenship, and is not necessarily the exclusive means of acquiring citizenship "at birth," since the category of "at birth" citizenship can clearly be expanded by law adopted by Congress. Such cases indicate that the Fourteenth Amendment establishes a "floor" for citizenship at birth, or for naturalization, which can be expanded by federal law.[159] The Supreme Court in *Rogers v. Bellei* explained that under the Fourteenth Amendment's citizenship clause the requirement that one would have to be either born in the United States or naturalized in the United States were designations for "Fourteenth-Amendment-first-sentence" citizenship only.[160] The category or designation of citizen "at birth" or "by birth" could, however, as expressly noted by the Court, be expanded and "modified by statute" (as it had been in England with respect to natural born subjects for more than 600 years): "We thus have an acknowledgment that our law in this area follows English concepts with an acceptance of the *jus soli*, that is, the place of birth governs citizenship status except as modified by statute."[161]

It is significant to note that in a more recent case, in 2001, the Supreme Court indicated that under current law and jurisprudence a child born to U.S. citizens while living or traveling abroad, and a child born in the geographic United States, had the same legal status. In *Tuan Anh Nguyen v. INS*,[162] the Court explained that a woman who is a U.S. citizen living abroad and expecting a child could re-enter the United States and have the child born "in" the United States, or could stay

---

[156] Afroyim v. Rusk, 387 U.S. 253, 263 (1967).

[157] The Supreme Court has warned against interpreting later enacted provisions of the Constitution as amending, merely by implication, separate, earlier provisions of Constitution. Freytag v. Commissioner, 501 U.S. 868, 886-887 (1991).

[158] *See, e.g.,* Corwin, THE PRESIDENT, OFFICE AND POWERS, 1787-1984, at 38-39; Gordon, *Who Can Be President of the United States: The Unresolved Enigma,* 28 MD. L. REV. at 12, 18; Michael Nelson, *Constitutional Qualifications for President,* PRESIDENTIAL STUDIES QUARTERLY, Vol. XVII, No. 2, at 396; Gordon, Mailman, & Yale-Loehr, IMMIGRATION LAW AND PROCEDURE, Vol. 7, § 92.03[1][b] (rev. ed. 2000).

[159] Robinson v. Bowen, 567 F.Supp.2d 1144, 1145-1146 (N.D. Cal. 2008), finding Senator McCain, born in the Panama Canal Zone to citizen-parents, eligible for President as a "natural born citizen."

[160] Rogers v. Bellei, 401 U.S. 815, 827 (1971).

[161] 401 U.S. at 828. It does not appear to be a significant argument against such interpretation that Congress could indirectly change by statute (by changing "at birth" citizenship requirements) who is eligible to be President, even though qualifications are "fixed" by the Constitution. The Supreme Court has expressly found that Congress could not change the qualifications for congressional office which were fixed in the Constitution (*Powell v. McCormack,* 395 U.S. 486 (1969)), but since citizenship for seven years (House) or nine years (Senate) is a constitutional qualification, and Congress may certainly change the various statutory requirements for naturalized citizenship, Congress could thus clearly, in effect, change how such qualification is attached in such circumstances. See also Corwin, THE PRESIDENT, OFFICE AND POWERS, 1787-1984, at 38-39, as to the inherent authority and apparent right of the country's national legislature to determine who its natural born citizens should be.

[162] 533 U.S. 53 (2001).

abroad and not travel back to this country and have the child born abroad, and that the child in either case would have the same status as far as U.S. citizenship:

> [T]he statute simply ensures *equivalence* between two expectant mothers who are citizens abroad if one chooses to reenter for the child's birth and the other chooses not to return, or does not have the means to do so.[163]

Concerning the contention made in earlier cases that everyone who is made a citizen only by federal statute is a "naturalized" citizen (even those who are made citizens at birth by statute), it may be noted that the common understanding and usage of the terms "naturalized" and "naturalization," as well as the precise legal meaning under current federal law, now indicate that someone who is a citizen "at birth" is *not* considered to have been "naturalized."[164] Justice Breyer, for example, dissenting on other grounds in *Miller v. Albright*, explained that "this kind of citizenship," that is, under "statutes that confer citizenship 'at birth,'" was not intended to "involve[ ] 'naturalization,'" citing current federal law at 8 U.S.C. § 1101(a)(23).[165] The Supreme Court recently recognized in *Tuan Anh Nguyen v. INS,* that federal law now specifically defines "naturalization" as the "conferring of nationality of a state upon a person *after* birth,"[166] and thus it could be argued that by current definition and understanding in federal law and jurisprudence, one who is entitled to U.S. citizenship automatically "at birth" or "by birth" could not be considered to be "naturalized."

The United States Court of Appeals for the Ninth Circuit has specifically recognized in a recent case that one may be a "natural born" citizen of the United Sates in two ways: either by being born in the United States, or by being born abroad of at least one citizen-parent who has met the residency requirement. In *United States v. Carlos Jesus Marguet-Pillado*, a case dealing with the propriety of an appeal based on requested jury instructions not given, the court stated:

> No one disputes that Marguet-Pillado's requested instruction was "an accurate statement of the law," in that it correctly stated the two circumstances in which an individual born in 1968 is a natural born United States citizen: (1) that the person was born in the United States or (2) born outside the United States to a biologically-related United States citizen parent who met certain residency requirements.[167]

Although the legal cases specifically concerning Senator McCain's eligibility were generally dismissed for want of subject matter jurisdiction (that is, the lack of legal standing of the plaintiff),[168] a federal district court for the Northern District of California did note that Senator McCain would qualify as a citizen "at birth," and thus was a "natural born" citizen, since he was born "out of the limits and jurisdiction of the United States" to U.S. citizen parents, as provided for in federal nationality statutes in force at the time of his birth.[169] The court found that the meaning of the phrase in the nationality statutes in force in 1936 (R.S. § 1993 (1855) and 48 Stat. 797 (1934)), that is, the phrase "born out of the limits and jurisdiction of the United States" to

---

[163] 533 U.S. at 61. Emphasis added.

[164] Miller v. Albright, 523 U.S. at 480 (Breyer, J. dissenting (on other grounds)); *Tuan Anh Nguyen,* 533 U.S. at 72.

[165] Miller v. Albright, 523 U.S. at 480. 8 U.S.C. § 1101(a)(23) now provides: "The term 'naturalization' means the conferring of nationality of a state upon a person after birth, by any means whatsoever."

[166] *Tuan Anh Nguyen,* 533 U.S. at 72 (emphasis added), citing 8 U.S.C. § 1101(a)(23).

[167] United States v. Carlos Jesus Marguet-Pillado, 648 F.3d 1001, 1006 (9th Cir. 2011).

[168] Hollander v. McCain, 566 F. Supp.2d 63 (D.N.H. 2008); Robinson v. Bowen, 567 F.Supp.2d 1144 (N.D. Cal. 2008).

[169] Robinson v. Bowen, 567 F.Supp.2d at 1146.

citizen parents, was merely the reverse or "converse of the phrase 'in the United States, and subject to the jurisdiction thereof'" appearing in the citizenship provision of the Fourteenth Amendment, and that such phrase thus would include all those born abroad of two U.S. citizen parents, such as Senator McCain:

> Article II states that "No Person except a natural born Citizen, or a Citizen at the time of the Adoption of this Constitution, shall be eligible to the Office of the President." Article II left to Congress the role of defining citizenship, including citizenship by reason of birth. *Rogers v. Bellei,* 401 U.S. 815, 828, 91 S.Ct. 1060, 28 L.Ed.2d 499 (1971). Many decades later, the Fourteenth Amendment set a floor on citizenship, overruled the *Dred Scott* decision, and provided that all born or naturalized in the United States, and subject to the jurisdiction thereof, were citizens by reason of birth (or naturalization proceedings, for that matter). *Id.* at 829-30, 91 S.Ct. 1060.
>
> At the time of Senator's McCain's birth, the pertinent citizenship provision prescribed that "[a]ny child hereafter born out of the limits and jurisdiction of the United States, whose father or mother or both at the time of the birth of such child is a citizen of the United States, is declared to be a citizen of the United States." Act of May 24, 1934, Pub. L. No. 73-250, 48 Stat. 797. The Supreme Court has interpreted the phrase "out of the limits and jurisdiction of the United States" in this statute to be the converse of the phrase "in the United States, and subject to the jurisdiction thereof," in the Fourteenth Amendment, and therefore to encompass all those not granted citizenship directly by the Fourteenth Amendment. [*United States v. Wong Kim Ark,* 169 U.S. 649, 687 (1898) ....] Under this view, Senator McCain was a citizen at birth. In 1937, to remove any doubt as to persons in Senator McCain's circumstances in the Canal Zone, Congress enacted 8 U.S.C. 1403(a), which declared that persons in Senator McCain's circumstances are citizens by virtue of their birth, thereby retroactively rendering Senator McCain a natural born citizen, if he was not one already. This order finds it highly probable, for the purposes of this motion for provisional relief, that Senator McCain is a natural born citizen. Plaintiff has not demonstrated the likelihood of success on the merits necessary to warrant the drastic remedy he seeks. [170]

The federal court in *Robinson v. Bowen* thus implicitly adopted a meaning of the term "natural born" citizen in the presidential eligibility clause which would include not only the narrow "common law" meaning (*jus soli*, being born geographically in the United States without reference to parental citizenship, as codified in the Fourteenth Amendment), but also the *statutory* designation by Congress of one entitled to U.S. citizenship "at birth" or "by birth" even if born abroad when such citizenship is transmitted from one's parent or parents (*jus sanguinis*).

## Legal Cases and President Obama

In addition to the lawsuits concerning Senator McCain's eligibility, there have been several allegations and numerous lawsuits brought challenging the status of President Obama as a "natural born" citizen, based on various theories, assertions, and speculations. These cases have uniformly been summarily dismissed, either because of a lack of jurisdiction of the court—in that the plaintiff or plaintiffs did not have legal standing, or for a failure to state a claim upon which relief could be granted—or because the plaintiff seeking a stay or an injunction against some future event was deemed "not likely to succeed on the merits."[171]

---

[170] Robinson v. Bowen, 567 F.Supp.2d at 1145-1146.

[171] *See,* for example, Berg v. Obama, 574 F.Supp.2d 509 (E.D. Pa. 2008), *aff'd* 586 F.3rd 234 (3rd Cir. 2009), *cert.* (continued...)

Some of the cases concerning President Obama, or the candidate then-Senator Obama, had alleged or speculated that the President was not born in the United States, but rather was born in some foreign country or another.[172] It should be noted that there is currently no requirement under federal law, nor was there under state law in 2008, for any federal candidate, that is, candidates to the U.S. Senate, the House of Representatives, or the office of President, to publish, produce, or release an official "birth certificate."[173] Under the intuitive democratic tradition within the United States, there has never been any federal officer or bureaucracy which acts as a "gatekeeper" controlling who may be a federal candidate.[174] Rather, there is in this country a general legal presumption of eligibility of the adult citizenry to hold political office[175] and, as noted as early as 1875 by former U.S. Court of Appeals Judge, and former Member of Congress (and chairman of the Committee on Elections), George W. McCrary, in his book, *A Treatise on the American Law of Elections*, discussing federal congressional elections, the legal presumption is *always* of eligibility, and thus the initial burden of proof is always upon those who challenge a candidate's eligibility, and not on a candidate to "prove" eligibility:

---

(...continued)

*denied,* 129 S.Ct. 920, *and app. for stay denied,* 129 S.Ct. 1030 (2009); Wrotnowski v. Bysiewicz, Secretary of the State of Connecticut, 958 A.2d 709 (Conn. 2008), *app .for stay denied,* 129 S.Ct. 775 (2008); Donofrio v. Wells (Secretary of State of New Jersey*),* Motion No. AM-0153-08T2, *app. for stay denied,* 129 S.Ct. 752 (2008); Hollister v. Soetoro, 601 F.Supp.2d 179 (D.D.C. 2009); *aff'd* No. 09-5080 (D.C. Cir. 2009), *cert. denied* 562 U.S. ___ (Jan. 18, 2011), *and rehearing denied,* 562 U.S. ___ , No. 10-678 (March 11, 2011); Keyes v. Bowen, Case No. 34-2008-80000096-CU-WM-GDS (Sup. Ct. Cal. March 13, 2009), *appeal denied.,* Ct. of Appeals of Cal., 3rd App. Dist. (C062321, Oct. 25, 2010), *review denied.,* CA Supreme Ct. (Feb. 2, 2011), *cert. denied.,* S.Ct. Docket No. 10-1351 (Oct. 3, 2011); Stamper v. United States, case No. 1:08 CV 2593 (N.D. Ohio 2008); Cohen v. Obama, Civil Action No. 08 2150 (D.D.C. 2008); Barnett, Rhodes, Kerchner v. Obama, 669 F. Supp. 2d 477 (D.N.J 2009), *aff'd* 612 F.3d 204 (3rd Cir. 2010), *cert. denied,* 131 S. Ct. 663 (2010).

[172] The importance to some in arguing that President Obama was born outside of the United States is that, given that the President's father was not a U.S. citizen at the time of the President's birth, the federal laws then, in 1961, would have required for citizenship "at birth" of one born outside of the United States to only *one* citizen-parent, that such citizen-parent have resided in the United States for not less than ten years, at least five of which were after the age of fourteen (8 U.S.C. § 1401(a)(7)) (1958 ed.), a requirement that the President's mother, because of her age, would not have met.

[173] Under state ballot access procedures for presidential electors, candidates or the political parties which nominate candidates for the presidency are generally required under the laws of the various states to certify in writing that the candidate is the nominee of the party and is eligible to the office. U.S. Senate, Committee on Rules and Administration, *Nomination and Election of the President and Vice President of the United States, 2008,* S. Doc. 111-15, at 269-343 (survey of state laws regarding selecting delegates to the national nominating conventions), and 347-428 ("Summary of State Laws Relating to Presidential Electors") (2010).

[174] See, e.g., Federal Election Commission, Advisory Opinion 2011-15, September 2, 2011. The so-called "vetting" of a candidate for *elected* federal office conducted by a federal bureaucracy or official as a prerequisite to run for office is alien to and unknown in the American democratic tradition. "Vetting" of candidates under the open democratic process and tradition in this country is a multi-step, and often grueling public process of meeting state ballot access requirements, facing opposition research by contestants for one's own party nomination in primaries, by political opponents from other parties in the general election, and examination by an independent press, media, and the public. See Hollister v. Soetoro, 601 F.Supp. 2d 179, 180 (D.D.C. 2009), *aff'd* 368 Fed. Appx. 154 (D.C. Cir. 2010), *cert. denied,* 131 S.Ct. 1017 (2011); Rhodes v. MacDonald, 670 F.Supp.2d 1363, 1377 (M.D.Ga. 2009), *aff'd,* Rhodes and Taitz v. MacDonald, 368 Fed. Appx. 949 (11th Cir. 2010), *cert. denied,* Taitz v. MacDonald, 131 S.Ct. 918 (2111). The final procedure of counting the electoral votes for President, challenging any electoral votes, and certifying the electoral result is conducted by Congress under the Twelfth Amendment and the procedures of the Electoral Count Act of 1887, 24 Stat. 373, ch. 90, 49th Cong., February 3, 1887. See now 3 U.S.C. §§ 3-21. See generally CRS Report RL32717, *Counting Electoral Votes: An Overview of Procedures at the Joint Session, Including Objections by Members of Congress,* by Jack Maskell and Elizabeth Rybicki.

[175] Chief Judge Posner of the United States Court of Appeals for the 7th Circuit noted, in another context, in *Herman v. Local 1011, United States Steelworkers of America,* 207 F.3d 924, 925 (7th Cir. 2000): "The democratic presumption is that any adult member of the polity ... is eligible to run for office. U.S. Term Limits, Inc .v. Thornton, 514 U.S. 779, 793-95, 819-20 (1995); Powell v. McCormack, 395 U.S. 486, 547 (1969)."

---

> The presumption always is, that a person chosen to an office is qualified to fill it, and it is never incumbent upon him to prove his eligibility. The certificate of election does not add to this presumption, but simply leaves it where the law places it, and he who denies the eligibility of a person who is certified to be elected, must take the burthen of proving that he is not eligible.[176]

Despite the absence of formal administrative or legal requirements to produce a "birth certificate" for ballot placement of federal candidates, and despite the fact that under the long-standing principles of American jurisprudence, and U.S. democratic tradition, the clear burden of proof must be upon those who challenge a federal candidate's eligibility, it may be noted that the only *official* documentation or record that had been publicly forwarded in the matter of President Obama's eligibility at the time of the 2008 election was an official, certified copy of the record of live birth released by the Obama campaign in June of 2008, as an apparent effort by then-candidate Obama to address rumors and innuendos concerning both his middle name as well as the place of his birth.[177] The copy of this certificate states on its face, as expressly *certified* by Hawaii health and vital records personnel, that Barack Obama was born in Hawaii, in the City of Honolulu on the Island of Oahu, at 7:24 P.M. on August 4, 1961.[178] Under Hawaii law, an officially certified copy of such health record is to be considered "for all purposes the same as the original,"[179] and is "*prima facie*" evidence of the facts asserted.[180]

Subsequent to that release in 2008, President Obama requested in writing from the State of Hawaii an exception to the public records laws and regulations of the State of Hawaii so that the Department of Health could release to the President a certified copy of his original, so-called "long form" certificate of live birth. The official certified copy was shown to reporters at a press conference in the White House, and a scanned copy of the document was posted for public

---

[176] George W. McCrary, A TREATISE ON THE AMERICAN LAW OF ELECTIONS, at 249-250 (1875, Fourth ed. by Henry L. McCune, 1897). The word "burthen" is a now-archaic variation of the word "burden." See also qualifications case regarding Member-elect Michalek in the U.S. House of Representatives, where affidavits and petitions signed by 125 citizens claimed that the Member-elect was not a citizen. When inquiry was made, complainants provided no actual evidence or proof of non-citizenship, and the matter was dismissed by the House without even requiring the Member-elect to respond or to provide a defense, as the complainants did not meet the required burden of proof to move forward. 1 HINDS' PRECEDENTS OF THE HOUSE OF REPRESENTATIVES, §§ 426, 427, pp. 406-413 (1907).

[177] A scanned copy of the certified COLB was "released" by the Obama campaign and made available on the candidate's website (http://fightthesmears.com/articles/5/birthcertificate). The campaign invited non-partisan, independent organizations involved in public policy and the political process to examine the certificate, including "factcheck.org," a project of the University of Pennsylvania's Annenberg Public Policy Center. See discussion at http://www.factcheck.org/elections-2008/print_born_in_the_usa.html, and the *St. Petersburg Times'* "Politfact.com," which describes itself as "a project of the St. Petersburg Times to help you find the truth in politics" ("Obama's birth certificate: Final chapter": http://www.politifact.com/truth-o-meter/article/2008/jun/27/obamas-birth-certificate-part-ii).

[178] In addition to the certification that the document is a "true copy" of the birth records on file, official personnel of the State of Hawaii have affirmed, in official statements, that such records were on file at the Department of Health, and show President Obama's birth in Hawaii, as certified. Hawaii Department of Health, News Release, "Statement by Dr. Chiyome Fukino," October 31, 2008, http://hawaii.gov/health/about/pr/2008/08-93.pdf; and statement of Dr. Fukino, Hawaii Department of Health, at http://hawaii.gov/health/about/pr/2009/09-063.pdf. See also testimony of the Director of Health before the Senate Committee on Judiciary and Government Operations, on SB 2937SD1, Relating to Information Practices, March 16, 2010. Note also *Honolulu Star-Bulletin*, "Officials verify birth certificate of Obama," November 1, 2008, and see contemporaneous newspaper announcements of Obama birth in August of 1961 in Honolulu, *The Sunday Advertiser*, "Health Bureau Statistics," p. B-6, August 13, 1961 (a scanned copy of this announcement appears at http://the.honoluluadvertiser.com/dailypix/2008/Nov/09/hawaii811090361V3_b.jpg), and the *Honolulu Star-Bulletin*, August 14, 1961, based on health records forwarded by the hospital to the newspapers.

[179] Hawaii Revised Statutes Ann., § 338-13.

[180] Hawaii Revised Statutes Ann., § 338-41(b).

---

viewing on the White House website on April 27, 2011.[181] The Department of Health of the State of Hawaii cites on its official website to the White House posting of the President's birth certificate as the document that the state certified and delivered.[182]

It should be noted that both documents from the State of Hawaii, that is, the so-called "short-form" Certification of Live Birth [the "COLB"], or the certified copy of the longer form certificate of live birth, according to the official declarations of officers of the State of Hawaii, have been officially *certified* by the state, and are therefore "self-authenticated documents" under Federal Rules of Evidence,[183] as well as "public records" of that state. Under the United States Constitution, a public record of a state is required to be given "full faith and credit" by all other states in the country.[184] Even if a state were to require its election officials for the first time ever to receive a "birth certificate" as a requirement for a federal candidate's ballot placement, a document certified by another state, such as a "short form" birth certificate, or the certified long form, would be required to be accepted by all states under the "full faith and credit" clause of the United States Constitution.[185]

With respect to any actual *contrary* evidence, it may be noted briefly that there appear to be no legitimate, official documentary records, or copies of such records, which have been produced or forwarded contradicting the *prima facie* record of President Obama's birth in Hawaii, as provided in the official certification (or certificate) of live birth released by the Obama campaign in 2008 and attested to by Hawaii Department of Health officials, or the certified copy of the "long form" birth certificate publicly shown and released on April 27, 2011. No verified, official record of birth from any other jurisdiction or country has been produced; no contradictory health record or hospital record has been forwarded; and no official record of travel (such as a passport record) appears to exist placing President Obama's mother in a foreign country at the time of the President's birth. A federal court has found with respect to birth records that "a record of birth contemporaneously made by governmental authority in official records would be almost conclusive evidence of birth."[186] As expressly verified by Hawaiian officials, and as officially

---

[181] http://www.whitehouse.gov/blog/2011/04/27/president-obamas-long-form-birth-certificate; and http://www.whitehouse.gov/sites/default/files/rss_viewer/birth-certificate-long-form.pdf. (Last visited on the date of this report). The documents released at that time also include letters to the Hawaii Department of Health requesting a certified copy of the original certification of live birth, and an official correspondence from the Hawaii Department of Health to the President regarding the copying and certification of the document.

[182] http://hawaii.gov/health/vital-records/obama.html (Last visited on date of this report).

[183] Federal Rules of Evidence (2010), Rule 901(b)(7) and 902. 28 U.S.C. app. Rule 902, see also Notes of Advisory Committee on Proposed Rules, Rule 902. The state certification in itself thus provides the proof of authenticity of the document, and verifies the records on file with the state.

[184] U.S. CONST., art. IV, § 1; see 28 U.S.C. § 1739, applying to all "nonjudicial records or books kept in any public office of any State, Territory , or Possession of the United States, or copies thereof ...."

[185] It may be noted that the Certification of Live Birth from Hawaii is a "birth certificate" under the uniform identification standards promulgated in federal law for all federal agencies. See P.L. 108-458, "Intelligence Reform and Terrorism Prevention Act of 2004," title VIII, § 7211(a), 118 Stat. 3825 (2004), amending P.L. 104-208, Div. C, "Illegal Immigration Reform and Immigrant Responsibility Act of 1996," title VI, § 656, 110 Stat. 3009-716 (1996), now codified at 5 U.S.C. § 301, note, setting out uniform federal standards for "identification-related documents." Federal law under these provisions now expressly defines a "birth certificate" as a certificate of birth for a citizen or national of the United States whose birth is registered in this country and is issued by a "State or local government agency or authorized custodian of record and produced from birth records *maintained* by such agency or custodian of record." A "birth certificate" thus does not need to be, and is generally *not*, the "original" record (which is now, more often than not, maintained electronically), but is rather a certified copy based on and produced from such health records "maintained" by the state or locality.

[186] Liacakos v. Kennedy, 195 F. Supp. 630, 631 (D.D.C. 1961).

certified on the documents produced by the State of Hawaii, such *contemporaneous* official record of birth in Hawaii exists.[187] The federal court in *Liacakos v. Kennedy* found that with no official *foreign* contemporaneous documentation, even a "delayed birth certificate" produced by the plaintiff, issued by the State of West Virginia 46 years *after* the alleged birth there, would provide *prima facie* evidence of "natural born citizenship."[188] That *prima facie* evidence, un-rebutted by any official foreign documentation, along with collateral evidence of self-assumed and asserted U.S. citizenship, would thus be conclusive and establish "natural born" status by a "fair preponderance of the evidence."[189] In the case of President Obama, rather than any actual contrary documentary evidence, there have instead been several "theories," allegations, rumors, and self-generated "doubts" and "questions" concerning the place and circumstances of President Obama's birth which, as noted in court decisions, have been posited on the Internet and "television news tabloid[s]," and upon which a number of the lawsuits were based.[190]

It may be noted that in addition to court dismissals based on lack of jurisdiction because of the failure of the plaintiff to show "standing" or to state a claim upon which relief may be granted, several of the cases regarding President Obama's "eligibility" were dismissed on the basis of the lack of subject matter jurisdiction because, as noted by the United States Court of Appeals for the 10th Circuit, for example, the plaintiff's alleged claim was "wholly insubstantial and frivolous" such that "federal jurisdiction is not extant."[191] Similarly, in *Stamper v. United States,* the United States District Court noted in dismissing an "eligibility" challenge of President Obama, that a federal court may dismiss a complaint "for lack of subject matter jurisdiction" when the "allegations of a complaint are totally implausible, attenuated, unsubstantial, frivolous, devoid of merit or no longer open to discussion," and in dismissing the case found that the court "is not required to accept unwarranted factual inferences."[192] The United States Court of Appeals for the Third Circuit in *Berg v. Obama,* in upholding the lower court's dismissal of plaintiff/counsel Berg's case, also noted "the obvious lack of any merit in Berg's contentions ...,"[193] and in *Kerchner v. Obama,* ruled that "[b]ecause we have decided that this appeal is frivolous, we will

---

[187] See footnotes 178, and 181-182 of this Report.

[188] 195 F.Supp. at 632-633.

[189] 195 F.Supp. at 634.

[190] Berg v. Obama, 574 F.Supp.2d 509, 513 (E.D. Pa. 2008), *aff'd* 586 F.3[rd] 234 (3rd Cir. 2009), *cert. denied,* 129 S.Ct. 920 (2009), noting plaintiff's reliance on various sources of allegations, including a "television news tabloid." *See also* dismissal of cases against the Ohio Secretary of State, Neal v. Brunner, Wayne Common Pleas case # 08CV72726; and Greenberg v. Brunner, Wood Common Pleas case # 08CV 1024. In the *Neal* case, as reported in *The Cincinnati Inquirer,* October 31, 2008, the judge stated: "The onus is upon one who challenges such public officer to demonstrate an abuse of discretion by admissible evidence – not hearsay, conclusory allegations or pure speculation .... It is abundantly clear that the allegations in Plaintiff's complaint concerning 'questions' about Senator Obama's status as a 'natural born citizen' are derived from Internet sources, the accuracy of which has not been demonstrated to either defendant Brunner or this magistrate." The basis of some of the "questions" raised in lawsuits appear to be the mere fact of the existence of other similar lawsuits, as well as disputed third-party statements. Berg, *supra* at 513; Keyes v. Bowen, Case No. 34-2008-80000096-CU-WM-GDS, slip op. at 4 (Sup. Ct. Cal. March 13, 2009).

[191] "Where a complaint seeks recovery directly under the Constitution or the laws of the United States, an exception to subject matter jurisdiction lies when 'such claim is wholly insubstantial and frivolous.' ... Having carefully reviewed Mr. Craig's amended complaint, we find it is 'very plain,' *Baker,* 369 U.S. at 199, that his 'alleged claim under the Constitution or federal statu[t]es' falls within this 'wholly insubstantial and frivolous' category such that federal jurisdiction is not extant." Craig v. United States, 340 Fed. Appx. 471, 473-474 (10th Cir. 2009), *cert. denied,* 130 S.Ct. 141 (2009).

[192] Stamper v. United States, Case No. 1:08 CV 2593 (N.D. Ohio November 4, 2008), Slip op. at 4 , 7 (citing to *Apple v. Glenn,* 183 F.3d 477,479 (6th Cir. 1999) and *Hagans v. Lavine,* 415 U.S. 528, 536-37 (1974)).

[193] Berg v. Obama, 586 F.3d at 239.

order counsel for Appellants to show cause why just damages and costs should not be imposed."[194]

In dismissing eligibility cases some federal courts have gone so far as to find "Rule 11" violations by plaintiff's counsel.[195] A federal district court in Georgia fined plaintiff's counsel $20,000 for a "Rule 11" violation, that is, for filing "frivolous" motions and for "using the federal judiciary as a platform to espouse controversial political beliefs rather than as a legitimate forum for hearing legal claims."[196] In the United States District Court for the District of Columbia, in dismissing another challenge to the President's "eligibility" by an attempt to press an "interpleader" claim, the judge ordered plaintiff's counsel to "show cause" why he should not be fined under Rule 11 for frivolous filings, and eventually "reprimanded" the counsel for filing a frivolous lawsuit.[197]

## Allegations of Loss of Citizenship

In some of the cases filed, plaintiffs have argued that even if President Obama had been born in Hawaii, the move to Indonesia by his mother with him at the time he was a minor in some way "nullified" the citizenship "at birth" status of President Obama, even though as a minor he moved back to and resided within the United States.[198] It should be noted, however, that the Supreme Court has clearly ruled that a citizen at birth, such as one born "in" the United States, does *not* forfeit his or her citizenship-at-birth status because of removal as a minor to a foreign country, even a country in which one or both parents are or become citizens and nationals. Rather, citizenship may only be forfeited by a citizen of the United States by an affirmative action of renunciation by one having the capacity to do so (that is, as an adult):

> It has long been a recognized principle in this country that if a child born here is taken during minority to the country of his parents' origin, where his parents resume their former allegiance, he does not thereby lose his citizenship in the United States provided that on attaining majority he elects to retain that citizenship and to return to the United States to assume its duties. ...

---

[194] Kerchner v. Obama, 612 F.3d 204, 209 (3rd Cir. 2010). Damages were not assessed, but Appellants were ordered to pay costs. Judgment, Kerchner v. Obama, No. 09-4209, Document: 003110204065 (July 2, 2010).

[195] The Federal Rules of Civil Procedure, at Rule 11(b)(2) require that in signing briefs and complaints to the court, an attorney represents that "the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law."

[196] Rhodes v. MacDonald, 670 F.Supp.2d 1363, 1378-1380 (D.M.Ga. 2009), *aff'd*, Rhodes and Taitz v. MacDonald, 368 Fed. Appx. 949 (11th Cir. 2010), *cert. denied*, Taitz v. MacDonald, 131 S.Ct. 2111): "The absolute absence of any legitimate legal argument, combined with the political diatribe in her motions, demonstrates that [counsel's] purpose is to advance a political agenda and not to pursue a legal cause of action. Rather than citing to binding legal precedent, she calls the President names, accuses the undersigned of treason, and gratuitously slanders the President's father. As the Court noted in an earlier order, counsel's wild accusations may be protected by the First Amendment when she makes them on her blog or in her press conferences, but the federal courts are reserved for hearing genuine legal disputes, not as a platform for political rhetoric and personal insults. ... The Court finds that counsel's conduct was willful and not merely negligent. ... Her response to the Court's show cause order is breathtaking in its arrogance and borders on delusional. ... Her initial complaint was legally frivolous. Upon being so informed, counsel followed it with a frivolous motion for reconsideration. In response to the Court's show cause order, she filed a frivolous motion to recuse."

[197] Holister v. Soetoro, memorandum order, 258 F.R.D. 1 (D.D.C. March 24, 2009), *aff'd* 368 Fed. Appx. 154 (D.C. Cir. 2010) (consolidated with 09-5161), *cert. denied*, 131 S.Ct. 1017 (2011).

[198] Berg v. Obama, 574 F.Supp.2d at 513.

---

> Expatriation is the voluntary renunciation or abandonment of nationality and allegiance. [footnotes omitted] It has no application to the removal from this country of a native citizen during minority. In such a case the voluntary action which is of the essence of the right of expatriation is lacking.[199]

The Supreme Court in a subsequent decision, in *Mandoli v. Acheson* in 1952, confirmed the meaning of its earlier decision in *Perkins v. Elg,* explaining:

> What it [*Perkins v. Elg*] held was that citizenship conferred by our Constitution upon a child born under its protection cannot be forfeited because the citizen during nonage is a passive beneficiary of foreign naturalization proceedings....[200]

The Supreme Court concluded in that case: "[W]e think the dignity of citizenship which the Constitution confers as a birthright upon every person born within its protection is not to be withdrawn or extinguished by the courts except pursuant to a clear statutory mandate."[201] Simply stated, the Supreme Court noted that to expatriate and forfeit one's U.S. citizenship "there must be a voluntary action and such action cannot be attributed to an infant whose removal to another country is beyond his control and who during minority is incapable of a binding choice."[202]

## Assertion of Two Citizen-Parent Requirement

Other lawsuits, which were also summarily dismissed, alleged that even if President Obama had been born in Hawaii, he was not a "natural born" citizen because his father was not a U.S. citizen, but rather was a citizen of Kenya and therefore a British subject. It was argued that President Obama at birth would thus have been entitled to British citizenship by operation of *British* laws. As one who had or was entitled to "dual citizenship," it was argued that President Obama could not be a "natural born citizen" of the United States.[203] This argument would also entail the unique notion that under American jurisprudence *parental* citizenship or lineage is the determining factor for eligibility to the Presidency for native born U.S. citizens.

*Dual Citizenship.* Merely because a child born within the United States could have, under the operation of *foreign* law, been a citizen also of that foreign nation because of a parent's nationality, citizenship, or place of birth (i.e., "dual citizenship"), would not affect the status of that child as a U.S. citizen "at birth" under the Fourteenth Amendment, the federal nationality laws, nor under Article II of the Constitution. The citizenship laws, rights, or recognitions of *other* nations could not influence and impact the United States' own determination of who its citizens "at birth" would be, that is, who would be a "natural born" citizen, as the question of

---

[199] Perkins v. Elg, 307 U.S. 325, 329, 334 (1939). See also Rogers v. Bellei, 401 U.S. 815, 835 (1971): : "... Congress has no 'power, express or implied, to take away an American citizen's citizenship without his assent.' *Afroyim v. Rusk,* 387 U.S., at 257."

[200] 344 U.S. 133, 138-139 (1952).

[201] *Id.* at 139.

[202] Perkins v. Elg, 307 U.S. at 334.

[203] *See, e.g,* .arguments in *Donofrio v. Wells,* No. 08A407, Application for Emergency Stay to the United States Supreme Court, contending that "candidate Obama is not eligible to the Presidency as he would not be a 'natural born citizen' of the United States even if it were proven he was born in Hawaii, since ... Senator Obama's father was born in Kenya and therefore, having been born with split and competing loyalties, candidate Obama is not a 'natural born citizen' ...." See also Berg v. Obama, 574 F.Supp.2d at 513.

citizenship and categories of citizenship are a function of "municipal law"—the internal law of every country, as opposed to matters of international law or foreign law.[204]

If allowing the recognition of citizenship under the law of foreign nations were determinative of natural born citizenship in the United States—as now argued by some advocates—then the operation of *foreign* law would, in effect, impact and be determinative of who is eligible to be President of the United States, a result wholly at odds with U.S. national sovereignty, that is, the "inherent right of every independent nation" to determine what classes of persons are to be its citizens.[205] As explained by the Supreme Court in 1939:

> On her birth in New York, the plaintiff became a citizen of the United States. ... In a comprehensive review of the principles and authorities governing the decision in that case— that a child born here of alien parentage becomes a citizen of the United States—the Court adverted to the "inherent right of every independent nation to determine for itself, and according to its own constitution and laws, what classes of persons shall be entitled to its citizenship." *United States v. Wong Kim Ark, supra*, p. 668. As municipal law determines how citizenship may be acquired, it follows that persons may have a dual nationality. [footnotes omitted] And the mere fact that the plaintiff may have acquired Swedish citizenship by virtue of the operation of Swedish law, on the resumption of that citizenship by her parents, does not compel the conclusion that she lost her own citizenship acquired under our law.[206]

The fact that a foreign country might recognize or allow a claim of dual citizenship or nationality of a child born in the United States because of the nationality or heritage of the child's mother or father, has never been determinative of "natural born" or other citizenship status in any case in American jurisprudence. The Court in *Perkins v. Elg* explained that dual nationality of a child does not affect the native-born status of a child born in the United States, and cited with approval an opinion of the Attorney General finding that a "native-born American citizen," even one with "dual citizenship," who returns to the United States would qualify to be President:

> One Steinkauler, a Prussian subject by birth, emigrated to the United States in 1848 ... and in the following year had a son who was born in St. Louis. Four years later Steinkauler returned to Germany taking this child and became domiciled in Weisbaden where they continuously resided.... On reviewing the pertinent points in the case, including the naturalization treaty of 1868 with North Germany, the Attorney General reached the following conclusion:
>
> "Young Steinkauler is a native-born American citizen. There is no law of the United States under which his father or any other person can deprive him of his birthright. He can return to America at the age of twenty-one, and in due time, if the people elect, he can become President of the United States ... [even though] the father, in accordance with the treaty and the laws, has renounced his American citizenship and his American allegiance and has acquired for himself and his son German citizenship and the rights which it carries...."[207]

*Citizenship of Parents*. Concerning specifically the reading into the Constitution of a two-citizen-parent requirement for "natural born" citizenship status, it should be noted that there is,

---

[204] United States v. Wong Kim Ark, 169 U.S. at 668; Perkins v. Elg, 307 U.S. at 329; *see also* Frederick Van Dyne, CITIZENSHIP OF THE UNITED STATES, at 3-4 (New York 1904).

[205] *Wong Kim Ark*, 169 U.S. at 668.

[206] Perkins v. Elg, 307 U.S. at 329.

[207] Perkins v. Elg, 307 U.S. at 330.

significantly, no historical nor controlling legal holding in American jurisprudence to support the argument that *parental* citizenship governs and controls the eligibility of a native born U.S. citizen to be President. As indicated in the discussion of the history of the constitutional provision, there is also no justification for this unique theory, which would exclude an entire class of native born U.S. citizens from eligibility for the Presidency, in any of the statements or writings of the framers of the Constitution, or in the entire record of the ratification debates of the United States Constitution.[208]

In 1825, in a significant and widely recognized work on the Constitution, William Rawle specifically noted that the term "natural born citizen" as used in the Constitution would include "every person born within the United States ... whether the parents are citizens or aliens...."[209] Similarly, in his treatise on *Citizenship of the United States*, Frederick Van Dyne, Assistant Solicitor of the Department of State, explained in 1904 that the rule governing citizenship is not one derived from "international law" or the so-called "law of nations," but is rather municipal law which "[e]very nation determines for itself" and, in the United States, derives from the common law principle of *jus soli*, dependant "on the place of birth," as modified by statute incorporating the principles of *jus sanguinis* to include the children of citizens "born out of the jurisdiction of the United States."[210] In reviewing Supreme Court decisional material, the author in this treatise noted that the Fourteenth Amendment and the 1866 civil rights act "reaffirm the fundamental principle of citizenship by birth" which "was generally held to be regulated by the common law, by which *all* persons born within the limits and allegiance of the United States were deemed to be natural born citizens thereof."[211]

Although the Supreme Court has never had to address the issue of "natural born" citizenship directly in the context of a challenge to the eligibility of one to be President, the federal courts have discussed the concept on numerous occasions for more than 200 years and have, other than in the *Dred Scott* decision, consistently relied upon the place of birth, without regard or reference to the status of one's parents, as the determining factor of natural born citizenship. In a celebrated state court ruling, in 1844, providing a detailed explanation of the legal history of the citizenship

---

[208] As an historical matter it may be noted that Chester A. Arthur, 21st President of the United States, was apparently born in the United States (despite rumors being spread by opponents that he was born in Canada) in 1829 to a U.S. citizen-mother and a father who was *not* a U.S. citizen, but rather a citizen of Ireland and a British subject, although there have been assertions by some that this fact was not widely known at the time. *See* Thomas Reeves, GENTLEMAN BOSS: THE LIFE OF CHESTER ALAN ARTHUR, 202-203 (1975)). There was also a question raised concerning Charles Evans Hughes, Republican candidate for President who narrowly lost to Woodrow Wilson in 1916, and who was born in the United States to parents who were British subjects. Note Medina, *The Presidential Qualifications Clause, supra* at 267, n. 72, citing to Long, *Is Mr. Charles Evans Hughes a "Natural Born Citizen" Within the Meaning of the Constitution?* 49 CHIC. LEGAL NEWS 146 (1916). Although a question was raised by this individual at the time of Hughes' candidacy, it did not appear to be an issue of any significance for Hughes or other presidential or vice-presidential candidates who were born in the U.S. of recent immigrants, as the "two-citizen-parent" argument with respect to native born U.S. citizens has not garnered serious legal consideration after *Wong Kim Ark* in 1898. The question did not appear to merit even a mention in the definitive, two-volume biography of Hughes. Merlo J. Pusey, CHARLES EVANS HUGHES, 316-366 (New York 1963).

[209] William Rawle, A VIEW OF THE CONSTITUTION THE UNITED STATES OF AMERICA, at 80 (1825).

[210] Frederick Van Dyne, CITIZENSHIP OF THE UNITED STATES, at 3-4 (New York 1904).

[211] *Id.* at 4, 12. Emphasis added. Van Dyne explained in his treatise on citizenship that children born in the United States, even of alien parents (other than for the exceptions of diplomats and hostile troops) are natural born citizens of the United States, and distinguished as mere *obiter dictum* contrary comments on "jurisdiction" by the Court in *The Slaughter House Cases*, 16 Wall. (83 U.S.) 36, 73 (1872) which, even by 1904, had been shown to be no longer controlling as to those points. *Id.* at 12-23.

laws and statutes in the United States, the following conclusion was provided with respect to natural born citizenship:

> Upon principle, therefore, I can entertain no doubt, but that by the law of the United States, every person born within the dominions and allegiance of the United States, *whatever were the situation of his parents, is a natural born citizen.*[212]

That the place of birth was the rule governing "natural born" citizenship under American jurisprudence, regardless of the status of one's parents (except for children of official diplomats or hostile armies), even before the adoption of the Fourteenth Amendment, was explained by the Supreme Court in *United States v. Wong Kim Ark,* in 1898, which noted that the Fourteenth Amendment "affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children born here of resident aliens, with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory ...."[213] The Supreme Court in *Wong Kim Ark* cited with approval those previous judicial rulings which held that every child born on the soil of the United States, and subject to its jurisdiction, are "natural born" citizens of this country, without regard to the nationality or citizenship status of their parents.[214] The Supreme Court, this time using the term "native born citizen" again explained in that case:

> Passing by questions once earnestly controverted, but finally put at rest by the Fourteenth Amendment of the Constitution, it is beyond doubt that, before the enactment of the Civil Rights Act of 1866 or the adoption of the Constitutional Amendment, all white persons, at least, born within the sovereignty of the United States, *whether children of citizens or of foreigners*, excepting only children of ambassadors or public ministers of a foreign government, *were native-born citizens of the United States.* [215]

As discussed previously, the Supreme Court has used the term "native born" citizens (as expressly used in *Wong Kim Ark* to mean those born in the United States "whether children of citizens or foreigners") as synonymous with, or at least included within the term "natural born," in subsequent references to eligibility to the Presidency. In *United States v. Schwimmer,* for example, the Court stated: "Except for *eligibility to the Presidency*, naturalized citizens stand on the same footing as do *native born citizens*"[216] Similarly, in *Luria v. United States* the Supreme Court stated: "Under our Constitution, a naturalized citizen stands on an equal footing with the native citizen in all respects, save that of eligibility to the Presidency,"[217] and noted in 1931 that other than the one instance in the Constitution which provides a difference, that is, the eligibility to the Presidency, "[t]he alien, when he becomes a naturalized citizen, acquires, with one exception, every right possessed under the Constitution by those citizens who are native born."[218]

---

[212] Lynch v. Clarke, 3 N.Y. Leg. Ob. 236, 250 (1844). Emphasis added.

[213] 169 U.S. at 693.

[214] 169 U.S. at 662-663, citing United States v. Rhodes, 27 Fed. Case 785 (No. 16151) (C.C. Ky. 1866), and Lynch v. Clark.

[215] 169 U.S. at 674-675. Emphasis added. Note that the dissent in *Wong Kim Ark* stated that under the majority's controlling decision, a child born to alien parents in the United States "whether of the Mongolian, Malay or other race, were eligible to the Presidency ...." 169 U.S. at 715 (Fuller, C.J. and Harlan, J. dissenting).

[216] 279 U.S. 644, 649 (1929).

[217] 231 U.S. 9, 22 (1913).

[218] United States v. MacIntosh, 283 U.S. at 623-624. See also Baumgardner v. United States, 322 U.S. 665, 673 (1944), (continued...)

With regard to the citizenship of children born in the United States to recent immigrants, it is significant to note that in this country in the late 1800's, the public's economic fears and hostility to foreigners led Congress to—in the words of one historian—"legitimize[ ] racism as national policy"[219] by adopting legislation to prevent immigration of Chinese laborers to the United States, and to prohibit *anyone* of Chinese nationality to obtain U.S. citizenship through naturalization.[220] Despite this law and its extensions, commonly known as the Chinese Exclusion Acts, the federal courts continually and consistently held that children born "in" the United States of Chinese nationals were "natural born" citizens of the United States, even though the parents were not, and could never be, U.S. citizens themselves under the exclusion laws. In one case concerning the identity of a petitioner, the Supreme Court of the United States explained that "[i]t is not disputed that if petitioner is the son" of two Chinese national citizens who were physically in the United States when petitioner was born, then he is "a natural born American citizen ...."[221] Similarly, in 1919, the United States Court of Appeals for the 5th Circuit ruled that the appellee, based solely on the fact that he was born in San Francisco, without *any* reference to the nationality of his parents, "is a natural-born citizen of the United States."[222]

In a case that preceded the Supreme Court's *Wong Kim Ark* decision, the United States Court of Appeals agreed with the petitioner's claim to be "a natural-born citizen of the United States" because of his *place* of birth, that is, within the United States, even though his parents were both "aliens" of Chinese nationality who were in the United States privately and "not here in any diplomatic or other official capacity under the emperor of China."[223] That federal court in 1884, relying on precedents including Assistant Vice-Chancellor Lewis Sandford's opinion in *Lynch v. Clarke*, explained the concept in American jurisprudence that one is a "natural born" citizen when born in the United States, and subject to the jurisdiction of the United States,[224] and that such was the state of American law even before the adoption of the Fourteenth Amendment (for other than those brought into the United States under slavery):

---

(...continued)

and Schneider v. Rusk, 377 U.S. 163, 165 (1963). Furthermore, as discussed previously, noted constitutional scholars have also used the term "native born" citizen as a short-hand device to mean those born in the United States, without reference to lineage or ancestry, concerning those who are eligible to the presidency. Kent, Commentaries on American Law, *supra* at 273; Story, A Familiar Exposition of the Constitution of the United States, at § 271, p. 167; St. George Tucker, William Blackstone, Blackstone's Commentaries: with notes and reference to the Constitution and laws, of the federal government of the United States and of the Commonwealth of Virginia, Vol. I, App., at 323; 7 Gordon, Mailman, & Yale-Loehr, Immigration Law and Procedure, at §§ 91.02[4][a] and § 91.02[4][c].

[219] Andrew Gyory, Closing the Gate: Race, Politics, and the Chinese Exclusion Act, at 1-2, 16 (UNC Press 1998).

[220] 22 Stat. 58, May 6, 1882. The original restrictions were to run for 10 years, but were extended another 10 years by the so-called Geary Act in 1892 (27 Stat. 25, May 5 1892), and then made permanent in 1902. The Chinese exclusion acts were repealed in 1943 (57 Stat. 600, December 13, 1943).

[221] Kwok Jan Fat v. White, 253 U.S. 454, 457 (1920). The Supreme Court also noted there: "It is better that many Chinese immigrants should be improperly admitted than that one natural born citizen of the United States should be permanently excluded from his country." 253 U.S. at 464.

[222] U.S. v. Low Hong, 261 F. 73, 74 (5th Cir. 1919).

[223] In re Look Tin Sing, 21 F. 905, 906 (Cal. Cir. 1884).

[224] That is, when the laws and jurisdiction of the United States are applicable to such person: "They alone are subject to the jurisdiction of the United States who are within their dominions and under the protection of their laws, and with the consequent obligation to obey them when obedience can be rendered ...." 21 F. at 906.

---

Independently of the constitutional provision, it has always been the doctrine of this country, except as applied to Africans brought here and sold as slaves, and their descendants, that birth within the dominions and jurisdiction of the United States of itself creates citizenship. This subject was elaborately considered by Assistant Vice-chancellor SANDFORD in *Lynch v. Clarke*, found in the first volume of his reports. [1 Sandf. 583.] In that case one Julia Lynch, born in New York in 1819, of alien parents, during their temporary sojourn in that city, returned with them the same year to their native country and always resided thereafters. It was held that she was a citizen of the United States. After an exhaustive examination of the law the vice-chancellor said that he entertained no doubt *that every person born within the dominions and allegiance of the United States, whatever the situation of his parents, was a natural-born citizen,* and added that this was the general understanding of the legal profession, and the universal impression of the public mind.[225]

More recent federal cases expressly recognize the principle explained in the nineteenth century and early twentieth century cases that one born in the United States and under its jurisdiction, even when one or *both* parents were "aliens," is considered a citizen of the United States by birth, and thus a "natural born" citizen of the United States. The court in *Dos Reis ex rel. Camara v. Nicolls*, for example, accepted the findings of fact that "The relator was born in the City of Fall River, Massachusetts, on December 31, 1921. His father was a native and citizen of Portugal, and his mother was a native of Brazil," and that, as found by the Commissioner of Immigration and Naturalization, affirming the decision of the Board of Special Inquiry, "that the relator was a natural-born citizen....."[226] In *Loo Goon Hop v. Dulles*, the court found that a person "having been born in this country," without any reference to, finding, or identification of the citizenship of that person's parents, is a "natural born citizen of the United States."[227] In *Yamauchi v. Rogers*, the federal court in reciting "findings of fact and conclusions of law," found that the plaintiff, born in California of a "Japanese national" who had married another "Japanese national," "is a natural born citizen of the United States....."[228] In *Diaz-Salazar v. INS*, the court there noted that children born in the United States, even to an "illegal" (or undocumented) alien father, "are natural-born citizens of the United States."[229] Similarly, in *Mustata v. U.S. Department of Justice*, the United States Court of Appeals, in reciting the facts of the case, noted: "Petitioners Marian and Lenuta Mustata are citizens of Romania. At the time of their petition, they resided in Michigan with their two minor children, *who are natural born citizens of the United States*."[230]

In 2008, a U.S. district court discussed the concept of "natural born" citizenship specifically with respect to the eligibility to be President as applying, since the founding of the Nation, to all who were born in and subject to the jurisdiction of the United States:

> Those born "in the United States, and subject to the jurisdiction thereof," U.S. Const., amend. XIV, have been considered American citizens under American law in effect since the

---

[225] 21 F. at 909. Emphasis added.

[226] 68 F.Supp. 773, 774 (D.Mass. 1946). The court there found that even as a natural born citizen, an individual such as relator could expatriate himself under the operation of the existing federal law by performing acts indicating the "voluntary renunciation or abandonment of nationality and allegiance," such as voluntarily serving in a foreign army.

[227] 119 F.Supp. 808 (D.D.C. 1954): "It is not denied that the person who it is claimed is the plaintiff's father is a natural born citizen of the United States, having been born in the country."

[228] 181 F. Supp. 934, 935-936 (D.D.C. 1960).

[229] 700 F.2d 1156, 1160 (7th Cir. 1982), *cert. denied*, 462 U.S. 1132 (1983).

[230] 179 F.3d 1017, 1019 (6th Cir. 1999). Emphasis added. See also United States v. Carlos Jesus Marguet-Pillado, 648 F.3d 1001, 1006 (9th Cir. 2011), agreeing with the underlying legal accuracy of proposed jury instruction defining "natural born citizen" as including one born in the United States, without reference to the citizenship of one's parents.

time of the founding, *United States v. Wong Kim Ark*, 169 U.S. 649, 674-75, 18 S.Ct. 456, 42 L.Ed. 890 (1898), and thus eligible for the presidency, *see, e.g., Schneider v. Rusk,* 377 U.S. 163, 165, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964)(dicta).[231]

Similarly, in dismissing an eligibility case concerning President Obama's birth in Hawaii, a state appellate court in Indiana, after a thorough review of federal case law, concluded that anyone born in the United States and subject to its jurisdiction, regardless of the citizenship of that person's parents, was a "natural born" citizen eligible to be President:

> Based on the language of Article II, Section 1, Clause 4 and the guidance provided by Wong Kim Ark, we conclude that persons born within the borders of the United States are "natural born Citizens" for Article II, Section 1 purposes, regardless of the citizenship of their parents. Just as a person "born within the British dominions [was] a natural born-born subject" at the time of the framing of the U.S. Constitution, so too were those "born in the allegiance of the United States [ ] natural-born citizens."[232]

The constitutional history, the nearly unanimous consensus of legal and constitutional scholars, and the consistent, relevant case law thus indicate that every child born in and subject to the jurisdiction of the United States (that is, not children of diplomatic personnel representing a foreign nation or military troops in hostile occupation), is a native born U.S. citizen and thus a "natural born Citizen" eligible to be President under the qualifications clause of the Constitution, regardless of the nationality or citizenship of one's parents. The legal issues regarding "natural born" citizenship and birth within the United States, without regard to lineage or ancestral bloodline, have been well settled in this country for more than a century, and such concepts date back to, and even pre-date, the founding of the nation.

The weight of more recent federal cases, as well as the majority of scholarship on the subject, also indicates that the term "natural born citizen" would most likely include, as well as native born citizens, those born abroad to U.S. citizen-parents, at least one of whom had previously resided in the United States, or those born abroad to one U.S. citizen parent who, prior to the birth, had met the requirements of federal law for physical presence in the country.[233]

# Author Contact Information

Jack Maskell
Legislative Attorney

---

[231] Hollander v. McCain, 566 F.Supp.2d 63, 66 (D.N.H. 2008).

[232] Ankeny v. Governor of the State of Indiana, 916 NE2d 678, 688 (2009), *petition to transfer jurisdiction denied* (Ind. Supreme Court, Apr. 5, 2010).

[233] See now 8 U.S.C. § 1401(a) - (h). Under current law, at 8 U.S.C. § 1401(g), a person born abroad to one U.S. citizen-parent would be a citizen at birth if that parent had resided in the United States for at least five years, two of which were after the time the parent was 14 years of age.