**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**DR. ORLY TAITZ, ESQ.; BRIAN FEDORKA;
LAURIE ROTH; LEAH LAX; TOM MACLERAN**                    **PLAINTIFFS**

**VS.**                              **Civil Case No. 3:12-CV-280-HTW-LRA**

**DEMOCRAT PARTY OF MISSISSIPPI;
SECRETARY OF STATE OF MISSISSIPPI;
BARACK HUSSEIN OBAMA; OBAMA FOR
AMERICA; NANCY PELOSI; DR. ALVIN
ONAKA; LORETTA FUDDY; MICHAEL
ASTRUE; JANE DOES, JOHN DOES 1-100**                    **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER
DISMISSING PLAINTIFFS' COMPLAINT**</u>

Before this court are several dispositive motions.  Defendant Secretary of State

of Mississippi has filed a motion for judgment on the pleadings [docket no. 8].  The

Mississippi Democratic Party, represented by the Democratic Party Executive

Committee ("MDEC") and named by the plaintiffs as the Democratic Party of

Mississippi, has filed a motion for judgment on the pleadings [docket no. 15].

Defendants Loretta Fuddy ("Fuddy")[1], the former Director of the Department of Health

for the State of Hawaii, and Dr. Alvin Onaka ("Onaka"), the Hawaii State Registrar, have

filed a motion to dismiss for lack of jurisdiction, or for failure to state a claim [docket no.

57].

Having determined that this court has federal question subject-matter jurisdiction

on a prior date, this court held a hearing on these motions on November 16, 2012.  At

---

[1] During the pendency of this lawsuit, defendant Fuddy died in a plane accident.  No party,
however, has filed a "suggestion of death," authorizing this court to substitute parties.

that time, the court requested additional briefing from each of the parties, which has been submitted.

Also, on January 21, 2014, Orly Taitz filed a Notice of New Material Facts [docket no. 96]. This notice purported to contain additional evidence in support of this lawsuit. This court has determined to disregard this additional evidence because it is immaterial to her ballot challenges and, as later discussed, the alleged evidence does not alter her lack of standing on her racketeering claims.

Having read the parties' submissions and the applicable law, this court is persuaded to grant the two (2) motions for judgment on the pleadings [docket nos. 8 and 15] filed by defendants Secretary of State and MDEC. This court further dismisses Onaka and Fuddy's motion [docket no. 57] as moot. Because this court is persuaded to dismiss this case, this court also dismisses as moot plaintiffs' motion to bifurcate [docket no. 46], plaintiffs motion for an evidentiary hearing [docket no. 64], and James R. Grinol's motion to intervene [docket no. 83].

## I. Background

**A. Facts**

Plaintiffs here accuse President Barack Obama ("President Obama"), Nancy Pelosi ("Pelosi"), and the other defendants of a conspiracy violating the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), Title 18 U.S.C. §§ 1961, *et seq.* Plaintiffs also have sued the Secretary of State of Mississippi ("the Secretary of State") to prevent him from placing President Obama's name on state presidential ballots and from certifying the final Mississippi election results.[2] The gravamen of the

---

[2] The primary and general elections have taken place in Mississippi. The Secretary of State thus, argues mootness. While plaintiffs' claims are arguably moot, especially because

first amended complaint is that President Obama is not eligible to be a candidate, or to serve as President of the United States of America because he is not a "natural born citizen," as required by the United States Constitution.[3]  To the contrary, say plaintiffs, President Obama, aided by the other defendants, has perpetrated a fraud on the United States electorate by using forged documents and an illegally-obtained social security number as evidence of his eligibility to serve as President of the United States.

The Secretary of State, as directed by Mississippi law, determined that President Obama was one of the "generally recognized" candidates "for the nomination of President of the United States," and placed his name on the ballot for the presidential preference primary.  Miss. Code. Ann. § 23-15-1089.

Plaintiff Orly Taitz ("Taitz") says that, in January of 2012, she filed a challenge with MDEC, claiming that President Obama is ineligible for the political office he sought and demanding that he be removed from the Mississippi primary election ballot.  *See* Ballot Challenge dated January 8, 2012, docket no. 6 at 16.  According to Taitz, MDEC never responded.

On February 14, 2012, Taitz filed her original petition for declaratory and injunctive relief against MDEC and the Secretary of State in the Circuit Court for the First Judicial District of Hinds County.  Original complaint, docket no. 6 at 8.  Taitz paid

---

President Obama's opponent, Mitt Romney, garnered all of Mississippi's Electoral College votes in the 2012 presidential election, this court dismisses the claims against the Secretary of State based on plaintiffs' failure to comply with state election law, and plaintiffs' failure to state a claim.

[3] U.S. CONST. art. II, §1, cl. 4 states that

> No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President; neither shall any Person be eligible to that Office who shall not have attained to the Age of thirty five Years, and been fourteen Years a Resident within the United States.

a $300 bond into the court registry as required to challenge the qualifications of a political party nominee in a primary election under Mississippi Code § 23-15-961[4].

The Mississippi Democratic primary, which President Obama won, was held on March 13, 2012, before the Circuit Court held a hearing in Taitz's lawsuit.  Plaintiff Taitz emailed Samuel Begley ("Begley"), an attorney for MDEC, on April 1, 2012, stating that "since the hearing on my challenge to candidate Obama in the primary election will be held after the election, I am requesting your client, the Democratic Party of Mississippi, to consider the aforementioned challenge as a general election challenge as well under [Mississippi] Code 23-15-963[5]."  Exhibit B to the Secretary of State's memo in support of motion to dismiss, docket no. 9-2.  This email is the sole record evidence of a "petition" to MDEC to challenge President Obama's qualifications for the general election.

Hinds County Circuit Judge R. Kenneth Coleman ("Judge Coleman") scheduled a hearing for all outstanding issues in this lawsuit on April 16, 2012, but continued that

---

[4] Miss. Code Ann. § 23-15-961 addresses challenges to candidate qualifications in primary elections.  *Town of Terry v. Smith*, 48 So.3d 507, 508 (Miss. 2010).  Section 4 of the statute addresses the bond requirement and states in pertinent part:

> Any party aggrieved by the action or inaction of the appropriate executive committee may file a petition for judicial review to the circuit court of the county in which the executive committee whose decision is being reviewed sits. . . .  Such person filing for judicial review shall give a cost bond in the sum of Three Hundred Dollars ($300.00) with two (2) or more sufficient sureties conditioned to pay all costs in case his petition be dismissed . . . .

The Mississippi Legislature amended Miss. Code Ann. § 23-15-961, effective September 17, 2012.  Because these events happened before the amended version went into effect, this court applies the previous, 1999 version.

[5] Miss. Code Ann. § 23-15-963(1) states:

> Any person desiring to contest the qualifications of another person who has qualified pursuant to the provisions of Section 23-15-359, Mississippi Code of 1972, as a candidate for any office elected at a general election, shall file a petition specifically setting forth the grounds of the challenge not later than thirty-one (31) days after the date of the first primary election set forth in Section 23-15-191, Mississippi Code of 1972. Such petition shall be filed with the same body with whom the candidate in question qualified pursuant to Section 23-15-359, Mississippi Code of 1972.

hearing.  Order, docket no. 6-10 at 5; Order continuing hearing, docket no. 6-9 at 13.

On April 19, 2012, Taitz filed a motion with the Mississippi Supreme Court accusing

Judge Coleman of bias and asking that the case be reassigned to a different judge.

Motion, docket no. 7 at 10.

Also on April 19, 2012, Taitz amended her complaint, attempting to challenge

President Obama's qualifications as a candidate for the general presidential election

under Mississippi Code § 23-15-963.  The amended complaint raised new claims under

the federal RICO statutes and added new plaintiffs and defendants.

The additional plaintiffs are:  Brian Fedorka ("Fedorka"), a citizen of the State of

Mississippi; Leah Lax ("Lax"), a purported Democratic presidential candidate; Laurie

Roth ("Roth"), a purported presidential candidate from the American Independent Party;

and Tom MacLeran ("MacLeran"), a purported Republican presidential candidate.  First

amended complaint at 3, docket no. 1-1.

Taitz's first amended complaint added the following new defendants:  President

Obama, the 2012 Democratic candidate for president; Obama for America, President

Obama's official campaign organization; Fuddy, former Director of the Hawaiian

Department of Health; Onaka, Registrar for the State of Hawaii; Michael Astrue

("Astrue"), Commissioner of the United States Social Security Administration; Pelosi,

"chair of the 2008 Presidential nominating convention, signatory on the certificate of

candidate Barack Obama;" and John and Jane Does 1-100 "who aided and abetted

Obama in elections fraud, forgery."  First amended complaint at 3-4, docket no 1-1.

Judge Coleman filed a letter with the Mississippi Supreme Court on April 24,

2012, voluntarily recusing himself and asking the Supreme Court to appoint another

judge to hear the lawsuit.  Letter, docket no. 7 at 1.  The Secretary of State, joined by MDEC, removed this lawsuit to federal court on that same day, citing this court's federal question subject-matter jurisdiction over plaintiffs' new RICO claims.  Notice of removal, docket no. 1.

The plaintiffs have alleged the following claims in their first amended complaint: (1) declaratory relief; (2) preliminary injunctive relief and permanent injunctive relief; and (3) RICO claims of fraud, mail and wire fraud, obstruction of justice, and retaliation against a witness, victim, or informant.[6]

To remedy the wrongs alleged, plaintiffs ask this court:  (1) to declare President Obama ineligible to be on the ballot as a presidential candidate; (2) to enjoin the Secretary of State from placing President Obama's name on the ballot in the general election and mandate that the Secretary of State decertify or annul the votes for President Obama in the primary election; (3) to award treble damages to the plaintiffs for the injuries they have suffered as a result of defendants' RICO violations; (4) to award plaintiffs their costs and fees for this lawsuit; and (5) to award plaintiffs punitive and exemplary damages.

## B. Voting and Electing a President

The process of electing a President of the United States, while critically important, is often misunderstood.  United States Presidents are elected through an indirect, representative process, not by direct votes of each citizen.  This process

---

[6] As mentioned in this court's prior order denying plaintiffs' motion to remand, the first amended complaint is far from clear.  This court has examined the complaint to parse the specific claims alleged.  Plaintiffs seem to allege additional claims in their RICO case statement, specifically: aiding and abetting fraud, misprision of felony, violation of plaintiffs' constitutional rights "under color of authority," and defamation.  Because these claims are contained in the RICO case statement, this court will treat them as additional allegations brought under the RICO statutes.

involves selection of electors who are tasked with casting their votes for a particular candidate.  The number of electors in each state is determined by the number of state representatives in the United States Senate and United States House of Representatives.  U.S. Const. art. II, § 1, cl. 2[7].  The Electoral College process springs from a compromise reached during the Constitutional Convention of 1787 between constitutional framers who wanted the Congress to select the president and those who wanted the president to be selected by popular vote of the citizenry.[8]

Individual citizens, however, have no constitutional right to vote for a presidential candidate, nor for the electors who represent them.  *Bush v. Gore*, 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).  The constitution grants each state legislature the right to decide how to select presidential electors.  *Id.* (citing Article II, § 1 of the United States Constitution); *Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70, 76, 121 S. Ct. 471, 148 L.Ed. 2d 366 (2000).[9]

---

[7] U.S. Const. art. II, § 1, cl. 2 states:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress:  but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

[8] Brandon H. Robb, *Making the Electoral College Work Today:  The Agreement Among the States to Elect the President by National Popular Vote*, 54 LOY. L. REV. 419, 427 (2008).

[9] "Although we did not address the same question petitioner raises here, in *McPherson v. Blacker*, 146 U.S. 1, 25, 13 S.Ct. 3, 36 L.Ed. 869 (1892), we said:

> '[Art. II, § 1, cl. 2,] does not read that the people or the citizens shall appoint, but that 'each State shall'; and if the words 'in such manner as the legislature thereof may direct,' had been omitted, it would seem that the legislative power of appointment could not have been successfully questioned in the absence of any provision in the state constitution in that regard.  Hence the insertion of those words, while operating as a limitation upon the State in respect of any attempt to circumscribe the legislative power, cannot be held to operate as a limitation on that power itself.'"

*Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. at 76.

Each state legislature has chosen to vest in the citizenry the right to select electors by enacting voting procedures and laws, which grant individual citizens the right to vote in the presidential elections. *Bush v. Gore*, 531 U.S. at 104. While the state legislature may appoint electors itself, once it grants this right to individuals, it must extend that voting right fairly and equally to the citizens of the state, with "equal weight accorded to each vote and . . . equal dignity owed to each voter." *Id.* Further, the state legislature may not discriminate against a class of voters. *Id.* at 104-105 ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.").

Most cases challenging state election procedures have been brought under the Fourteenth Amendment[10] to the Constitution, attacking state action as violative of the Equal Protection Clause. These cases generally fall into two (2) categories: (1) ballot access cases—hopeful candidates' challenges to the state denying them placement on an election ballot, *see, e.g.*, *Moore v. Hosemann*, 591 F.3d 741 (5th Cir. 2009) (socialist party candidate challenged the Secretary of State's refusal to put his name on the ballot for President when the candidate had submitted his application after the close of business on the deadline day); and (2) apportionment cases—voters' challenges to apportionment of state or federal legislative representatives, *see, e.g., Baker v. Carr*, 369 U.S. 186, 245, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (Tennessee citizens challenged Tennessee's apportionment of representatives to the State General Assembly under the Equal Protection Clause).

---

[10] U.S. CONST. amend. XIV, § 1 states, in its pertinent part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

Both types of challenges involve a specific injury to an individual citizen, such as a prospective candidates' access to run as a candidate on the ballot in an election, or a voter's right to have his or her vote carry equal weight as those in other geographies. For example, in *Baker*, the plaintiff alleged that "a single vote in Moore County, Tennessee, is worth 19 votes in Hamilton County." *Id. at* 245 (Douglas, J., concurring). Likewise, in *Storer v. Brown*, the plaintiff argued that California election law interfered with his First Amendment right to free association[11] because the laws limited his ability to run as a candidate for more than one party. *See Storer v. Brown*, 415 U.S. 724, 728, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). Plaintiffs *sub judice*, however, do not claim such an individual or particularized injury. These plaintiffs argue that they have been injured by the candidacy and election of a president whom they believe is not qualified for the position.

### II. Motion for Judgment on the Pleadings by the Secretary of State

Defendant Secretary of State has filed a motion for judgment on the pleadings [docket no. 8], asking this court to dismiss him from this lawsuit. Plaintiffs have sued the Secretary of State, asking this court to enjoin him from placing President Obama's name on the Democratic presidential preference primary ballot, under Mississippi Code § 23-15-961, and to enjoin the Secretary of State from placing President Obama's name on the general election ballot, under Mississippi Code § 23-15-963. The Secretary of State says that the plaintiffs' general election challenge is untimely and fails to state a claim for which relief may be granted. With respect to the presidential preference

---

[11] U.S. CONST. amend. I states: "Congress shall make no law respecting . . . the right of the people peaceably to assemble . . . ."

primary, the Secretary of State also attacks the plaintiffs' challenge on the grounds that it is untimely and moot, and because it fails to state a claim.

Plaintiffs here have sued the Secretary of State solely in his official capacity.  To the extent that plaintiffs accuse him of RICO violations, says the Secretary of State, these claims must be dismissed because Taitz's pleadings fail to meet the pleading standard required in Rule 9[12] of the Federal Rules of Civil Procedure.  Further, says the Secretary of State, the plaintiffs have failed to plead adequate RICO claims.

## A.  Mississippi Election Law and the Primary Election Challenge

Miss. Code Ann. § 23-15-961 provides the exclusive method in Mississippi for someone to challenge a party candidate's qualifications in the presidential preference primary.  Miss. Code Ann. § 23-15-961(7)[13]; *Gourlay v. Williams*, 874 So.2d 987, 988 (Miss. 2004).  As the statute plainly states, "[t]he procedure set forth above shall be the sole and only manner in which the qualifications of a candidate seeking public office as a party nominee may be challenged prior to the time of his nomination or election." Miss. Code Ann. § 23-15-961(7).

---

[12] Rule 9 of the Federal Rules of Civil Procedure states, in its pertinent parts:
> b) Fraud or Mistake; Conditions of Mind. In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.
> * * *
> (f) Time and Place. An allegation of time or place is material when testing the sufficiency of a pleading

[13] Miss. Code Ann. § 23-15-961(7) states:
> The *procedure set forth above shall be the sole and only manner in which the qualifications of a candidate seeking public office as a party nominee may be challenged prior to the time of his nomination or election.*  After a party nominee has been elected to public office, the election may be challenged as otherwise provided by law.  After a party nominee assumes an elective office, his qualifications to hold that office may be contested as otherwise provided by law.

(emphasis added)

Pursuant to Miss. Code Ann. § 23-15-961, a challenger is required to file a petition with the executive committee of the candidate's party "within ten (10) days after the qualifying deadline for the office."  Miss. Code Ann. § 23-15-961(1)[14].  The executive committee then has ten (10) days to rule on that petition.  Miss. Code Ann. § 23-15-961(2)[15].  Failure of the executive committee to act constitutes a denial of the petition.  Miss. Code Ann. § 23-15-961(3)[16].  A party may seek judicial review by filing a petition in the circuit court of the county where the executive committee is located within fifteen (15) days of the date of filing the original petition.  Miss. Code Ann. § 23-15-961(4).[17] The party seeking judicial review must file a $300 bond "with two (2) or more sufficient sureties conditioned to pay all costs in case his petition be dismissed."  *Id.*  Failure to comply with these provisions will bar judicial review.  *Gourlay*, 874 So.2d at 988 (referencing Miss. Code Ann. § 23-15-961(7)).

---

[14] Miss. Code Ann. § 23-15-961(1) states:
> Any person desiring to contest the qualifications of another person as a candidate for nomination in a political party primary election shall file a petition specifically setting forth the grounds of the challenge *within ten (10) days after the qualifying deadline for the office* in question.  Such petition shall be *filed with the executive committee* with whom the candidate in question qualified.
(emphasis added).

[15] Miss. Code Ann. § 23-15-961(2) states:
> *Within ten (10) days of receipt of the petition described above, the appropriate executive committee shall meet and rule upon the petition.*  At least two (2) days before the hearing to consider the petition, the appropriate executive committee shall give notice to both the petitioner and the contested candidate of the time and place of the hearing on the petition.  Each party shall be given an opportunity to be heard at such meeting and present evidence in support of his position.
(emphasis added)

[16] Miss. Code Ann. § 23-15-961(3) states:
> If the appropriate executive committee *fails to rule upon the petition within the time required above, such inaction shall be interpreted as a denial of the request* for relief contained in the petition."
(emphasis added).

[17] Miss. Code Ann. § 23-15-961(4), *supra* footnote 4.

Computation of time for statutory deadlines is the same under both the Mississippi Code[18] and the Mississippi Rules of Civil Procedure[19]. For time periods of seven (7) or more days, "day" refers to a calendar day. Miss. Code Ann. § 1-3-67; M.R.C.P. Rule 6(a). For prescribed periods of less than seven (7) days "intermediate Saturdays, Sundays and legal holidays shall be excluded" from the computation of time, meaning only business days are counted. Miss. Code Ann. § 1-3-67; M.R.C.P. Rule 6(a).

### 1. Claims by Plaintiffs Fedorka, Roth, MacLeran, and Lax

Plaintiffs Fedorka, Roth, MacLeran, and Lax joined this lawsuit after Taitz had filed suit in state court. These plaintiffs have neither alleged nor offered evidence that any of them ever filed a challenge with MDEC as required by Mississippi statutory law prior to petitioning for judicial review. Any claims which these plaintiffs seek to pursue

---

[18] Miss. Code Ann. § 1-3-67 states:
> When process shall be required to be served or notice given any number of days, the day of the act, event or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included unless it is a Saturday, a Sunday or a legal holiday, or any other day when the courthouse or the clerk's office is in fact closed, whether with or without legal authority, in which event the period runs until the end of the next day which is not a Saturday, a Sunday, a legal holiday, or any other day when the courthouse or the clerk's office is closed. When the period of time prescribed or allowed is less than seven (7) days, intermediate Saturdays, Sundays and legal holidays shall be excluded in the computation.

[19] M.R.C.P. Rule 6(a) states
> In computing any period of time prescribed or allowed by these rules, by order of court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, as defined by statute, or any other day when the courthouse or the clerk's office is in fact closed, whether with or without legal authority, in which event the period runs until the end of the next day which is not a Saturday, a Sunday, a legal holiday, or any other day when the courthouse or the clerk's office is closed. When the period of time prescribed or allowed is less than seven days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation. In the event any legal holiday falls on a Sunday, the next following day shall be a legal holiday.

under Miss. Code Ann. § 23-15-961 are barred from judicial review for their failure to comply with the state law prerequisites for filing suit.  Accordingly, to the extent that these plaintiffs attempt to challenge placement of President Obama on the primary preference ballot under Miss. Code Ann.  § 23-15-961, this court dismisses their claims.[20]

### 2.  Claims by Plaintiff Taitz

Taitz's challenge to President Obama's candidacy in the primary election must be dismissed as untimely.  Taitz's petition is dated January 8, 2012, but the record is not clear as to when it was filed with MDEC.  The Secretary of State says that the qualifying deadline for the presidential primary election in Mississippi was January 14, 2012.[21]  To object timely to President Obama's qualifications, Taitz would have had to file a petition with MDEC before January 24, 2012, ten (10) calendar days after the filing deadline.  Assuming Taitz filed her petition with MDEC before the statutory deadline of January 24, 2012, the latest due date for her to petition for judicial review would have been February 8, 2012, fifteen (15) days after the deadline for filing her original petition.

Taitz filed her complaint in the Hinds County Circuit Court on February 14, 2012, which was six (6) days late.  Original complaint, docket no. 6 at 8.  Taitz's argument that she counted business days and not calendar days does not help her cause.  Under

---

[20] Plaintiffs' complaint is confusing.  It does not clearly articulate specific claims under Mississippi election law, but rather expends four (4) pages quoting Miss. Code Ann. §§ 23-15-961 and 23-15-963.  First amended complaint at 9-12, docket no. 1-1.  Defendant Secretary of State and this court have surmised from the plaintiffs' lengthy recitation of the statutes and from plaintiffs' demands for relief that plaintiffs have made two claims:  (1) a challenge to President Obama's credentials for placement on the ballot in the presidential preference primary, and (2) a challenge to President Obama's credentials to be placed on the ballot in the general election.

[21] MISSISSIPPI SECRETARY OF STATE'S OFFICE, 2012 CANDIDATE QUALIFYING GUIDE, *available at* http://www.sos.ms.gov/links/elections/candidates_lobbyist_center/tab1/2012%20Candidate%20 Qualifying%20Guide.pdf (last visited Mar. 31, 2015).

Mississippi law, the method for calculating time periods of seven (7) days or more mandates counting of calendar days.  Miss. Code Ann. § 1-3-67; M.R.C.P. Rule 6(a). This court, then, dismisses Taitz's claim brought under Miss. Code Ann. § 23-15-961 as untimely.

Taitz objects to the Secretary of State's interpretation of Mississippi law, saying that Miss. Code Ann. § 23-15-961 only applies to a "party nominee," and President Obama was not his party's nominee until he was nominated on September 6, 2012, at the Democratic National Convention.  Taitz says that because she filed her complaint in state court in February of 2012, and her amended complaint in April of 2012, before President Obama was officially nominated by his party, the strictures of this Mississippi statute should not apply to her dispute.  To support her cause, Taitz offers a theoretical "what if" scenario about voters challenging a candidate who does not qualify in a particular state's ballot, but wins the party nomination, saying application of these deadlines would "disenfranchise" voters in that state if they could not challenge the party nominee.  She, however, provides no law to support her position that Mississippi election law should not apply to her ballot challenge in Mississippi.

The Secretary of State has raised multiple reasons to dismiss this claim, including mootness.  The court finds it sufficient for dismissal that plaintiffs' claims, brought under Miss. Code Ann. § 23-15-96, are barred by the plaintiffs' failure to comply with the state statutory prerequisites.  This claim is dismissed as to all defendants.

**B.  Mississippi Election Law and General Election Challenge**

After the primary election took place, Taitz attempted challenge President Obama's qualifications for the general election, under Miss. Code Ann. § 23-15-963.

Plaintiffs have asked this court to declare President Obama ineligible to be on the ballot for the 2012 general election, to enjoin the Secretary of State from placing President Obama on the ballot, and to enjoin the Secretary of State from certifying the general election results.

The Secretary of State has challenged the validity of Taitz's email to attorney Begley as a proper "petition" to MDEC attacking President Obama's general election qualifications.  Further, says the Secretary of State, all other plaintiffs claims must be dismissed because they have not alleged that they attempted to petition MDEC at all. The Secretary of State also says that dismissal is appropriate because Taitz's petition to the Circuit Court for judicial review was defective, and was not accompanied by a $300 bond as required by statute.

With respect to the Mississippi's general election, Miss. Code Ann. § 23-15-963 provides the exclusive mechanism to challenge the qualifications of a candidate to be placed on the ballot.  Miss. Code Ann. § 23-15-963(7).[22],[23]

The language of Miss. Code Ann. § 23-15-963 closely follows that of Miss. Code Ann. § 23-15-961, which governs the primary election.  A person challenging a general

---

[22] Miss. Code Ann. § 23-15-963(7) states:
> The procedure set forth above shall be the sole and only manner in which the qualifications of a candidate seeking public office who qualified pursuant to the provisions of Section 23-15-359, Mississippi Code of 1972, may be challenged prior to the time of his election. After any such person has been elected to public office, the election may be challenged as otherwise provided by law. After any person assumes an elective office, his qualifications to hold that office may be contested as otherwise provided by law.

[23] Miss. Code Ann. § 23-15-359(1) names the candidates who may be challenged under § 23-15-963. Section 23-15-359(1) states in pertinent part:
> The ballot shall contain the names of all *party nominees certified by the appropriate executive committee, and independent and special election candidates who have timely filed petitions containing the required signatures.*

(emphasis added)

election candidate's qualifications must file a petition with the appropriate political body or official, in this case MDEC, "not later than thirty-one (31) days after the date of the first primary election set forth in Section 23-15-191." Miss. Code Ann. § 23-15-963(1).[24] Inaction by the political body or official is deemed a denial. Miss. Code Ann. § 23-15-963(5).[25] To seek judicial review a plaintiff must file a petition to the circuit court "no later than fifteen (15) days after the date the petition was originally filed with the appropriate election officials." Miss. Code Ann. § 23-15-963(6).[26]

This court agrees with the Secretary of State that no plaintiff, other than Taitz, claims to have filed a petition with MDEC challenging President Obama's general election bid. This court, therefore, finds that to the extent plaintiffs Fedorka, Roth, MacLeran, and Lax, purport to bring claims under Miss. Code Ann. § 23-15-963, those claims must be dismissed. Even if these plaintiffs could join Taitz's general election claims against the Secretary of State, their claims would have to be dismissed for failure to fulfill state statutory requirements as discussed below.

---

[24] Miss. Code Ann. § 23-15-963(1), *supra* footnote 5.

[25] Miss. Code Ann. § 23-15-963(5), states:
> If the appropriate election officials fail to rule upon the petition within the time required above, such inaction shall be interpreted as a denial of the request for relief contained in the petition.

[26] Miss. Code Ann. § 23-15-963(6) states:
> Any party aggrieved by the action or inaction of the appropriate election officials *may file a petition for judicial review to the circuit court of the county in which the election officials whose decision is being reviewed sits. Such petition must be filed no later than fifteen (15) days after the date the petition was originally filed with the appropriate election officials.* Such person filing for judicial review *shall give a cost bond in the sum of Three Hundred Dollars ($300.00) with two (2) or more sufficient sureties conditioned to pay all costs in case his petition be dismissed,* and an additional bond may be required, by the court, if necessary, at any subsequent stage of the proceedings.
(emphasis added).

Assuming, *arguendo*, that Taitz's April 1, 2012, email to attorney Begley could be considered a petition to MDEC under Mississippi law, Taitz's petition for judicial review would have been due to the Circuit Court by April 16, 2012, fifteen (15) days after Taitz sent her email to Begley.  Taitz and the other plaintiffs filed their first amended complaint, which included the general election challenge, in the Circuit Court of Hinds County on April 19, 2012, three (3) days late.

Further, as the Secretary of State points out, the plaintiffs failed to file an additional $300 bond with this petition.  This court finds that Taitz's claim under Miss. Code Ann. § 23-15-963 is barred by Taitz's failure to comply with Mississippi election law.

## C.  Whether Plaintiffs Have Stated a Claim to Enjoin the Secretary of State

The Secretary of State argues that even if Taitz had followed the proper procedures under state law to challenge President Obama's qualifications, she has asserted no cognizable claim against the Secretary of State.  According to the Secretary of State, the statutes governing elections do not impose a legal duty on the Secretary of State to investigate a candidate's qualifications.  The statutes in question, says the Secretary of State, legally required him to certify President Obama's and Vice President Biden's names to the circuit clerks for placement on the election ballots.  The court has no power to enjoin him, says the Secretary of State, from carrying out these legally mandated duties which are not judicial nor quasi-judicial in nature.

Taitz has challenged neither the validity nor the constitutionality of Mississippi election law.  To the contrary, she has attempted to contest President Obama's eligibility under the authority of those statutes.  Taitz argues that the Secretary of State

has a duty or responsibility to verify President Obama's eligibility to hold the office of President of the United States before placing him on the ballot for the primary or general election.  Essentially, Taitz asks this court to order the Secretary of State to verify that Obama is a natural born citizen.  Further, says Taitz, the Secretary of State should be enjoined from certifying votes for President Obama if the Secretary of State does not verify President Obama's qualifications. The Secretary of State compares Taitz's claim for declaratory and injunctive relief to the filing of a writ of mandamus.[27]

A writ of mandamus may be used to "direct an official or commission to perform its official duty or to perform a ministerial act . . . ."  *In re Wilbourn*, 590 So.2d 1381, 1385 (Miss. 1991).  For a court to issue a writ of mandamus, the petitioner must show that:  (1) the petitioner is authorized to bring suit; (2) the petitioner has a clear right to the relief sought; (3) the defendant has a legal duty to do the thing which the petitioner seeks to compel; and (4) no other adequate remedy at law exists.  *Bennett v. Bd. of Supervisors of Pearl River Cnty.*, 987 So.2d 984, 986 (Miss. 2008).  Both federal and Mississippi state law require a petitioner for a writ of mandamus to show that the official in question has a clear legal duty to act.  *See id.* at 986; *Giddings v. Chandler*, 979 F.2d 1104, 1108 (5th Cir. 1992).[28]

---

[27] A writ of mandamus is "a writ issued by a court to compel performance of a particular act by a lower court or a governmental officer or body, usually to correct a prior action or failure to act." BLACK'S LAW DICTIONARY-MANDAMUS (9th ed. 2009).

[28] Federal law requirements for a writ of mandamus against federal officers are similar to Mississippi state law requirements.  Under Title 28 U.S.C. § 1361, a district court may issue a writ of mandamus "to compel an officer or employee of the United States or agency thereof to perform a duty owed to the plaintiff."  Mandamus relief is appropriate "only when the plaintiff's claim is clear and certain and the duty of the officer is ministerial and so plainly prescribed as to be free from doubt."  *Giddings*, 979 F.2d at 1108.  Thus, both state and federal law require the petitioner to show that the official has a legal duty to do the thing petitioner seeks to compel.

A writ of prohibition,[29] similar to an injunction, may be used to restrain or prevent an official with judicial or quasi-judicial powers from conduct which exceeds that official's authority. *Barnes v. Ladner*, 131 So.2d 458, 463-64 (Miss. 1961). These tools of mandamus and prohibition, however, may not be used "to restrain or prohibit the Secretary of State from performing the acts mandatorily required of him" by state law. *Id.* at 464.

The court must look to the Mississippi election code to determine if the Secretary of State is required to vet presidential candidates' qualifications prior to placing them on the ballot, or if he is legally obligated to place on the ballot those candidates who comply with the procedures mandated by statute. When construing a statute, if the language is clear and unambiguous, the court's inquiry will begin and end with an examination of that statutory language. *Sebelius v. Cloer*, _____ U.S. _____, 133 S.Ct. 1886, 1893, 185 L.Ed.2d 1003 (2013). "Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Id.*

## 1. Primary Election

Courts consistently have upheld restrictions to ballot access as necessary for the state to manage the electoral process. *See, e.g., Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (finding that states have an interest in regulating ballot access to avoid confusion, deception, and frustration "of the democratic process at the general election"). Courts have found constitutional certain statutes that say a candidate must be generally recognized in the media or must have raised enough

---

[29] A writ of prohibition is: "1. A law or order that forbids a certain action. 2. An extraordinary writ issued by an appellate court to prevent a lower court from exceeding its jurisdiction or to prevent a nonjudicial officer or entity from exercising a power." BLACK'S LAW DICTIONARY-PROHIBITION (9th ed. 2009).

support to receive federal matching funds.  S*ee, e.g. LaRouche v. Sheehan*, 591 F.Supp. 917 (D. Md. 1984).

Some courts have struck down state ballot access statutes under the "void for vagueness" doctrine, because they insufficiently instruct the candidate how to gain access to the ballot.  *See, e.g., Duke v. Connell*, 790 F.Supp. 50 (D.R.I. 1992) (finding that the language "bona fide national candidates" unconstitutionally vague.); *see also Kay v. Mills*, 490 F.Supp. 844 (E.D. Ky. 1980) (finding a Kentucky statute void for vagueness when it permitted the Kentucky State Board of Elections to place candidates on the ballot if they are "generally advocated and nationally recognized as candidates of the political parties [and running] for the office of the President of the United States").

The plaintiffs here have not challenged Mississippi's primary election statute, and have not alleged that any of them were seeking ballot access.  The court will not attack a constitutional issue if the claims may be resolved on another basis, and will not raise a constitutional challenge not raised by the parties.  These cases addressing the constitutionality of the language of state primary election laws restricting ballot access, then, do not apply under the circumstances presented here.

Miss. Code Ann. § 23-15-1089 defines the Secretary of State's responsibility with respect to the primary election.  This statute states:

> The Secretary of State *shall place the name of a candidate upon the presidential preference primary ballot when the Secretary of State shall have determined that such a candidate is generally recognized throughout the United States or Mississippi as a candidate for the nomination of President of the United States.*
>
> On or before December 15 immediately preceding a presidential preference primary election the Secretary of State shall publicly announce and distribute to the news media for publication a list of the candidates he intends to place on the ballot at the following presidential preference

primary election.  Following this announcement he may add candidates to his selection, but he may not delete any candidate whose name appears on the announced list, unless the candidate dies or has withdrawn as a candidate as provided in this chapter.[30]

Before placing a candidate on the ballot for the presidential preference primary, the Secretary of State must decide whether that candidate is "generally recognized throughout the United States or Mississippi for the nomination of President of the United States."  Miss. Code Ann. § 23-15-1089.  The determination of whether a candidate is "generally recognized" as a nominee involves discretion on the part of the Secretary of State.

The statute, however, has no language that would create a legal duty for the Secretary of State to demand each candidate present credentials.  Nor does the statute create a duty for the Secretary of State to complete a background check or other investigation into the constitutional qualifications of the candidates.  This court is persuaded that once the Secretary of State determines that a candidate is "generally recognized" as a nominee, which President Obama unquestionably was in December of 2011, the Secretary of State is required to place that candidate on the primary ballot under Mississippi law.

Beyond the obligation Taitz claims is embedded in the Mississippi election statutes, Taitz has cited only one case in support of her claim that the Secretary of State has a duty to investigate the credentials of each presidential candidate:  *Peace & Freedom Party v. Bowen*, 912 F.Supp.2d 905 (E.D. Cal. 2012).  In that case, the California Secretary of State removed a candidate from the 2012 presidential primary

---

[30] At the time of this opinion, no court in Mississippi has ruled on or interpreted this statute.  This court finds no opinion by either a Mississippi state court or a federal court citing Mississippi Code Ann. § 23-15-1089.

ballot in California because the candidate was twenty-seven (27), under the eligible age for holding the office of President of the United States[31]. *Id.* at 908. The California court held that the California Secretary of State's decision to prohibit the underage candidate from appearing on the ballot was constitutional because the state "'[may] seek[ ] to prevent the clogging of its election machinery [and] avoid voter confusion' by restricting who is listed on the ballot to persons eligible to assume the presidential office" and "state election officials can and do prohibit certain candidates from appearing on the ballot, including those 'who d[o] not satisfy the age requirement for becoming a member of Congress' or for becoming president of the United States.'" *Id.* at 909, 911.

*Peace & Freedom Party*, though, being an opinion from California, is not binding precedent in this court. Further, the holding in that case does not impose an affirmative duty upon the Secretary of State to investigate each candidate's qualifications; rather, the case permits the Secretary of State to remove a candidate who clearly does not qualify for the position he or she seeks. In other words, the court did not impose a duty on the California Secretary of State to vet candidates; instead, the court recognized the California Secretary of State's authority to exclude a candidate who, admittedly, did not meet the minimum requirements.

This court can find no clear legal duty, created by the Mississippi election statutes, for the Secretary of State to inquire into or investigate each presidential candidate's credentials. For that reason, Taitz has failed to state a claim against the Secretary of State for a declaratory judgment or injunction.

---

[31] U.S. CONST. art II, § 1, cl. 4 states, in its pertinent part: "no person . . . shall be eligible to the Office of President . . . who shall not have attained the Age of thirty five Years."

2.  General Election

Miss. Code Ann. § 23-15-785(1) describes the Secretary of State's responsibilities with respect to the general election ballot.  Section 23-15-785(1) states:

> When presidential electors are to be chosen, the Secretary of [the] State of Mississippi *shall certify to the circuit clerks of the several counties the names of all candidates for President and Vice President who are nominated by any national convention* or other like assembly of any political party or by written petition signed by at least one thousand (1,000) qualified voters of this state.

No Mississippi court, or federal court for that matter, has addressed this statute to determine whether it imposes some duty on the Secretary of State to ascertain the qualifications of the candidate prior to certifying the names of the candidates to the circuit clerks of the Mississippi counties. [32]

This statute states that the Secretary of State "shall" certify those candidates nominated by any national convention.  The term "shall" imposes a mandatory duty on the Secretary of State to certify those candidates which meet the requirements of the statute.  The statute includes no language creating a legal obligation or duty for the Secretary of State to investigate the qualifications of the candidates.  The clear language of the statute requires the Secretary of State to accept those candidates nominated by "any national convention," and certify their names to the circuit clerks for placement on the ballot in the general election.

At the time the plaintiffs filed the first amended complaint, President Obama was the presumptive nominee for the Democratic Party, but the Democratic National Convention had not yet been held.  No one here disputes, though, that President

---

[32] One case has interpreted Miss. Code. Ann. § 23-15-785.  *See Moore*, 591 F.3d at 741, *remanded to* 2010 WL 3190755 (S.D. Miss. 2010).  That case, however, deals with the Secretary of State's discretion to refuse to certify a candidate who submitted his application after the close of business on the deadline day.

Obama was nominated at the Democratic National Convention as the Democratic Party's nominee for President of the United States.  This court finds, then, that the Secretary of State was obligated by Mississippi law to place President Obama on the ballot for the general election when the Democratic Party certified his nomination as its candidate.

### 3.  Federalism, Political Question, and Separation of Powers

A larger issue confronting the court here is, under our form of government, who should have the primary role to regulate and police our national political process?  Should this court intervene?  Or has the issue been delegated to another branch of government?  And what is the role of state officers in these national elections?

"Political questions" are a category of nonjusticiable issues "committed by the Constitution to another branch of government."  *Baker*, 369 U.S. at 211.  Because an issue that is deemed a political question is delegated to either the executive or legislative branch, the courts are forbidden from intervening.  *Id.*  The political question doctrines springs from the doctrine of separation of powers, which is based on the idea that the executive, judicial, and legislative branches of government are equal and independent branches, each with its own role in the administration of government.  Each branch must respect the power and authority the other branches wield in their respective realms.  In *Baker*, the United States Supreme Court articulated circumstances in which a political question may arise to threaten this separation of powers:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding

without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217.

"Federalism" is a separation of powers between a state government and the federal government.  The concept of federalism recognizes that certain powers properly belong to a centralized federal government, and other powers properly belong to a localized state government.  *See* Seigfried Weissner, *Federalism: An Architecture for Freedom,* 1 NEW EUR. L. REV. 129, 132-33 (1993).

Both state and federal courts have dismissed cases similar to the one *sub judice*, some lodged by plaintiff Taitz, concluding that granting plaintiffs' requested relief would impermissibly violate the concepts of federalism, the political question doctrine, and separation of powers.  This court finds this case on all fours with both *Keyes v. Bowen*, 117 Cal.Rptr.3d 207 (Cal.Ct.App. 2010), and *Grinols v. Electoral Coll.*, 2013 WL 211135 (E.D.Cal. 2013), cases where the courts ruled that federalism and the separation of powers doctrine barred judicial review of the plaintiffs' challenges to President Obama's qualifications.

In *Keyes*, plaintiffs sued to prevent the Secretary of State of California from placing then-candidate Obama's name on the ballot in the 2008 election.  *Keyes*, 117 Cal.Rptr.3d. at 208.  The plaintiffs argued that the California Secretary of State had to require documentary proof of each candidate's constitutional qualifications before allowing the candidate to be placed on the ballot.  *Id.* at 210.

The California election code in question stated, "the Secretary of State shall cause the names of the candidates for President and Vice President of the several political parties to be placed upon the ballot for the ensuing general election." *Id.* at 214. Much like the Mississippi statute, the Secretary of State was required to certify the names of candidates nominated by their respective political parties.

The California Court of Appeals for the Third District of California denied plaintiffs' requested relief, finding that the California Secretary of State had no discretion to investigate the candidates' credentials, but was mandated by law "to place on the ballot the names of the several political parties' candidates." *Id.* at 215.

The *Keyes* court stated that the Constitution and laws of the United States delegate to Congress the authority to raise and decide objections to a presidential nominee's candidacy. *Id.* at 215-16 (citing the Twelfth Amendment[33] and Title 3 U.S.C.

---

[33] U.S. Const. amend. XII

The Electors shall meet in their respective states and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate;--The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted;--The person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed; and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President. But in choosing the President, the votes shall be taken by states, the representation from each state having one vote; a quorum for this purpose shall consist of a member or members from two-thirds of the states, and a majority of all the states shall be necessary to a choice. And if the House of Representatives shall not choose a President whenever the right of choice shall devolve upon them, before the fourth day of March next following, then the Vice-President shall act as President, as in the case of the death or other constitutional disability of the President.--The person having the greatest number of votes as Vice-President, shall be the Vice-President, if such number be a majority of the whole number of Electors appointed, and if no person have a majority, then from the two highest numbers on the

§ 15[34]).  The court in *Keyes* supported its decision with the pragmatic view of the states'

role, saying:

> the truly absurd result would be to require each state's election official to investigate and determine whether the proffered candidate met eligibility criteria of the United States Constitution, giving each the power to override a party's selection of a presidential candidate.  *The presidential nominating process is not subject to each of the 50 states' election officials independently deciding whether a presidential nominee is qualified, as this could lead to chaotic results.*  Were the courts of 50 states at liberty to issue injunctions restricting certification of duly-elected presidential electors, the result could be conflicting rulings and delayed transition of power in derogation of statutory and constitutional deadlines.

*Id.* at 215. (emphasis added).

---

list, the Senate shall choose the Vice-President; a quorum for the purpose shall consist of two-thirds of the whole number of Senators, and a majority of the whole number shall be necessary to a choice. But no person constitutionally ineligible to the office of President shall be eligible to that of Vice-President of the United States.

[34] Title 3 U.S.C. § 15 states in pertinent part:
Congress shall be in session on the sixth day of January succeeding every meeting of the electors. . . . Two tellers shall be previously appointed on the part of the Senate and two on the part of the House of Representatives, to whom shall be handed, as they are opened by the President of the Senate, all the certificates and papers purporting to be certificates of the electoral votes . . . ; and said tellers, having then read the same in the presence and hearing of the two Houses, shall make a list of the votes as they shall appear from the said certificates; and the votes having been ascertained and counted according to the rules in this subchapter provided, the result of the same shall be delivered to the President of the Senate, who shall thereupon announce the state of the vote, which announcement shall be deemed a sufficient declaration of the persons, if any, elected President and Vice President of the United States, . . . . *Upon such reading of any such certificate or paper, the President of the Senate shall call for objections, if any. Every objection shall be made in writing, and shall state clearly and concisely, and without argument, the ground thereof, and shall be signed by at least one Senator and one Member of the House of Representatives before the same shall be received. When all objections so made to any vote or paper from a State shall have been received and read, the Senate shall thereupon withdraw, and such objections shall be submitted to the Senate for its decision; and the Speaker of the House of Representatives shall, in like manner, submit such objections to the House of Representatives for its decision*; and no electoral vote or votes from any State which shall have been regularly given by electors whose appointment has been lawfully certified to according to section 6 of this title from which but one return has been received shall be rejected, but the two Houses concurrently may reject the vote or votes when they agree that such vote or votes have not been so regularly given by electors whose appointment has been so certified.
(emphasis added)

In *Grinols*, 2013 WL 211135 *1, plaintiff Taitz acted as attorney for plaintiffs who challenged President Obama's constitutional qualifications to serve as President of the United States.[35]  The plaintiffs in *Grinols* asked the court for a temporary restraining order to prevent, among other things:

> (1) California's Secretary of State and Governor from certifying the Certificate of Ascertainment [which lists the electors for each candidate and the number of votes received by each candidate's electors]; (2) the Electoral College from tallying the 2012 presidential election votes; and (3) the Governor of California from forwarding the Certificate of Electoral Vote to the United States Congress . . . .

*Id.* at *1.

The district court decided that the plaintiffs' claims were "legally untenable" and nonjusticiable because the relief requested violated the separation of powers and political question doctrines.  *Id.* at *2.  In particular, the district court noted that the United States Constitution had entrusted the issue of presidential qualifications and removal from office with the legislative branch.  *Id.* at *6.

The Twelfth Amendment, said the district court, guides the electoral college process in Congress.  Under the Twelfth Amendment, the President of the Senate[36] presides over a meeting of the two (2) houses of Congress to count the electoral votes. *Id.* at *4.  This amendment authorizes the House of Representatives to choose a president and the Senate to choose a vice president if no candidate receives a majority of the electoral votes.  *Id.*  Should neither the president-elect nor the vice-president-

---

[35] *In Grinols*, Attorney Taitz represented five (5) plaintiffs:  James Grinols, Robert Odden, Edward Noonan, Keith Judd, and Thomas Gregory MacLeran.  Thomas Gregory MacLeran is also a plaintiff in this lawsuit.

[36] The President of the Senate is the sitting Vice President of the United States.

elect qualify to serve, the Twentieth Amendment[37] authorizes Congress to devise a method for selecting a president and vice-president.  *Id.*

Further, the *Grinols* court noted that the Twenty-Fifth Amendment[38] permits only Congress to remove a president from office.  *Id.* at *6.  Under the Twenty-Fifth Amendment, the Vice President or some other executive body created by Congress must inform the Congress that the president is unfit to discharge his duties.  Thereafter, Congress must determine whether to remove the president.

The *Grinols* court could find no Constitutional provision that would empower the judiciary to remove a president from office or enjoin an elected president from taking

---

[37] U.S. CONST. amend. XX, § 3 states in pertinent part:

> If a President shall not have been chosen before the time fixed for the beginning of his term, or if the President elect shall have failed to qualify, then the Vice President elect shall act as President until a President shall have qualified; and the Congress may by law provide for the case wherein neither a President elect nor a Vice President elect shall have qualified, declaring who shall then act as President, or the manner in which one who is to act shall be selected, and such person shall act accordingly until a President or Vice President shall have qualified.

[38] U.S. Const., amend. XXV § 4 states:

> Whenever the Vice President and a majority of either the principal officers of the executive departments or of such other body as Congress may by law provide, transmit to the President pro tempore of the Senate and the Speaker of the House of Representatives their written declaration that the President is unable to discharge the powers and duties of his office, the Vice President shall immediately assume the powers and duties of the office as Acting President.
>
> Thereafter, when the President transmits to the President pro tempore of the Senate and the Speaker of the House of Representatives his written declaration that no inability exists, he shall resume the powers and duties of his office unless the Vice President and a majority of either the principal officers of the executive department or of such other body as Congress may by law provide, transmit within four days to the President pro tempore of the Senate and the Speaker of the House of Representatives their written declaration that the President is unable to discharge the powers and duties of his office. Thereupon Congress shall decide the issue, assembling within forty-eight hours for that purpose if not in session. If the Congress, within twenty-one days after receipt of the latter written declaration, or, if Congress is not in session, within twenty-one days after Congress is required to assemble, determines by two-thirds vote of both Houses that the President is unable to discharge the powers and duties of his office, the Vice President shall continue to discharge the same as Acting President; otherwise, the President shall resume the powers and duties of his office.

office.  *Id.*  The *Grinols* court also concluded that if it were to grant the declaratory relief requested by the plaintiffs, it would necessarily interfere with the prerogative of Congress to determine if the president is fit to discharge his duties.  *Id.* at *7.

Likewise, this court can find no authority in the Constitution which would permit it to determine that a sitting president is unqualified for office or a president-elect is unqualified to take office.  These prerogatives are firmly committed to the legislative branch of our government.  Plaintiffs want this court to declare President Obama ineligible to serve as President of the United States and bar the Secretary of State from placing President Obama on the ballot or nullify any votes cast by Mississippi voters for President Obama.  This court agrees with the courts in both *Keyes* and *Grinols* that these matters are entrusted to the care of the United States Congress, not this court. For this reason, the court finds that the plaintiffs have failed to demonstrate a proper legal footing for this court to mandate or enjoin the Secretary of State in his duties with respect to the presidential election.

**D.  RICO Claim**

Plaintiffs' first amended complaint disavowed any RICO claim against the Secretary of State:

> Secretary of State of Mississippi is sued only in his official capacity as the chief elections officer of the State of Mississippi and he is sued only as a respondent in relation to the declaratory relief and injunctive relief in seeking his action in his official capacity . . . to remove candidate Obama from the ballot in the general 2012 Presidential election and in de-certifying any and all votes for Obama fraudulently received by Obama in the Primary 2012 Presidential election.  Secretary of State is NOT being sued in RICO causes of action.

First amended complaint at 3-4, docket no. 1-1.  Plaintiffs' RICO statement, however, alleges fraud on the part of the Secretary of State.

Rule 9 of the Federal Rules of Civil Procedure requires the plaintiff to allege with particularity the time, place, and manner of each act of fraud.  Plaintiffs have claimed that the Secretary of State was "on notice" of fraud because of  a prior lawsuit against the Secretary of State in Mississippi, *Thomas v. Hoseman*, civil action no. 2:08-cv-241-KS-MTP, which raised similar allegations against President Obama.

Because the plaintiff motioned for voluntary dismissal, that lawsuit was never prosecuted to resolution, and involved no adjudication of the facts surrounding President Obama's "natural born" status.  That suit, therefore, merely notified the Secretary of State of allegations against President Obama.

Knowledge that someone has accused another person of committing a wrong does not necessarily mean that the accusation is true.  At best, plaintiffs have shown that the Secretary of State was aware of the dispute over President Obama's identification documents or disregarded prior litigants' unproven accusations.  Plaintiffs, however, have not alleged even minimal facts to accuse the Secretary of State of fraud, nor have they succeeded in their burden under Rule 9.  Nor have plaintiffs alleged that the Secretary of State was somehow complicit in, or agreed to carry out, a purported RICO scheme

**E.  Conclusion**

For the reasons discussed above, this court finds that the Secretary of State's motion for judgment on the pleadings [docket no. 8] is well-taken and should be granted.  This court, therefore, dismisses all claims against the Secretary of State.

### III. Motion for Judgment on the Pleadings Filed by MDEC

MDEC has filed a motion for judgment on the pleadings [docket no. 15], asking this court to dismiss this lawsuit in its entirety.  President Obama, Pelosi, and Obama for America have joined in and adopted this motion, the accompanying memorandum, and MDEC's reply brief.  Docket no. 60.  MDEC urges dismissal on the following grounds: (1) plaintiffs' state law claims are barred because the plaintiffs have failed to follow the jurisdictional requirements of state election laws or, in the alternative, these claims are moot now that the election has passed; (2) plaintiffs lack standing to seek declaratory or injunctive relief or, in the alternative, the plaintiffs' claims are moot now that the election has passed; and (3) plaintiffs lack standing to file their RICO claims or, in the alternative, plaintiffs have failed to allege a RICO "enterprise."  This court already has dismissed all claims brought by Taitz and her co-plaintiffs under Mississippi election statutes in Section II above.

### A.  Injunctive and Declaratory Relief

This court, according to MDEC, lacks jurisdiction to issue the injunctive or declaratory relief plaintiffs seek, because these plaintiffs lack standing under Article III of the United States Constitution.  MDEC also argues that these claims are moot because the primary and general election have taken place.  Finally, says MDEC, the plaintiffs' claims are so lacking in merit as to be frivolous.

Federal courts have limited jurisdiction as defined by the United States Constitution and acts of Congress.  Standing "is perhaps the most important of jurisdictional doctrines."  *United States v. Hays*, 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (internal citations omitted).  The doctrine of standing derives its

potency from Article III, Section 2, of the United States Constitution,[39] which limits the federal judicial power to the resolution of "cases" and "controversies."  *Hollander v. McCain*, 566 F.Supp.2d 63, 67 (D.N.H. 2008).  The purpose of the standing doctrine, "which is built on separation-of-powers principles, [is] to prevent the judicial process from being used to usurp the powers of the political branches."  *Clapper v. Amnesty Int'l USA*, ___ U.S. ____, 133 S.Ct. 1138, 1146, 185 L.Ed.2d 264 (2013).

To have Article III standing, a plaintiff must show:  (1) "an injury in fact" that is "concrete and particularized" and "actual or imminent;" (2) a causal connection between the defendant's conduct and plaintiff's injury; and (3) a likelihood that a favorable decision by the court will be able to redress or remedy the injury.  *Hays*, 515 U.S. at 743.  The burden falls to the party asking the court to resolve the dispute to "clearly allege facts" that demonstrate standing.  *Id.*

The United States Supreme Court has consistently rejected a plaintiff's standing to bring a lawsuit based on "generalized grievances" against governmental misconduct that does not impact the plaintiff in some unique way.  *Id.* (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Ex parte Levitt*, 302 U.S. 633, 58 S.Ct.

---

[39] U.S. Const. art. III, § 2, cl. 1 states:
> The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;--to all Cases affecting Ambassadors, other public Ministers and Consuls;--to all Cases of admiralty and maritime Jurisdiction;--to Controversies to which the United States shall be a Party;--to Controversies between two or more States;-- between a State and Citizens of another State;--between Citizens of different States;-- between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

1, 82 L.Ed. 493 (1937)).  Ultimately, these cases have reached the same conclusion:  a generalized grievance does not rise to the level of an injury-in-fact for the purposes of standing.

In *Hays*, the United States Supreme Court found that plaintiffs, who did not live in the particular voting district that they contended was created by illegal, racially-motivated gerrymandering, did not have standing to challenge the boundaries of the state's voting districts in federal court.  *Hays*, 515 U.S. at 747.  The court stated that "anybody in the State" could not show a direct injury from improper redistricting.  *Id.* at 744-45.  To have standing to sue, plaintiffs who did not live in the district in question had to show "specific evidence that [they had] been personally subjected to racial classification." *Id.*

In *Hollander*, the United States District Court for the District of New Hampshire dismissed a lawsuit brought by a New Hampshire voter against presidential candidate John McCain and the Republican National Committee.  *Hollander*, 566 F.Supp.2d at 64.  Plaintiff Hollander alleged that McCain, who was born in the Panama Canal Zone, was not a "natural born citizen" and, thus, not eligible to be president of the United States.  *Id.* at 66.  Hollander said that he was injured because McCain's appearance on the primary ballot in New Hampshire diluted his and other Republicans' votes, such that their votes would "count less than the votes of those who voted in other parties' primary elections."  *Id.* at 67.  The district court found that Hollander lacked standing because he failed to allege a concrete injury specific to him, as opposed to a harm that "would adversely affect only the generalized interest of all citizens in constitutional governance."  *Id.* at 68 (citing *Schlesinger*, 418 U.S. at 217).

34

Numerous federal courts confronted with challenges to President Obama's qualifications have found that plaintiffs lacked standing because the plaintiffs' claims were either generalized grievances or could not be redressed through court action.  *See Drake v. Obama*, 664 F.3d 774 (9th Cir. 2011) (finding that active duty military personnel, former military personnel, state representatives, taxpayers, and an Obama relative had no injury-in-fact, other than generalized grievances, to satisfy standing; also finding that presidential candidates had no "competitive standing" after a president has been sworn in); *see Kerchner v. Obama*, 612 F.3d 204 (3d Cir. 2010) (finding that two service men did not have standing to sue to remove President Obama because their alleged injuries only amounted to a generalized grievance); *see Berg v. Obama*, 574 F.Supp.2d 509 (E.D.Pa. 2008), *aff'd* 586 F.3d 234 (3d Cir. 2009) (finding that voters lack standing when the harm alleged is abstract and widely held by the general public); *see Hollander*, 566 F.Supp.2d at 63 (finding that an allegation of failure to follow the requirements of the Constitution, without showing an actual injury-in-fact, is not sufficient to grant standing to a person challenging the qualifications of a person running for president); *see Robinson v. Bowen*, 567 F.Supp.2d 1144 (N.D.Cal. 2008) (stating that the Constitution committed to members of the Senate and the House of Representatives the right to adjudicate objections to allegedly unqualified candidates).

Plaintiff Taitz has cited *Miss. State Democratic Party v. Barbour*, 491 F.Supp.2d 641 (N.D.Miss. 2007), to support her cause.  In that case, the Mississippi Democratic Party challenged the constitutionality of Mississippi statutes governing state primary elections.  *Id.* at 644.  The district court reached the merits, finding that the Mississippi

Democratic Party had standing to sue, and granted summary judgment in favor of the Mississippi Democratic Party.  *Id.* at 661-62.

On appeal, the Fifth Circuit decided that the plaintiff's claims were not yet ripe for adjudication because plaintiff provided no evidence of concrete plans or "serious interest" in implementing a closed primary in violation of the challenged Mississippi law. *Miss. Democratic Party v. Barbour*, 529 F.3d 538, 546 (5th Cir. 2008).  While the Fifth Circuit reversed on different grounds than the type of standing at issue here,[40] the facts of *Barbour* are not on all fours with plaintiffs' claims here.

In *Barbour*, the Mississippi Democratic Party and MDEC (jointly "MDEC") challenged Mississippi's statute governing primary elections saying that the statute allowed anyone, regardless of party affiliation, to vote in the Democratic Party primary. *Id.* at 541.  This circumstance, said MDEC, violated the political party's First Amendment  right of free association.  *Id.* at 542-43.  The plaintiffs here make very different claims, insisting that President Obama's bid for the office of President has "deprived [voters] of a lawful election."  First amended complaint at 25, docket no. 1-1. These plaintiffs' claims are far from the specific allegations of harm involved in *Barbour*.

Some courts have recognized "competitive standing" of a candidate in a particular election to challenge his competitor's credentials.  The court in *Drake*, 664 F.3d at 783 (citing *Owen v. Mulligan*, 640 F.2d 1130, 1132-33 (9th Cir. 1981)),

---

[40] Ripeness and standing are closely related doctrines which limit federal court's jurisdiction under Article III of the Constitution.  *Barbour*, 529 F.3d at 544.  Both require that an "injury be imminent rather than conjectural or hypothetical."  *Id.* at 545.  Ripeness is primarily concerned with timing–"whether the harm asserted has matured sufficiently to warrant judicial intervention." *Id.* at 544.

referenced competitive standing saying that "the potential loss of an election [is] an injury-in-fact sufficient to give a local candidate and Republican party officials standing."

Taitz cites a case involving "competitive standing," *Fulani v. Hogsett*, 917 F.2d 1028, 1029 (7th Cir. 1990), in which the New Alliance party's presidential candidate, Lenora Fulani ("Fulani"), challenged placement of the Democratic and Republican nominees on the same ballot with her in the Indiana presidential election.  Fulani challenged the competing candidates saying they had failed to follow the proper state election procedures.  *Id.* at 1030.  The United States Court of Appeals for the Seventh Circuit found that Fulani had standing to challenge the competing candidates because the presence of other candidates on the ballot resulted in increased competition which required additional campaigning and funds.  *Id.*

This Circuit also has recognized "competitive standing" under certain circumstances.  The United States Court of Appeals for the Fifth Circuit, in *Tex. Democratic Party v. Benkiser,* 459 F.3d 582, 586-88 (5th Cir. 2006), found that the Texas Democratic Party ("TDP") had Article III standing to obtain an injunction in federal court preventing the Republican Party of Texas ("RPT") from removing an ineligible candidate from the ballot for a United States Congressional seat and replacing him with a different candidate.

The TDP challenged a ballot change late in the election cycle in federal court, alleging that the TDP would suffer immediate financial loss because it would have to "raise and expend additional funds and resources to prepare a new and different campaign in a short time frame."  *Id.* at 586.  The district court agreed with the TDP, finding it had standing to challenge the RPT's and defendant's actions, and enjoined the

Texas Secretary of State from removing the Republican candidate's name from the ballot. *Id.* at 585.

The Fifth Circuit affirmed the district court's decision, finding that the TDP had standing based on its allegations of financial harm, and the negative impact a last minute change could have on its candidate on the ballot in that election. *Id.* at 586-87.

*Fulani* and *Benkiser*, however, are distinguishable from the case at hand. In this lawsuit, the plaintiffs have provided no evidence nor alleged any facts that show they have a particularized injury. The first amended complaint demands equitable relief because "no financial damages would suffice." First amended complaint at 25, docket no. 1-1. Plaintiffs demand a declaratory judgment and an injunction because, allegedly, "[v]oters are being deprived of a lawful election" and the plaintiffs are being deprived "of the basic civil right to have a lawful election." *Id.* at 26. These claims fall squarely into the category of harms common to the general public, which courts have repeatedly found do not suffice to confer standing on a plaintiff. *See Drake*, 664 F.3d at 774; *see Berg*, 574 F.Supp.2d at 509, *aff'd* 586 F.3d 234 (4th Cir. 2009); *see Hollander*, 566 F.Supp.2d at 63.

With respect to competitive standing, the first amended complaint alleges that three (3) plaintiffs—Lax, Roth, and MacLeran—were running for the office of President of the United States. First amended complaint at 3, docket no. 1-1. The complaint, however, does not allege that any of these plaintiffs sought to be placed on the Mississippi ballot, either in the primary or general election. While the first amended complaint alleges that Lax is a Democrat and was running for President and McLaren was a Republican presidential candidate, it does not allege that these plaintiffs sought

the nomination of their respective parties.  These candidates cannot establish competitive standing to challenge placement of President Obama's name on the Mississippi ballot without some showing that they, too, were competing on that ballot.

Plaintiff Fedorka is the only plaintiff who alleges residence in Mississippi.  He is named in the first amended complaint as a "citizen of the state of Mississippi and a registered legal voter in Mississippi."  Under the facts presented here, a voter lacks standing to sue in federal court because individual voters have "no greater stake in this lawsuit than any other United States citizen."  *Drake*, 664 F.3d at 782.

Taitz complains of a unique harm to herself.  She alleges that she has:

received multiple death threats from Obama supporters who do not believe their 'messiah' is capable of committing elections fraud. . . . Unless the injunction is issued and the public is apprised of the evidence of the elections fraud and forgery by Obama, such threats will continue until one of Obama's supporters will succeed in making his threat a reality.

First amended complaint at 26, docket no. 1-1.

While threats of violence are quite serious, this court is persuaded that these alleged injuries are too attenuated from the wrongs alleged to confer standing on Taitz. A targeted physical attack against a third party is not generally the type of harm the court would expect to flow from election-related fraud.

Further, Taitz does not allege that any of the defendants here have threatened her with physical harm.  Taitz admits in the complaint that the "Obama supporters" who have threatened her are members of the public who do not even know that President Obama has, according to Taitz, committed elections fraud.  *See* first amended complaint at 26, docket no. 1-1.

The court can provide no remedy for these alleged harms.  These unnamed "Obama supporters" are not parties here, and this court is without authority to exert jurisdiction over them.  Whether these "supporters" would be dissuaded from their threats if the court addressed the merits of plaintiffs' claims is at best speculative and tenuous.  The court is persuaded that this is not the type of injury that could be addressed with the relief sought by plaintiffs.

Plaintiffs next point to other cases and court documents saying that other courts have exerted jurisdiction over similar claims, and this court is bound to grant her standing based on principles of *res judicata* or collateral estoppel.  For example, an administrative law judge in Georgia heard evidence and the merits of plaintiffs' challenge to President Obama's qualifications in the case of *Farrar v. Obama*, Case No. OSAH-SECSTATE-CE-1215136-60-Malihi.  Judge Michael M. Malihi, Deputy Chief Administrative Law Judge in the Office of State Administrative Hearings in Georgia, held an evidentiary hearing on January 26, 2012, and allowed Taitz to present evidence of President Obama's fraud and foreign nationality.[41]  Judge Malihi, after a full hearing, found Taitz's "proof" unconvincing.[42],[43]

---

[41] This court has found a transcript of the hearing conducted by Judge Malihi and the Judge's February 3, 2012, opinion in the records of the Georgia Office of State Administrative Hearings at http://www.osah.ga.gov/recent-cases.html (last visited Mar. 31, 2015).

[42] Judge Malihi, in his written opinion, stated that "plaintiffs presented the testimony of eight witnesses and seven exhibits in support of their position. . . .  The Court finds the testimony of the witnesses, as well as the exhibits tendered, to be of little, if any, probative value, and thus wholly insufficient to support plaintiffs' allegations."  The court found that Taitz failed to qualify the alleged "expert witnesses" as experts, and that "[n]one of the testifying witnesses provided persuasive testimony."

Judge Malihi addressed Taitz's legal arguments regarding the definition of a "natural born citizen," and her assertion that President Obama does not meet that definition.  Judge Malihi found that Taitz failed to show that President Obama was not born within the territorial borders of the United States, and that President Obama is a natural born citizen, eligible to be a candidate for the presidential primary election under Georgia law.

Judge Malihi, as a state administrative law judge is not constrained by the Article III standing requirement, which limits this federal court's jurisdiction.  State courts are courts of general jurisdiction.  Only the federal courts are so bound by these constitutional strictures.  *See Barrett Computer Servs., Inc. v. PDA, Inc.*, 884 F.2d 214, 218 (5th Cir. 1989) ("By definition, standing goes to "the 'case or controversy' limitation on federal court jurisdiction, and [an inquiry into a party's standing] focuses primarily 'on the party seeking to get his complaint before a federal court.'").  Judge Malihi's proceedings, therefore, do not bestow standing on plaintiffs to adjudicate these matters in this federal court.

Taitz also has submitted a subpoena *duces tecum* issued by the United States District Court for the District of Hawaii.  The subpoena is addressed to defendant Fuddy, Director of Health, Hawaii Health Department, and demands that she produce President Obama's "original 1961 typewritten birth certificate."  Docket no. 69-1 at 31.

Taitz, however, appears to have obtained a blank subpoena from the Clerk of Court for the United States District Court for the District of Hawaii, as is authorized by Rule 45 of the Federal Rules of Civil Procedure, and filled in the contents of the subpoena herself.  Rule 45 directs the clerk to issue a blank subpoena to a party or

---

[43] This court has reviewed the dockets and documents for cases referenced by plaintiffs in support of their arguments.  The court may consider documents in another court's record to establish facts such as, "that a specific document was filed, that a party took a certain position, that certain judicial findings, allegations, or admissions were made."  *In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 205 (3d Cir. 1995).

Under the authority of Rule 201 of the Federal Rules of Evidence, this court may take judicial notice of an adjudicative fact that is "not subject to reasonable dispute . . . as long as it is not unfair to a party to do so and does not undermine the trial court's factfinding authority."  *Id.* at 205-206 (citing Fed.R.E. 201).

While this court has reviewed dockets and pleadings from cases cited by plaintiffs in order to clarify the plaintiffs' somewhat jumbled arguments, this court has not relied on any factual findings or legal determinations from those cases.

attorney who requests one.  Rule 45(a)(3) of the Federal Rules of Civil Procedure states:

> The clerk must issue a subpoena, signed but otherwise in blank, to a party who requests it.  That party must complete it before service.  An attorney also may issue and sign a subpoena as an officer of:
> (A)     a court in which the attorney is authorized to practice; or
> (B)     a court for a district where a deposition is to be taken or production is to be made, if the attorney is authorized to practice in the court where the action is pending.

Taitz seems to have obtained this subpoena in connection with a lawsuit she filed in the United States District Court for the District of Columbia.  *Taitz v. Astrue*, 806 F.Supp.2d 214 (D.D.C. 2011) *aff'd* by 2012 WL 1930959 (D.C.Cir. May 25, 2012).  Taitz sued Astrue, the Commissioner of the United States Social Security Administration, under the Freedom of Information Act, seeking release of documents related to President Obama's social security number.  *Id.* at 216.  During the pendency of that lawsuit, she had this subpoena issued in Hawaii, and attempted to use it to obtain a copy of President Obama's original birth certificate from that states' vital records department.  *Taitz v. Astrue*, Civil case no. 1:11-cv-519-SOM-RLP.  Taitz allegedly served this subpoena on defendant Fuddy, and then moved to compel Fuddy to attend a hearing and to produce President Obama's birth certificate.  The United States District Court for the District of Hawaii denied Taitz motion to compel Fuddy to appear or to produce the requested documents because the underlying lawsuit in the District of Columbia had been dismissed.

The District Court in Hawaii never passed on whether the subpoena was valid, whether Taitz had standing in the underlying matter, or whether Fuddy could be compelled to produce President Obama's birth certificate.  The District Court in the

District of Columbia granted summary judgment in favor of defendant Astrue, finding that Taitz could not legally compel Astrue to release the documents she sought under the Freedom of Information Act.  *See Astrue*, 806 F.Supp.2d at 220.  This subpoena provides no support that Taitz and the other plaintiffs have standing to pursue this lawsuit in this federal court.

This court finds that the plaintiffs lack standing to pursue the declaratory and injunctive relief named in their complaint.  The plaintiffs have alleged no particularized injury that would confer Article III standing on them to bring this lawsuit.  Further, the authority and documents cited by plaintiff Taitz provide no support to her argument that this court is collaterally estopped from finding that plaintiffs lack standing.

## B.  RICO claims

Before proceeding, this court makes clear that the plaintiffs' complaint and RICO statement are far from a model of clarity.  The plaintiffs' documents are disjointed and at times incomprehensible.  Many sections appear to be lifted directly from other pleadings in other cases, without regard to whether those sections are relevant to the case *sub judice.*  The complaint and RICO statement also cite pages of statutes without explanation of their specific applicability to the facts here, merely copied-and-pasted from the United States Code.  Further, plaintiffs have deluged the court with documents brimming with accusations, conclusory statements, and general attacks.  As the Fifth Circuit has previously stated, "[v]ital facts . . . may not be established by piling inference upon inference.  Some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence."  *Davis-Lynch, Inc.*, 667 F.3d at 553 (internal quotations omitted).

Plaintiffs have essentially asked this court to make their arguments for them; in common parlance, plaintiffs have thrown a haystack at the court, expecting the court to find a needle therein.  *See Old Tim Enters. v. Int'l Coffee Corp.*, 862 F.2d 1213, 1220 (5th Cir. 1989) (a RICO plaintiff cannot allege every possible avenue of recovery "while retaining a level of generality and indefiniteness that would mask any legal deficiencies and preclude effective challenge").  Although this court construes *pro se* pleadings liberally, this court is not the plaintiffs' attorney, and this court will not read the *pro se* pleadings so broadly as to include a cause of action not alleged.  *Richards v. British Petroleum*, 869 F.Supp.2d 730, 737 (E.D. La 2012).  Further, while Taitz is acting *pro se* as a plaintiff here, she is a licensed attorney and presumably should have the requisite skill and competence to prosecute a lawsuit.

Plaintiffs have filed RICO claims, a RICO case statement, and a supplemental RICO statement, saying that defendants are part of an expansive fraudulent scheme. Plaintiffs allege that President Obama has committed fraud by failing to provide valid documentary evidence of his natural born citizen status and by using forged identification documents.  Plaintiffs accuse President Obama of mail and wire fraud for posting his allegedly fabricated long form birth certificate on the internet and sending his declaration of candidacy to all fifty (50) states in both the 2008 presidential election and the 2012 presidential election.

Plaintiffs say that Onaka, Fuddy, Astrue, Pelosi, the Secretary of State, MDEC, and Obama for America are guilty of misprision of felony, under Title 18 U.S.C. § 4,[44] for

---

[44] Title 18 U.S.C. § 4 states:
> Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same

aiding and abetting President Obama in his fraud, social security fraud, elections fraud, and use of a forged postal stamp on his selective service certificate.

Plaintiffs also accuse Obama for America of being a RICO association-in-fact enterprise.[45]

The RICO statutes were enacted as part of the Organized Crime Control Act of 1970, "to prevent the infiltration of legitimate business operations affecting interstate commerce" by organized crime and the monies generated by criminal activity. *Iannelli v. United States*, 420 U.S. 770, 787 n.19, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975).  In addition to criminal penalties, these statutes create a private civil cause of action for any individual who is "injured in his business or property" by a defendant's "racketeering" as described in Title 18 U.S.C. § 1962.  Title 18 U.S.C. § 1964(c).[46]  The statute allows the injured party to recover treble damages.  *Id.*

Subsections (a) through (c) of § 1962 describe three (3) types of RICO violations. To satisfy the common elements of these subsections, which make up a *prima facie* case of civil RICO, a plaintiff must allege that the defendant is "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise."  *Abraham v. Singh*, 480 F.3d 351,

---

to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

[45] Title 18 U.S.C. § 1961(4) defines an "enterprise as, "any individual, partnership, corporation, association, or other legal entity, and *any union or group of individuals associated in fact although not a legal entity*;" (emphasis added).

[46] Title 18 U.S.C. § 1964(c) states in part:
Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .

355 (5th Cir. 2007).  Subsection (d) codifies conspiracy as a violation of RICO.  The

specific prohibited activities under § 1962 may be summarized as follows:

> (a) a person who has received income from a pattern of racketeering
> activity *cannot invest that income in an enterprise*;
> (b) a person *cannot acquire or maintain an interest in an enterprise*
> through a pattern of racketeering;
> (c) a person who is employed by or associated with an enterprise *cannot
> conduct the affairs of the enterprise* through a pattern of racketeering
> activity.

*Abraham*, 480 F.3d at 354-55 (emphasis added).

A RICO enterprise need not be a "business-like" entity, but it must have a

structure that encompasses "a purpose, relationships among those associated with the

enterprise, and longevity sufficient to permit these associates to pursue the enterprise's

purpose."  *Boyle v. United States*, 556 U.S. 938, 945-56, 129 S.Ct. 2237, 173 L.Ed.2d

1265 (2009).  "An association-in-fact enterprise is a group of persons associated

together for a common purpose of engaging in a course of conduct."  *Id.* at 946 (internal

citation omitted).  The RICO enterprise need not have a formal structure, or "chain of

command."  *Id.* at 948.

The enterprise must exist as a distinct and independent entity, apart from the

pattern of racketeering activity itself.  *Id.* at 947.  "Proof of one does not necessarily

establish the other."  *Id.*  The proof of a pattern or racketeering, though, may in some

circumstances also prove the existence of a RICO enterprise.  *Id.*

A "pattern of racketeering activity" requires a showing of "two or more predicate

criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal

activity."  *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009).

Racketeering activities, also called predicate acts, are defined in Title 18 U.S.C. § 1961.[47]  These acts are federal or state crimes that are punishable by more than one (1) year of imprisonment.  *Id.*  The statute lists specific federal crimes which constitute RICO predicate acts, including mail and wire fraud, offenses involving bankruptcy or securities fraud, and drug-related crimes.  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 481-82, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (citing Title 18 U.S.C. § 1961(1)).

## C.  RICO standing

Defendants challenge the plaintiffs standing to bring this lawsuit, saying that the plaintiffs have not alleged an injury cognizable under RICO.  To have RICO standing, a plaintiff must show he has suffered an injury, and that the injury was caused by, or "by reason of," the defendants RICO activity.  *See Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 606 (5th Cir. 1998).  Plaintiffs may satisfy this standing requirement by showing they suffered an injury that was proximately caused by the defendants' predicate acts. *See Sedima, S.P.R.L.*, 473 U.S. at 497.

Injury under civil RICO is defined as harm to "business or property;" thus, personal injuries such as medical expenses, emotional distress, or injuries related to defamation are not cognizable under RICO.  *Gaines*, 965 F.Supp. at 890 (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979)).

---

[47] Title 18 U.S.C. § 1961(1) provides a long list of state and federal law crimes which constitute RICO predicate acts.

Title 18 U.S.C. § 1961(1)(A) states that "[a]ny act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year" is an act of racketeering.

Title 18 U.S.C. § 1961(1)(B) provides a list of federal crimes, found in Title 18 of the United States Code, which constitute RICO predicate acts.

When a plaintiff brings claims under § 1961(a) and (b), a RICO injury must stem from investing racketeering proceeds into an enterprise or gaining control of an enterprise through racketeering activities.  *Abraham*, 480 F.3d at 354-55.  A plaintiff may not maintain a cause of action under these two subsections when she claims injury solely caused by predicate criminal acts. *Id.* at 356-57.  Taitz only has claimed injury allegedly caused by predicate acts of defendants and their associates. For this reason, she has failed to allege a cause of action under either § 1961(a) or (b).

In order to determine if the defendants' alleged racketeering activity has caused injury to the plaintiffs' "business or property," this court will review the alleged racketeering acts and injuries.  In reviewing the plaintiffs' allegations and purported injuries, the court does not pass on whether the plaintiffs have sufficiently pled each of the numerous predicate acts cited.

Furthermore, this court will not address the "new evidence" that plaintiffs provided to the court on January 21, 2014.  That purported evidence alleges that President Obama is responsible for the deaths of various individuals.  Even if this court took those allegations as true, the plaintiffs' businesses and properties have not been harmed by those alleged crimes.

Lastly, this court already has dismissed the Secretary of State, and will not address allegations against the Secretary of State here.

1.  Predicate acts

Plaintiffs do not appear to have made the effort to pinpoint specific crimes committed, but instead accuse the defendants of nearly all possible predicate crimes by

copying the bulk of § 1961 of RICO into their pleadings.[48]  Plaintiffs' allegations,

however, focus primarily on mail and wire fraud[49], and misprision of felony[50].

---

[48] In her RICO statement and supplemental RICO statement [docket nos. 49 and 73].  Taitz accuses the defendants of the following laundry list of predicate acts taken from the RICO statute: Title 18, Section 201 (relating to bribery); sections 471-473 (relating to counterfeiting); section 1028 (relating to fraud and related activity in connection with identification documents); section 1341 (relating to mail fraud); section 1343 (relating to wire fraud); section 1344 (relating to financial institution fraud); section 1425 (relating to the procurement of citizenship or nationalization unlawfully); section 1426 (relating to the reproduction of naturalization or citizenship papers); section 1427 (relating to the sale of naturalization or citizenship papers); sections 1461-1465 (relating to obscene matter), section 1503 (relating to obstruction of justice); section 1510 (relating to obstruction of criminal investigations); section 1511 (relating to the obstruction of State or local law enforcement); section 1512 (relating to tampering with a witness, victim, or an informant); section 1513 (relating to retaliating against a witness, victim, or an informant); section 1542 (relating to false statement in application and use of passport); section 1543 (relating to forgery or false use of passport); section 1544 (relating to misuse of passport); section 1546 (relating to fraud and misuse of visas, permits, and other documents); section 1951 (relating to interference with commerce, robbery, or extortion); section 1952 (relating to racketeering); section 1956 (relating to the laundering of monetary instruments); section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity); section 1960 (relating to illegal money transmitters); sections 2314 and 2315 (relating to interstate transportation of stolen property); section 2320 (relating to trafficking in goods or services bearing counterfeit marks).

   Title 18 U.S.C. § 1961(1)(F) cites crimes indictable under the Immigration and Nationality Act.  Taitz accuses these defendants of violating the following sections of the Act: section 274 (relating to bringing in and harboring certain aliens); section 277 (relating to aiding or assisting certain aliens to enter the United States); and section 278 (relating to importation of alien for immoral purpose), if the act indictable under such section of such Act was committed for the purpose of financial gain.

   Finally Taitz cites Title 18 U.S.C. § 1961(1)(G), which makes "any act that is indictable under any provision listed in section 2332b(g)(5)(B)," a predicate act.  This section of the criminal code relates to acts of terrorism transcending national boundaries.

[49] The elements necessary to prove mail or wire fraud under Title 18 U.S.C. §§ 1341 and 1343 are:  "(1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme."  *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004).

[50] "The elements of misprision of felony are:  1) the principal committed and completed the alleged felony; 2) defendant had full knowledge of that fact; 3) defendant failed to notify the authorities; and 4) defendant took steps to conceal the crime."  *United States v. Cefalu*, 85 F.3d 964, 969 (2d Cir. 1996) (citations omitted).

### a.  President Obama

Plaintiffs say that President Obama committed fraud by failing to provide valid documentary evidence of his natural born status and by using forged identification documents.  President Obama, say plaintiffs, committed mail and wire fraud when he posted his allegedly fraudulent long form birth certificate on the internet, and sent his declaration of candidacy to each of the fifty (50) states in 2008 and in 2012.  Taitz also accuses President Obama of fraud in his "release the mugs" campaign, in which he sold coffee mugs with his picture and the slogan "Made in the USA."  Taitz accuses President Obama of misprision of felony, under Title 18 U.S.C. § 4,[51] citing his alleged social security fraud, elections fraud, and use of a forged postal date stamp on his selective service certificate.

Under the heading of RICO claims, plaintiffs also accuse President Obama of obstruction of justice[52],[53] for attempting to quash a subpoena, and for failing to respond

---

[51] Title 18 U.S.C. § 4, *supra* footnote 44.

[52] Plaintiffs cite Title 18 U.S.C. § 1503, which is a predicate act under the RICO statutes.  Title 18 U.S.C. § 1503(a) states, in its pertinent part:
> Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b).

[53] The elements of a *prima facie* case of obstruction of justice are "that there was a pending judicial proceeding, the defendant had knowledge or notice of the pending proceeding, and the defendant acted corruptly with the specific intent to obstruct or impede the proceeding or the due administration of justice."  *United States v. Neal*, 951 F.2d 630, 632 (5th Cir. 1992).

to the subpoena in the Georgia case of *Farrar v. Obama*, OSAH-SECSTATE-CE-1215136-60-MALIHI, heard by a state administrative court.[54]  Also related to the *Farrar v. Obama* case, Taitz says that Obama attempted to intimidate her, in violation of federal witness tampering law, Title 18 U.S.C. 1512,[55] by having his attorney Michael Jablonski send letters to the Secretary of State of Georgia "personally attacking Taitz and demanding some action be taken against her."  *Id.*

The complaint says that President Obama has retaliated against a witness, victim or informant (the plaintiffs), in violation of Title 18 U.S.C. 1513,[56] by holding a press conference on April 27, 2011, in which he presented what he alleged was his long form birth certificate and called Taitz and her followers a "side show" and "carnival barkers." Taitz says that after this press conference, she was "subjected to a wave of attacks, which included defamation, slander of her character, harassment, [and] persecutions." First amended complaint at 12, docket no. 1-1.  Taitz does not name her attackers.

Plaintiffs accuse President Obama's campaign manager, Julianna Smoot, of insulting and harassing Taitz in a statement that Smoot made on President Obama's campaign website on November 19, 2011, when the campaign re-released President

---

[54] Taitz served as the plaintiffs' attorney in that lawsuit.

[55] Violation of Title 18 U.S.C. § 1512, the federal witness tampering statute, is a predicate act under RICO and makes it a federal crime to attempt to prevent a witness from testifying in a federal court through the use of force or coercion.  *See United States v. Lester*, 749 F.2d 1288, 1293 (9th Cir. 1984).

[56] Retaliation against a federal witness is a RICO predicate act.  This federal crime is codified at Title 18 U.S.C. § 1513.  A *prima facie* case under this statute has the following elements: (1) the defendant knowingly engaged in conduct either causing, or threatening to cause, bodily injury to another person, and (2) acted with the intent to retaliate for, *inter alia,* the testimony of a witness at an official proceeding."  *United States v. Wardell*, 591 F.3d 1279, 1291 (10th Cir. 2009).

Obama's "Made in the USA" coffee mugs for sale.[57]  *See* first amended complaint at 40,

docket no. 1-1.

b.  Onaka, Fuddy, and Astrue

Taitz accuses Onaka, Fuddy, and Astrue[58] of misprision of felony under Title 18

U.S.C. § 4.  Taitz says that Onaka, Fuddy, and Astrue, using their positions as Hawaii

State Registrar, Director of the Hawaii Department of Health, and Commissioner of the

United States Social Security Administration, respectively, have aided and abetted

President Obama by covering-up President Obama's social security fraud, elections

fraud, use of a forged birth certificate, and use of a forged postal date stamp on his

selective service certificate.

According to plaintiffs, defendant Fuddy has obstructed justice because Fuddy

failed to comply with an allegedly "valid federal subpoena" demanding that Fuddy allow

---

[57] In a blog post from November 19, 2011, on President Obama's campaign website, Julianna Smoot stated:

> Yesterday, four Republicans in the New Hampshire State House allowed a hearing requested by Orly Taitz, the notorious dentist-lawyer-birther who wants President Obama officially removed from the state's primary ballot.
>
> So in honor of conspiracy theorists everywhere, we're re-releasing the campaign's limited-edition "Made in the USA" mugs.  There's clearly nothing we can do to satisfy this crowd—or anyone else who insists on wasting time and energy on nonsense like this.
>
> But when it starts to make your head hurt, I've found the best remedy is to have some tea in my "Made in the USA" mug.
>
> Works like a charm. I recommend Earl Grey.

Julianna Smoot, *Release the Mugs*, BARACKOBAMA.COM, www.barackobama.com/news/entry/release-the-mugs (last visited Mar. 7, 2014).

[58] Defendant Astrue, Commissioner of the United States Social Security Administration, has not responded to this lawsuit.  This court, in a prior order, denied a motion for default judgment against Astrue, finding that the plaintiffs have not properly served Astrue with process.  Docket no. 93.

Taitz to inspect President Obama's original long form birth certificate.[59]  First amended

complaint at 39, docket no. 1-1.

In a supplemental RICO statement, plaintiffs accuse Onaka and Fuddy of

authorizing a computer forgery of President Obama's birth certificate in violation of Title

18 U.S.C. §§ 471,[60] 472,[61] 473[62],[63] (relating to counterfeiting), 1028 [64] (relating to fraud

---

[59] As discussed in Section III.A. above, Taitz attempted to compel Fuddy to comply with a
subpoena to appear and produce President Obama's original long form birth certificate in *Taitz
v. Astrue*, Civil case no. 1:11-cv-519-SOM-RLP, in the United States District Court for the
District of Hawaii.  The district court denied Taitz motion to compel and dismissed the action.

[60] Title 18 U.S.C. § 471 states that, "[w]hoever, with intent to defraud, falsely makes, forges,
counterfeits, or alters any obligation or other security of the United States, shall be fined under
this title or imprisoned not more than 20 years, or both."

[61] Title 18 U.S.C. § 472 state that, "[w]hoever, with intent to defraud, passes, utters, publishes,
or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United
States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered
obligation or other security of the United States, shall be fined under this title or imprisoned not
more than 20 years, or both."

[62] Title 18 U.S.C. § 473 states that "[w]hoever buys, sells, exchanges, transfers, receives, or
delivers any false, forged, counterfeited, or altered obligation or other security of the United
States, with the intent that the same be passed, published, or used as true and genuine, shall
be fined under this title or imprisoned not more than 20 years, or both."

[63] Title 18 U.S.C. §§ 471, 472, and 473 deal with counterfeiting of money or United States
government monetary obligations, and not general allegations of fraud.  *See Barbee v. United
States*, 392 F.2d 532, 536 (5th Cir. 1968) (stating:
> The purpose of (the existing counterfeiting statute) is the protection of the bonds or
> currency of the United States, and not the punishment of any fraud or wrong upon
> individuals.  Nevertheless, the sanctions should be applied when the physical integrity of
> the currency is challenged in any way. As stated by our Court in *Brooks v. United States*,
> 76 F.2d 871 (5th Cir. 1935), 'The manifest object of the statute here involved is to protect
> against all attempts at fraud upon the genuine monetary obligations or securities of the
> United States.').

[64] Title 18 U.S.C. § 1028 makes it a federal crime, among other things, to produce, transfer, or
possess "a document of a type intended or commonly accepted for the purposes of identification
of individuals and that document be or appear to be made by or under the authority of the
United States, [which] the defendant knew . . . was stolen or produced without the authority of
the United States."  *United States v. Fuller*, 531 F.3d 1020, 1027 (9th Cir. 2008).

and related activity in connection with identification documents), 1341[65] (relating to mail fraud), and 1343[66] (relating to wire fraud).

### c.  Pelosi

Plaintiffs charge Pelosi with fraud and misprision of felony, under Title 18 U.S.C. § 4, for aiding and abetting President Obama's extensive alleged fraud.  Plaintiffs also accuse Pelosi of "49 counts of fraud by signing altered certificates of candidacy."  First amended complaint at 34, docket no. 1-1.  According to plaintiffs, Pelosi also committed fraud when, "in her capacity [as] chairwoman of the Democratic National convention[, she] worked together with Obama and Jane and John Does and changed the certificate of candidacy sent to Hawaii on Obama's behalf."  RICO statement at 2, docket no. 49.

### d.  MDEC

Plaintiffs say that, like Onaka, Fuddy, and Astrue, MDEC is guilty of misprision of felony for aiding and abetting President Obama in the various fraudulent activities he

---

[65] Title 18 U.S.C.A. § 1341 states in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

[66] Title 18 U.S.C.A. § 1343 states in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

has allegedly conducted in association with forging documents and passing himself off as a legitimate candidate for the office of President of the United States.

According to Taitz, MDEC has retaliated against a witness, victim, or informant because it has "used this case . . . to harass and intimidate plaintiff Taitz, intimidate her supporters and donors by making unreasonable and outlandish demands on her."  First amended complaint at 41, docket no. 1-1.

e.  Obama for America

Plaintiffs say that Obama for America is both a RICO enterprise, and guilty of misprision of felony for its part in aiding and abetting President Obama in his various allegedly fraudulent activities.

Plaintiffs accuse Obama for America of retaliation against a witness, victim or informant for "posting defamatory statements [on its website] in order to defame, harass, and intimidate plaintiffs."  First amended complaint at 40, docket no. 1-1.

2.  Injury

Plaintiffs have thrown the proverbial "kitchen sink" at the defendants, but seem to hang their hats on claims of fraud, including mail and wire fraud, misprision of felony, defamation, and witness tampering as the source of their injuries.  The fraud, mail fraud, and wire fraud allegations all center around President Obama obtaining fraudulent identification documents and then publicizing them to show he is eligible to be President of the United States, thus harming the legitimacy of the electoral process.  Regarding the witness tampering statutes, plaintiffs say that the alleged defamation and insults carried out by President Obama's supporters are acts of intimidation.

The court does not pass on whether plaintiffs have alleged acts which fit the definitions of the any of the cornucopia of predicate acts alleged, but will focus here on whether plaintiffs suffered injuries cognizable under RICO.  The court, however, will not entertain accusations of predicate acts based solely on the plaintiffs' copying-and-pasting a criminal statute into their pleadings.

### a.  Injury related to predicate acts of fraud, mail fraud and wire fraud

The plaintiffs say that President Obama has caused them injury by "usurping" the presidency of the United States via fraudulent means.  According to the complaint, the plaintiffs have been "deprived of their First Amendment right to free speech, in that they were deprived of their right of participating in free elections."  First amended complaint at 42, docket no. 1-1; *see* RICO statement at 25, docket no. 49.  In the RICO statement, plaintiffs also allege they have suffered violation of their First Amendment right to redress grievances "under color of authority," and violation of their Fifth Amendment due process rights "under color of authority."[67]  RICO statement at 28-29, docket no. 49.  Plaintiffs also claim to have been injured by Attorneys Scott Tepper ("Tepper") and Begley, who asked this court to take judicial notice of President Obama's birth certificate, despite plaintiffs' contention that the document is forged.

---

[67] In the RICO Statement, plaintiffs list "causes of action" starting with the "Second Cause of Action."  RICO statement at 17, docket no. 49.  The "causes of action" listed in the RICO statement are:  (1) RICO-predicate crime fraud; (2) RICO-mail and wire fraud; (3) RICO-predicate crime misprision of felony-social security fraud; (4) RICO-predicate crime misprision of felony-elections fraud; (5) RICO-predicate crime misprision of felony-use of a forged postal stamp on the selective service certificate of Obama; (6) violation under the color of authority of the First Amendment and Fourteenth Amendment right to free speech; (7) violation of the First Amendment and Fourteenth Amendment right for redress of grievances under color of law; (8) violation of Fifth Amendment of due process and Fourteenth Amendment equal protection of rights under color of authority; and (9) defamation.  While these are styled as "causes of action," they are listed in the plaintiffs' RICO statement, and the plaintiffs have not moved to amend their complaint.  The court, therefore, will treat these "causes of action" as claims made under the umbrella of RICO.

While the plaintiffs say that they "suffered damages as a result of [the] violations by the defendants," they cite no specific damages or injury other than these constitutional slights or generalized complaints.  Claims of government violations of constitutional rights, generally brought under Title 18 U.S.C. § 1983,[68] are not predicate acts under the RICO statutes.  *Taitz v. Obama*, 707 F.Supp.2d 1, 6 (D.D.C. 2010). Taitz already has had similar RICO claims dismissed in *Taitz v. Obama* by the United States District Court for the District of Columbia for this same reason.  *Id.* (stating "neither violations of 42 U.S.C. § 1983 nor 42 U.S.C. § 1985 are 'racketeering activities' which could be the basis for Ms. Taitz's RICO claim.").  These Constitutional slights are not the types of injuries RICO was created to address.  The court finds that the injuries alleged by the plaintiffs related to fraud, mail fraud, and wire fraud are not cognizable under RICO and cannot serve to provide standing for these claims.

### b. Injury related to misprision of felony and obstruction of justice

Plaintiffs accuse all defendants of misprision of felony for aiding and abetting Obama in his fraudulent schemes. They also attack various defendants for purported obstruction of justice, computer forgery, and other related activities inherently necessary in a scheme of this magnitude.   Much like their allegations of fraud, these attacks lack any underpinning of RICO-type injuries.  The plaintiffs claim that their injuries are Constitutional in nature, related to the negative impact of Obama's Presidency on the

---

[68] Taitz has relied, unsuccessfully, on Title 42 U.S.C. § 1983 to sue President Obama in the past.  *Taitz v. Obama*, 707 F.Supp.2d at 1.  This statute allows plaintiffs to sue government entities for depriving individuals of their rights guaranteed under the United States Constitution and federal law.  The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.  *Wyatt v. Cole*, 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992).

electoral process and the nation.  These "injuries" are not losses to plaintiffs' business and property, and thus do not lend standing to the plaintiffs to pursue civil RICO claims.

Further, plaintiffs Fedorka, Roth, MacLeran, and Lax have alleged no injury to business or property at all.  These plaintiffs have voiced only generalized complaints about damage to the integrity of the political process in the United States, vague and conclusory allegations that the defendants have harassed them, and accusations that the government has violated their constitutional rights "under color of law." Consequently, this court finds that all RICO claims lodged by these plaintiffs must be dismissed.

   c.   Injury related to predicate acts in violation of witness
        tampering statutes

Taitz is the only plaintiff who has cited any conceivable injury to her business or property.  Taitz says she has suffered financial injury related to attacks on her California bar license, her dental practice, commercial subleases, and her other property. According to Taitz, she was forced to spend over $10,000.00 in legal fees to defend her California bar license, when Tepper, attorney for President Obama, caused the California Bar Association to investigate her.

Taitz also complains that unknown Obama supporters have vandalized her property, harassed her, harassed her tenants, and tampered with her car, email account, and website.  This harassment, says Taitz, has cost her approximately $400,000.00 in rental income, $500,000.00 in lost income to her dental practice, and thousands of dollars in repairs to her websites.

Taitz alleges that a $20,000.00 sanction, imposed on her by Judge Clay Land ("Judge Land") of the United States District Court for the Middle District of Georgia

under Rule 11 of the Federal Rules of Civil Procedure for pursuing frivolous litigation, was a RICO injury caused by these defendants' racketeering activity. *See Rhodes v. MacDonald*, 670 F.Supp.2d 1363 (M.D. Ga. 2009) *aff'd* 368 Fed.Appx. 949 (11th Cir. 2010). Taitz argues that Judge Land's sanctioning her is proof that she is "persecuted by the Establishment." Docket no. 69 at 32.

Finally, says Taitz, George Soros, a contributor to the Obama Campaign, has harassed and attempted to intimidate her by commissioning artist Dan Lacey to paint "pancake paintings" of her. This artist has painted numerous "pancake paintings" of political figures and celebrities in odd circumstances, adorned with pancakes. Taitz says that Lacey painted graphic depictions of her in the nude, giving birth to a pancake.

Taitz argues that these actions constitute violations of Title 18 U.S.C. §§ 1461 *et seq.,* 1512, 1513, and other criminal statutes, all crimes that qualify as predicate acts under RICO. According to Taitz, Soros has committed these predicate acts by commissioning Lacey to create the pancake paintings, then posting pictures of the paintings on the internet to defame, intimidate, and harass her. Taitz says that Obama supporters have even emailed these images to her children.

Taitz, however, does not say that President Obama or any other defendant directed Soros to commission these paintings, or that there was an agreement between Soros and any defendant. She also does not claim that the proceeds used by Soros to commission the paintings came from any racketeering activity. Further, Taitz does not allege that she suffered economic injury to her business or property as a result of this painting, so these alleged injuries are not cognizable under RICO.

Taitz charges the defendants with conspiring to violate the RICO statutes, citing Title 18 U.S.C. § 1962(d).  Under § 1962(d), a plaintiff must show that:  "(1) two or more persons agreed to commit a substantive RICO offense, and (2) the defendant knew of and agreed to the overall objective of the RICO offense."  *Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 551 (5th Cir. 2012).  A defendant does not have to "commit or agree to commit the requisite two or more predicate acts of 'racketeering activity' to be held criminally liable as a conspirator under RICO."  *Id.* at 552.  The defendant need only know of, and agree to, the overall scheme.  *Id.*  The specific act or acts that allegedly cause the plaintiff injury, however, must be independently wrongful under RICO.  *Id*.

As an initial matter, neither Judge Land[69] nor Tepper has been joined as a defendant in this lawsuit.  Although the actions of an alleged conspirator can be imputed upon all members of the conspiracy, this court will not permit Taitz to litigate the alleged wrongdoings of non-joined individuals without first joining those individuals so that they may defend themselves. *See, generally, Beck v. Prupis*, 529 U.S. 494, 503, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000).

In the meantime, Taitz's claims that President Obama was involved in a conspiracy with Tepper and Judge Land must fail.  Taitz only makes conclusory allegations linking the two (2) men with a criminal conspiracy.  Taitz does not provide any factual allegation that Tepper or Judge Land were part of a conspiracy or that their actions were intended to further a criminal conspiracy that was approved by President

---

[69] Judge Land, of course, is entitled to judicial immunity for any alleged actions he took in his capacity as a judge.  *Forrester v. White*, 484 U.S. 219, 225, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988) ("judicial immunity . . .insulate[s] judges from vexatious actions prosecuted by disgruntled litigants").

Obama and the other defendants.  Therefore, Taitz's pleadings fall short of Rule 8[70] of

the Federal Rules of Civil Procedure, as articulated in *Bell Atlantic Corp v. Twombly*,

550 U.S. 544, 127 S.Ct 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal*, 556 U.S.

662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

In *Twombly*, the United States Supreme Court held that to state a claim for

conspiracy the complaint must offer "enough factual matter (taken as true) to suggest

that an agreement was made. . . .  [A] bare assertion of conspiracy will not suffice."

*Twombly*, 550 U.S. at 556.  Likewise, in *Iqbal*, the United States Supreme Court held

that, although the court must accept the complaint's factual allegations as true, the court

was not bound to accept "threadbare recitals of a cause of action's elements, supported

by mere conclusory statements."  *Iqbal*, 556 U.S. at 663.

Taitz, in linking Tepper's actions to a criminal conspiracy allegedly approved by

President Obama, only says that "Tepper misused and abused his position as a part

time investigator to launch collateral attacks on Taitz, in order to attack her CA license

and prevent her from going after Obama and his forged IDs."  Taitz's statement is no

more than a conclusory allegation for which she alleges no facts in support.  Even

assuming that this conclusory allegation was true, Taitz alleges no facts that would

demonstrate that Tepper engaged in this activity to further a criminal conspiracy that

was approved by President Obama.  Furthermore, when this court asked Taitz to clarify

---

[70] Rule 8(a) of the Federal Rules of Civil Procedure states:
    (a) Claim for Relief. A pleading that states a claim for relief must contain:
        (1) a short and plain statement of the grounds for the court's jurisdiction, unless the
        court already has jurisdiction and the claim needs no new jurisdictional support;
        (2) a short and plain statement of the claim showing that the pleader is entitled to
        relief; and
        (3) a demand for the relief sought, which may include relief in the alternative or
        different types of relief.

her RICO statement by filing a supplemental RICO statement, she failed to mention Tepper.  Docket no. 73.

Regarding threats and intimidation, which Taitz says have caused her loss of rental income and income to her dental clinic, Taitz does not identify the perpetrators, nor tie them to these defendants or to a conspiracy that involves these defendants.  She goes so far as to acknowledge in her RICO statement that the perpetrators had no connection to Obama nor knew of the purported RICO scheme.  RICO statement at 30, docket no. 49 ("Plaintiff Taitz received multiple death threats from Obama supporters who do not believe that their 'messiah' is capable of committing elections fraud [or of using] forged documents.").

Similar to the claims against Tepper, Taitz's complaint and RICO statement do not link Judge Land to a conspiracy.  Taitz claims that Judge Land "arbitrarily refused to address grievances by Taitz's clients," "attacked Taitz and her clients with defamatory statements and sanctions," and denied her due process.  RICO statement at 28-29, docket no. 48.  Taitz, however, does not allege facts showing that Judge Land is a member of a RICO conspiracy approved by President Obama.  Nor does Taitz allege any facts showing that Judge Lands' actions were in furtherance of the alleged RICO conspiracy.

Taitz, in essence, has failed to meet the Rule 8 pleading standards, and her RICO claims against the defendants must fail.

## D.  Conclusion

Plaintiffs here lack standing to sue for the injunctive and declaratory relief sought. The plaintiffs have asserted a generalized grievance against President Obama and his

eligibility to hold the office of President of the United States, but they can show no unique or particularized injury which would allow them to bring suit in federal court. Nor have plaintiffs succeeded in alleging injury under the federal RICO statutes. Further, plaintiffs have failed to plead their claims with sufficient particularity under the Federal Rules of Civil Procedure. This court, therefore, is persuaded that the motion by MDEC for judgment on the pleadings is well-taken and should be granted. Plaintiffs' claims for declaratory relief, injunctive relief, and for damages under RICO are dismissed.

### IV. Motion to Dismiss filed by Onaka and Fuddy

Defendants Onaka and Fuddy have filed a motion to dismiss under Rule 12 of the Federal Rules of Civil Procedure [docket no. 57]. These defendants say that this court lacks personal jurisdiction[71] over them because the plaintiffs failed to serve them properly with process, and that the plaintiffs have failed to state a claim against them. Defendants Onaka and Fuddy also filed a motion to strike the plaintiffs' alleged proof of service [docket no. 72].

This court has evaluated the complaint, RICO statement, and supplemental RICO statement and determined that all of plaintiffs' claims must be dismissed. The court, therefore, need not address defendant Onaka's and Fuddy's arguments, because all of plaintiffs' claims have been found deficient. This motion to dismiss and the motion to strike, therefore, are moot.

### V.    Conclusion

Plaintiffs have sued these defendants for relief under the Mississippi election statutes, for injunctive relief, for declaratory relief, and for treble damages under federal

---

[71] Fed.R.Civ.P. 12(b)(2), (4), and (5) call for dismissal for "lack of personal jurisdiction; . . . "insufficient process;" and "insufficient service of process," respectively.

RICO statutes.  This court has reviewed the extensive and jumbled pleadings by the plaintiffs, as well as hundreds of pages of documents filed in the docket.  For the reasons explained above, this court is not persuaded that the plaintiffs have asserted any viable causes of action here.  This court, thus, dismisses the plaintiffs' claims.  The motions for Judgment on the Pleadings [docket nos. 8 and 15] are granted.  In addition, the motion to dismiss [docket no. 57] and the motion to strike [docket no. 72] are dismissed as moot.

Because this court is dismissing the plaintiff's case, this court also dismisses as moot plaintiffs' motion to bifurcate [docket no. 46], plaintiffs motion for an evidentiary hearing [docket no. 64], and James R. Grinol's motion to intervene [docket no. 83].

**SO ORDERED AND ADJUDGED**, this, the 31st of March, 2015.


_____s/ HENRY T. WINGATE_____
**UNITED STATES DISTRICT JUDGE**


**MEMORANDUM OPINION AND ORDER**
**DISMISSING PLAINTIFFS' COMPLAINT**
**CIVIL CAUSE NO. 3:12-CV-280-HTW-LRA**